## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:   04-61178-CIV-HUCK/SIMONTON

PETER LETTERESE AND
ASSOCIATES, INC.,

      Plaintiff,

vs.

WORLD INSTITUTE OF
SCIENTOLOGY ENTERPRISES
INC., *et al.*,

      Defendants.

_____/



FILED by _____ D.C.

**AUG 2 3 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Plaintiff Peter Letterese and Associates, Inc.'s Motion for Summary Judgment on the Issues of Exclusive Rights and Copyright Infringement filed on July 6, 2005 (D.E. # 270), Defendant W.I.S.E.'s Motion for Summary Judgment filed on July 6, 2005, Defendant Church of Scientology International's Motion for Summary Judgment filed on July 6, 2005, and Defendant Church of Spiritual Technology's Motion for Summary Judgment filed on July 6, 2005 (D.E. # 282).  The Court has reviewed the motions for summary judgment, the oppositions thereto, the replies in support thereof and other pertinent portions of the record, heard oral argument of counsel on August 16, 2005, and is otherwise duly advised in the premises.  For the reasons below, Defendants' Motions for Summary Judgment are GRANTED.

### BACKGROUND

Plaintiff holds the exclusive rights to the copyrights of the literary works of Les Dane ("Dane"), including the book *Big League Sales Closing Techniques*, later known as *Surefire Sales*

*Closing Techniques* ("*Big League Sales*").  Second Amended Complaint ¶ 23.[1]  *Big League Sales* was first published in 1971.  Third Affidavit of Donald Drader ("Drader Third Aff."), Exh. E.  *Big League Sales* discusses a number of "step-by-step" sales techniques organized into twelve chapters. *Id.*  As Dane himself acknowledged, many of the sales techniques in *Big League Sales* were either specifically copied from other salespeople or generally known in the sales industry.  *See* Third Affidavit of Neil Levin ("Third Levin Aff.") ¶¶ 13-16.

The remaining defendants[2] are various entities affiliated with the Church of Scientology (the "Church").  Defendant World Institute of Scientology Enterprises ("WISE") creates and sells packs of materials for a course teaching sales techniques.  Third Drader Aff. ¶¶ 6, 13.  These course materials contain checksheets and drills for students to perform in connection with their reading of assigned books, including *Big League Sales*. *Id.* ¶¶ 12, 14.  *Big League Sales* is just one of the works studied in the course.  In fact, "the extensive, principal materials for that course . . . are based on writings of L. Ron Hubbard." *Id.* ¶ 14.

The checksheets list the portions of *Big League Sales* to be read by the course participant, and the drills demonstrate the use of the sales techniques. *Id.* ¶ 16, Exh. D.  Course participants pay a flat price of $75 for the pack of course materials, including a copy of *Big League Sales*. *Id.* ¶ 6.  The student must obtain and read *Big League Sales* in order to complete the course. *Id.* ¶ 16.  WISE

---

[1]  In their Opposition to Plaintiff's Motion for Summary Judgment, Defendants indicate that they do not dispute Plaintiff's possession of exclusive rights to the copyrights of the literary works of Dane. *See, e.g.*, W.I.S.E. Defendants' Opp. at 4 ("Defendants have taken discovery on the issue of standing, and they are not challenging that [Plaintiff] holds exclusive rights to the Les Dane works.").

[2]  On August 23, 2005, the Court granted Plaintiff's Motion for Leave to Amend, by which Plaintiff withdrew all claims against all previously named defendants other than WISE, CSI, and CST and its claim for statutory damages.

has not copied *Big League Sales* for purposes of distribution to course participants. *Id.* ¶ 12; Deposition Transcript of Peter Letterese ("Letterese Depo. Tr.") at 222.

Defendant Church of Scientology International ("CSI") oversees the provision and use of course materials at the various Church entities and locations. Third Levin Aff. ¶ 17. Part of that function is the creation and distribution of checksheets for use in Church courses. *Id.* Essentially two types of courses prepared by CSI pertain to *Big League Sales*: the Professional Registration Course and Organization Executive Course. *Id.* ¶ 21. These courses direct the student to read *Big League Sales* and perform drills which apply the techniques in *Big League Sales*. *Id.* The CSI course materials are not self-sufficient. In other words, the student must have a copy of and read *Big League Sales* to complete the course. *Id.* ¶ 23. CSI has made slight revisions to course materials pertaining to *Big League Sales*, "but basically the same checksheets, drills, and courses have existed in one form or another since 1972." *Id.* ¶ 8.

Defendant Church of Spiritual Technology ("CST") owns the intellectual property rights to the works of L. Ron Hubbard. Second Affidavit of Ryland Hawkins (D.E. # 288) ¶ 5. In 1993, CST obtained the rights to a license issued by the trustee of the Hubbard estate to WISE for the use of the trademarks of Hubbard's works. *Id.* ¶ 20. In 1994, CST gave a license to CSI for its use of Hubbard's works. *Id.* ¶ 8. CST claims not to have reviewed any of WISE and CSI's materials pertaining to *Big League Sales*. *Id.* ¶¶ 7, 22. However, CST had the right to review the WISE materials pursuant to the license agreement. *Id.* Exh. G at 5-6.[3] CST also had the right to royalties,

---

[3] Specifically, CST appears to have had the "right to control the quality and nature of . . . [a]ll products and materials produced by WISE or WISE members which display or otherwise utilize the Marks [and a]ll compilations and derivative works of and from the Works." *Id.* Exh. G at 5. The term "Works" includes the Organization Executive Course. *Id.* Exh. G at Exh. B.

*id.* Exh. G at 9, and in fact received royalties from WISE. *Id.* ¶ 24.

*Big League Sales* was incorporated into Church teachings soon after its first publication in 1971. Affidavit of Neil Levin ("First Levin Aff.") (D.E. # 93) ¶ 6; Third Levin Aff. ¶ 7, Exh. 1-4. Dane knew of the Church's use of *Big League Sales* – not only supporting but actively participating in such use. Third Levin Aff. ¶ 9; First Levin Aff. ¶ 7; Second Affidavit of Tommy Gustafsson ("Second Gustafsson Aff.") (D.E. # 281) ¶¶ 3-6. For example, in the mid-1980s, Dane himself traveled around the world to conduct Church seminars on *Big League Sales*. Second Gustafsson Aff. ¶ 4; Third Levin Aff. ¶ 9. In conducting those seminars, Dane used Church-prepared materials containing sales drills related to *Big League Sales*. *Id.* Dane personally performed a number of the drills at the Church seminars. Second Gustafsson Aff. ¶ 5.

Peter Letterese, a principal of Plaintiff, was also involved in the Church as a practicing Scientologist from 1973 to the early 1990s. *See* Affidavit of Peter D. Letterese (D.E. # 373) ¶¶ 1-2; Letterese Depo. Tr. at 238. Letterese studied *Big League Sales* in one of the first Church courses he attended. *Id.* at 239:15-19. Letterese later took the Organization Executive Course, one of the allegedly infringing courses. *Id.* at 215-16. Letterese also had knowledge of Church courses pertaining to *Big League Sales* throughout the time of his affiliation with the Church. Affidavit of Peter D. Letterese (D.E. #323) ¶¶ 7-10. In fact, Letterese stated the following in his affidavit:

> While the Church taught courses that had material from *Big League Sales Closing Techniques* in it, I knew that Les Dane had lectured for the Church in the 1980s. I had no reason to think and I did not think that the Church's usage of any Les Dane material was unauthorized and improper, or that the Church had or did not have an implied license to use the Les Dane material in courses.

Affidavit of Peter D. Letterese (D.E. # 414) ¶ 2. In January 1994, Plaintiff "acquired by written contract exclusive rights in all literary works of the late author Les Dane executed by Ms. Lois B.

Dane . . . and by [Plaintiff], including the right of enforcement . . . ." Affidavit of Barbara Fawcett (D.E. # 117) ¶ 2. *See also* Affidavit of David L. Hoffman (D.E. # 73) Exh. A.; Affidavit of Peter D. Letterese (D.E. # 297) ¶ 2 (noting that Exhibit A to Hoffman Affidavit grants the "exclusive license with Mrs. Lois B. Dane aka Betty Dane providing the right for [Plaintiff] to bring suits on the copyrights of Les Dane").[4]

Defendants have prepared extensive comparative analyses of *Big League Sales* and their course materials. Defendants compare the two products on a word-by-word basis. Approximately 1% of the entire WISE course materials, 0.4% of the Professional Registration Course, and 2% of the Organization Executive Course constitute individual words or phrases either paraphrased or taken *verbatim* from *Big League Sales*. Third Drader Aff. ¶ 19, Exh. D; Third Levin Aff. ¶ 30. Conversely, approximately 0.8%, 0.8%, and 0.3% of the individual words and phrases of *Big League Sales* appear in the WISE course materials, Professional Registration Course, and Organization Executive Course, respectively. Third Drader Aff. ¶ 20, Exh. E; Third Levin Aff. ¶ 31. Thus, Defendants contend that any copying of *Big League Sales* is *de minimis*. Plaintiff does not contest Defendants' word-by-word computation.

Rather, Plaintiff argues that a word-by-word analysis is the wrong analysis. Accordingly, Plaintiff evaluates the course materials at the level of the chapters of *Big League Sales*. That is, where

---

[4] Plaintiff recently sought leave to amend the First Amended Complaint (Revised) in order to "clarify" that Plaintiff obtained exclusive rights to *Big League Sales* in 1999. Plaintiff's attempt to make this amendment is not only improper at this late stage in the litigation, but arguably sanctionable, based on Plaintiff's repeated assertions to the contrary – including seeking summary judgment on the issue of exclusivity, relying on Barbara Fawcett and David Hoffman's sworn testimony that Plaintiff acquired exclusive rights in 1994. *See* Plaintiff Peter Letterese and Associates, Inc.'s Motion for Summary Judgment on the Issues of Exclusive Rights and Copyright Infringement (D.E. # 270).

a chapter title from *Big League Sales* is likewise used in Defendants' materials, the chapter is considered by Plaintiff as copied for infringement purposes. As a result, Plaintiff contends that Defendants' materials address all twelve chapters of *Big League Sales* and "that six of the twelve chapters had all or almost all their subheadings addressed." Affidavit of David L. Hoffman (D.E. # 374). Thus, Plaintiff uses its chapter-heading-by-chapter-heading analysis to quantify more than half of the "selection" and "arrangement" of the sales techniques in *Big League Sales* as appropriated by Defendants. *See* Plaintiff's Statement of Material Facts as to Which There Exist Genuine Issues to be Tried (D.E. # 380) at 4.

On July 26, 2005, Plaintiff stipulated that, despite the fact that *Big League Sales* was in fact published (but out of print), "there is no potential market for any of [its Dane related] material, i.e., [Plaintiff] ha[s] never made a sale, [it's] never going to make a sale." July 26, 2005 Tr. at 22:25-23:15. Plaintiff's counsel specified that this stipulation "would be for purposes of this case only and for purposes of the statutory damages and the fair use defense." *Id.* Subsequently, Plaintiff amended its First Amended Complaint (Revised) to the extent that (1) Plaintiff deleted all references to and requests for statutory damages, and (2) Plaintiff dismissed all claims against all defendants other than WISE, CSI, and CST. As a result of this latest amendment, Plaintiff no longer seeks any form of monetary relief, only equitable and declaratory relief.[5]

---

[5] The Court notes, as an aside, that there is no right to a jury under the Seventh Amendment where, as here, only equitable relief and declaratory relief of the type here is sought. *See, e.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 719 (1999) ("It is settled law that the Seventh Amendment does not apply" to "suits seeking only injunctive relief"); *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.,* 299 F.3d 643, 649 (7th Cir. 2002) ("[A] plaintiff who is seeking equitable relief and not damages cannot wrest an entitlement to a jury trial by the facile expedient of attaching a claim for declaratory judgment."); *Wilson v. City of Aliceville,* 779 F.2d 631, 635 (11th Cir. 1986) (finding that for case "entirely in equity there is no right to a jury trial"). Thus, if this case were to proceed to trial, the Court

## ANALYSIS

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.* On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a finding in the moving party's favor. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

While the burden on the moving party is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative, is not enough. *Id. See also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

Defendants' motions for summary judgment raise a plethora of challenges to Plaintiff's claims under the copyright laws. For example, WISE and CSI largely dispute the copyrightability of *Big League Sales* and the substantial similarity between that book and their courses and materials. CST

---

would consider the same evidence presented here as the trier of fact, and its factual findings would be "reviewed for clear error." *A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003).

has adopted these arguments, and offered separate arguments on the issues of contributory and vicarious infringement. The motions for summary judgment place less attention on the "fair use" doctrine, which constitutes an affirmative defense to copyright infringement. 17 U.S.C. § 107 (West Supp. 2005). *See Pac. & S. Co. v. Duncan*, 744 F.2d 1490, 1494 (11th Cir. 1984) ("fair use" signifies "limited and useful forms of copying and distribution that are tolerated as exceptions to copyright protection").

### A.    *Infringement*

WISE and CSI devote considerable effort to showing that there was no infringement of *Big League Sales*. To establish infringement, there must be "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Moreover, "the plaintiff must show that the defendant's work is substantially similar to the plaintiff's protected expression." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994). "Substantial similarity, in this sense, exists where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Leigh v. Warner Bros. Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (internal quotation marks omitted).

The Court agrees with many of the arguments raised by WISE and CSI that the individual words and phrases in *Big League Sales* are not copyrightable. For example, Dane himself admitted that many of the sales techniques contained in his book were borrowed from other salespeople or commonly known in the sales industry. *See* Third Levin Aff. ¶¶ 13-16. Moreover, many of these words and phrases are mere ideas, headings, or "scenes-a-faire" for which there is no copyright protection. *See* 17 U.S.C. § 102(b); *Beal*, 20 F.3d at 459-60 (literary content that "naturally flow[s] from a common theme" is not copyrightable).

At the same time, the Court agrees with Plaintiff that Defendants to some degree miss the

forest through the trees. Although individual words and phrases in *Big League Sales* may not be

copyrightable, the "selection" or "arrangement" of those words and phrases itself may be worthy of

protection. Specifically, the Copyright Act extends protection to "compilations," which are "formed

by the collection and assembly of preexisting materials or of data that are selected, coordinated, or

arranged in such a way that the resulting work as a whole constitutes an original work of authorship."

17 U.S.C. §§ 101, 103(a). "A factual compilation is eligible for copyright if it features an original

selection or arrangement of facts, but the copyright is limited to the particular selection or

arrangement."[6] *Feist*, 499 U.S. at 350-51. That copyright protection, however, is "thin." *Id.* at 349.

"Where, as here, it is the publisher of the compilation who claims a copyright injury to its selection and

arrangement of preexisting material, as a whole, and not the authors of the preexisting material, it is

irrelevant whether the preexisting materials are themselves capable of being copyrighted." *S. Bell Tel.*

---

[6] Contrary to Defendants' suggestions, compilation protection extends to a number of works other than telephone directories. *See, e.g., Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992) ("attachment of labels" to drawings merits protection as an "original selection or arrangement of facts") (internal quotation marks omitted); *Bus. Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 403 (2d Cir. 1989) (finding "compilation" infringement of industry study where "[i]t was not only [plaintiff's] specific language, but also [plaintiff's] selection, coordination and arrangement that [defendant] appropriated"); *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1246 (M.D. Fla. 2002) (finding reference manual copyrightable as a compilation "[b]ecause plaintiff chose the arrangement and selection of what was to be included in the reference manual"); *Penelope v. Brown*, 792 F. Supp. 132, 135 (D. Mass. 1992) (granting compilation protection where author "selected these preexisting statements to express her ideas"). The Court also disagrees with Defendants' reliance on 37 C.F.R. § 202.1 for the proposition that the "mere listing of ingredients or contents" is not copyrightable. The set of sales techniques in *Big League Sales* is not a "mere listing" of facts, but rather could arguably contain at least the minimal requisite level of originality to be protected as a compilation. *See Feist*, 499 U.S. at 350-51; *Arica Inst., Inc.*, 970 F.2d at 1077 (finding that the "attachment of labels to the enneagram figure contains the minimal degree of creativity necessary to make it copyrightable").

& *Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 810 (11th Cir. 1985).

In the preface of *Big League Sales* ("How this Book Will Do MIRACLES for You"), Dane emphasized that "[t]he *pattern* of this Big League how-to-close book will follow what I call the 'Brick Overcoat' as its pattern or theme. *Step-by-specific-step*, it will remove the bricks until the prospective buyer is stripped of his fear – his sales resistance – and becomes susceptible to a close." Drader Third Aff. Exh. E (emphasis added). Therefore, the inherent value of *Big League Sales* comes not just from the sales techniques and concepts, but particularly from the way they were "selected, coordinated, or arranged" by Dane. 17 U.S.C. § 101. It is then that selection or arrangement – not the individual words and phrases in isolation – that must be compared to Defendants' works, because substantial similarity to *Big League Sales* is assessed "with regard to its protected elements." *Leigh*, 212 F.3d at 1214.

"A court may grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only noncopyrightable elements of the plaintiff's work *or* if no reasonable jury would find that the two works are substantially similar." *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257 (11th Cir. 1999) (emphasis in original). *See Leigh*, 212 F.3d at 1216 ("'Substantial similarity' is a question of fact, and summary judgment is only appropriate if no reasonable jury could differ in weighing the evidence."). Although the Court finds that *Big League Sales* is entitled, at most, to only "thin" protection and that Defendants' materials differ to at least some degree from whatever is protected, the Court need not decide here the close question, taking the evidence in the light most favorable to Plaintiff, of whether Defendants have infringed *Big League Sales*. That is because of the clear and dispositive application of the "fair use" doctrine to the facts at hand. In other words, even if Defendants have infringed *Big League Sales* and that infringement

is seen in the light most favorable to Plaintiff, Defendants' "fair use" of *Big League Sales* acts as a complete defense to all of Plaintiff's claims.[7]

## B.    *Fair Use*

The Copyright Act delineates the "fair use" defense in express terms:

[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —

(1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)   the nature of the copyrighted work;

(3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)   the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Each of the four statutory factors must be considered in a fair use analysis. *See id.* ("the factors to be considered shall include" the four statutory factors). However, these four factors are not exclusive. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). "Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 578.

The evaluation of the "fair use" factors is a mixed question of law and fact. *See Bateman v.*

---

[7] Similarly, the "fair use" defense is dispositive of CST's motion for summary judgment, despite the appearance of genuine issues of material fact regarding CST's right to supervise the infringing activity and financial benefit therefrom as to be liable for contributory or vicarious infringement under the applicable legal standards. *See Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987); *S. Bell Tel. & Tel. Co.*, 756 F.2d at 811 (parties with "financial interest in the infringing activity and the right to supervise" are liable "even if they were ignorant of the infringement"). It is well-established that "[t]here can be no contributory infringement without a direct infringement." *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004). Because "the fair use of a copyrighted work . . . is not an infringement of copyright," 17 U.S.C. § 107, that defense also negates these forms of secondary liability.

*Mnemonics, Inc.*, 79 F.3d 1532, 1542 n.22 (11th Cir. 1996). Although summary judgment is more

the exception than the rule on the issue of fair use, it is appropriate where the Court "has found facts

sufficient to evaluate each of the four statutory factors." *Pac. & S. Co.*, 744 F.2d at 1495 n.8. *See*

*also Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1258 (2d Cir. 1986); *Penelope*, 792 F. Supp.

at 136 (summary judgment appropriate where "a reasonable trier of fact could reach but one

conclusion: that [defendant]'s use was fair within the meaning of 17 U.S.C. § 107"). Therefore,

summary judgment can be awarded in favor defendants on fair use even if material facts remain in

dispute regarding copyright infringement. *See Arica Inst., Inc.*, 970 F.2d at 1077 (affirming summary

judgment for defendant on fair use although plaintiff "has established the elements of copyright

infringement, to a degree sufficient to withstand summary judgment").

      1.      <u>Consent of Dane and Plaintiff</u>

In addition to the four statutory factors, the Court adopts a "fifth" factor: the copyright

owner's actual consent to the use of the copyrighted material. Although this consideration is relevant

to the four statutory factors (*e.g.*, the character of the use), the Court elevates its status given both

its locus at the theoretical core of the fair use doctrine and its particular salience to the factual

circumstances at hand.

      Prior to the codification of the common law doctrine in 1976:

> [T]he author's consent to a reasonable use of his copyrighted work ha[d] always been
> implied by the courts as a necessary incident of the constitutional policy of promoting
> the progress of science and the useful arts, since a prohibition of such use would inhibit
> subsequent writers from attempting to improve upon prior works and thus . . . frustrate
> the very ends sought to be attained.

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985) (quoting H. Ball, *Law*

*of Copyright and Literary Property* 260 (1944)). The primary consideration, therefore, was the

"importance of the material copied or performed from the point of view of the reasonable copyright owner. In other words, would the reasonable copyright owner have consented to the use?" *Id.* at 549-50 (quoting A. Latman, *Fair Use of Copyrighted Works* 15 (1958)).

Indeed, the traditional "fair use" analysis appears to be necessary only in the absence of actual consent. *See Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 144 n.2 (2d Cir. 1998) ("The doctrine of 'fair use' allows the appropriation of a copyrighted work without consent under certain circumstances."). In other words, if the copyright owner actually consented, there would be no need to determine whether he or she would have reasonably done so.

There is unrefuted record evidence that both Dane and Plaintiff knew of, assented to, and participated in Defendants' use of *Big League Sales* for decades. Dane himself traveled around the world in the 1980s to conduct Church seminars on *Big League Sales* and performed drills based on Church-prepared materials. Second Gustafsson Aff. ¶¶ 4-5; Third Levin Aff. ¶ 9. Meanwhile, Letterese became a practicing Scientologist in 1973 and studied *Big League Sales* as one of his first courses at the Church. *See* Affidavit of Peter D. Letterese (D.E. # 373) ¶ 2; Letterese Depo. Tr. at 238-239. Letterese later took the allegedly infringing Organization Executive Course, *id.* at 215-16, and had knowledge of Church courses pertaining to *Big League Sales* throughout the time of his affiliation with the Church. Affidavit of Peter D. Letterese (D.E. #323) ¶¶ 7-10. Letterese also admitted to knowing of Dane's participation in Church courses in the 1980s, and "had no reason to think and . . . did not think that the Church's usage of any Les Dane material was unauthorized and improper." Affidavit of Peter D. Letterese (D.E. # 414) ¶ 2.

In effect, both Dane and Plaintiff agreed for decades that Defendants advanced the goals of copyright law to "promot[e] the progress of science and the useful arts" in their use of *Big League*

-13-

*Sales. Harper & Row*, 471 U.S. at 549. In other words, both Dane and Plaintiff implicitly, if not explicitly, acknowledged that Defendants' use was "fair" by knowing about it, assenting to it, and even participating in it. These facts also permeate the Court's evaluation of the four statutory factors which, although not exclusive, must be applied in the fair use analysis.

　　　2.　　The Four Statutory Factors

　　The Court also finds that each of the four statutory factors weighs in favor of Defendants. Each of these factors is addressed in turn.

　　　a.　　Purpose and Character of the Use

　　The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The "central purpose of this investigation" is to determine whether the infringing work is "transformative"[8] – that is, whether the infringing work "merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal citations and quotation marks omitted). *See also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 478 (1984) (Blackmun, J., dissenting) (first statutory factor assesses whether defendant's use "result[s] in some added benefit to the public beyond that produced by the first author's book").

　　Defendants in no way seek to supersede *Big League Sales* in offering the courses with

---

　　　[8] Defendants argue that Plaintiff itself has characterized the course materials as "transformative." *See* Plaintiff's Motion for Preliminary Injunction (D.E. # 116) at 2, 4. However, Defendants take what appears to be Plaintiff's poor and loose choice of words out of context. Plaintiff appears to have used the word "transformative" to describe the course materials as "derivative" of *Big League Sales*, not "supplemental" thereto as the term "transformative" typically signifies in the fair use context.

checksheets and drills. Rather, Defendants simply supplement and enhance the study of *Big League Sales* with new forms of instruction and demonstration. Moreover, the form and extent of Defendants' references to *Big League Sales* are entirely reasonable and expected – especially as to Plaintiff's main contention that Defendants used Dane's organization of sales techniques. In a course of study, such as those offered by Defendants, which assigns instructive books as a part of the curriculum, it would be nonsensical to teach the books but not refer to their contents, not instruct students in what order to read it, or not provide illustrative examples of their contents.

The Court finds persuasive the fair use analysis in analogous circumstances in two cases not cited by the parties. In *Arica Institute*, the plaintiff provided trainings based on the work of Oscar Ichazo, including his use of enneagons, nine-pointed figures with one-word labels attached to each endpoint. 970 F.2d at 1069-70. The defendant published a self-help book entitled *The Enneagram: Understanding Yourself and the Others in Your Life.* As the title suggests, the book focused largely on the same nine-pointed figures, with a discussion of Ichazo's works and virtually identical labeling of figures. *Id.* at 1071. The court found that summary judgment was improper on the issue of infringement with respect to the discussions of Ichazo's works and labels, but affirmed the award of summary judgment on fair use. With respect to the first factor, the court opined that "[t]hese discussions, while they include aspects of Ichazo's work, go well beyond it" in the form of new material "as illustrations and explanations of the nine personality types." *Id.* at 1077. "[Defendant] thus builds upon Ichazo's work to further develop our store of knowledge in this area." *Id.* at 1078. Similarly, Defendants build upon *Big League Sales* to develop further the use and education of the sales techniques collected therein.

In *Penelope*, the plaintiff wrote a book, *Stylistics*, compiling "syntactic constructions to

illustrate how they can be used to manipulate the reader." 792 F. Supp. at 134. The defendant, an author of popular fiction, wrote a manual for aspiring writers entitled *Starting from Scratch*. Part of the defendant's manual incorporated many of the examples used by the plaintiff in *Stylistics*. *Id.* The court found that "*Starting from Scratch* supplements *Stylistics* by trying to express some of the same material in a much simpler way so as to inform the average reader." *Id.* at 136. The same is true here: Defendants' courses and materials merely attempt to provide a user-friendly method of reading and learning from *Big League Sales*.

Although the commercial nature of the use is relevant to the first factor, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. *See also id.* at 584 (noting that "the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character").[9] Defendants' use not only is highly "transformative," but does not appear to be "commercial." For purposes of the fair use doctrine, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. Here, Dane and Plaintiff knew about Defendants' use of *Big League Sales* but never charged or demanded a fee for it. Therefore, there appears to have been no "customary price" at all for their particular use of *Big League Sales*.

In any event, Defendants do not stand to profit where each copy of *Big League Sales* used in

---

[9] In light of these later pronouncements, Plaintiff erroneously relies on the Supreme Court's earlier statement that "[i]f the [infringed product] were used to make copies for a commercial or profit-making purpose, such use would presumptively be unfair." *Sony Corp.*, 464 U.S. at 449.

the courses was purchased (*i.e.* not copied). Even if Defendants profited from the courses, it is inconceivable that they generated such profits based primarily on the copied material contained in the checksheets and drills where *Big League Sales* was just a small portion of what was studied. *See* Third Drader Aff. ¶ 14 ("the extensive, principal materials for [the WISE] course . . . are based on writings by L. Ron Hubbard"); *id.* ¶ 19, Exh. D, Third Levin Aff. ¶ 30 (*Big League Sales* comprises from 0.4% to 2% of the words in Defendants' course materials). *See also Penelope*, 792 F. Supp. at 137 ("[T]hough Brown certainly stood to profit from her book, it is difficult to see how she stood to profit directly from the copied material."). Regardless, any commercial aspect of Defendants' use of *Big League Sales* is outweighed by its highly "transformative" nature. *Campbell*, 510 U.S. at 579.

"Also relevant to the 'character' of the use is the propriety of the defendant's conduct," as "[f]air use presupposes 'good faith' and 'fair dealing.'" *Harper & Row*, 471 U.S. at 562 (internal citations and quotation marks omitted). *See also Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) ("good faith also weighs in [defendant's] favor on this prong of the fair use test"); *Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir. 1983) ("fair use presupposes that the defendant has acted fairly and in good faith"). As discussed above, the record reflects that Dane and Plaintiff actually had knowledge of, assented to, and even participated in Defendants' use of *Big League Sales* – not in isolated circumstances, but for decades.

Moreover, there is no record evidence suggesting that, prior to this lawsuit, Plaintiff's sentiments or Defendants' materials ever changed sufficiently over time as to require Defendants to request further permission to utilize *Big League Sales* as part of their curriculum. *See Marcus*, 695 F.2d at 1176 ("attempt by defendant to secure plaintiff's permission to copy the contents of her booklet or to credit plaintiff for the use of her material" is relevant to fair use analysis); *Penelope*, 792

F. Supp. at 137 (first factor favored defendant where "she did not suspect that her minimal use of [plaintiff's book] triggered an obligation to seek [plaintiff]'s permission"). *See also Nuñez*, 235 F.3d at 23 ("Although acknowledgment does not excuse infringement, the failure to acknowledge counts against the infringer."). Defendants first utilized *Big League Sales* in the 1970s in good faith with Dane's permission, and continued such use for decades without any protestations from Dane or Plaintiff. Defendants never attempted to conceal their use of *Big League Sales*, never unlawfully copied the book, and never failed to credit Dane as the author of his book. These facts all indicate that Defendants' use was proper.

Based on all these considerations, the first factor strongly favors a finding of fair use.

b.   The Nature of the Copyrighted Work

"This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. As the Supreme Court has stated, a "use is less likely to be deemed fair when the copyrighted work is a creative product." *Stewart v. Abend*, 495 U.S. 207, 237 (1990) (quoting *Abend v. MCA, Inc.*, 863 F.2d 1465, 1481 (2d Cir. 1988)). In other words, "fair use is more likely to be found in factual works than in fictional works." *Id. See also Harper & Row*, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."). Moreover, "the copyright in a factual compilation is thin." *Feist*, 499 U.S. at 349.

As Plaintiff conceded in open court, *Big League Sales* is a nonfiction work regarding sales techniques which, while not bare facts, are more of a factual than creative nature. At most, the Court could find that *Big League Sales* is copyrightable as a "compilation" of otherwise unprotected material

-18-

entitled to "thin" protection. Moreover, as a how-to book, there is public benefit from wider dissemination of *Big League Sales*. As Plaintiff has stipulated that it does not sell *Big League Sales*, its "[l]ack of availability lends [Defendants] greater justification for reproducing it." *Penelope*, 792 F. Supp. at 138.

Moreover, contrary to Plaintiff's assertion at oral argument, *Big League Sales* is not "unpublished" as to warrant greater copyright protection. *See Harper & Row*, 471 U.S. at 564 (finding that "the scope of fair use is narrower with respect to unpublished works"). The greater protection accorded to "unpublished works" enforces "the author's right to control the *first public appearance* of his expression." *Id.* (emphasis added). It is undisputed that *Big League Sales* was first published in 1971. *See* Third Drader Aff. Exh. E. Just because *Big League Sales* is no longer being printed and sold does not make it "unpublished" for purposes of the fair use analysis.

Accordingly, the second factor also favors a finding of fair use.

        c.      Amount and Substantiality of Copying

This factor considers whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal citations and quotation marks omitted). Indeed, "the extent of permissible copying varies with the purpose and character of the use." *Id.* Even copying of an entire work may be fair depending on these circumstances. *See Sony Corp.*, 464 U.S. at 449-50 (based on nature of work and purpose of copying, "the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use") (internal citation omitted); *Harper & Row*, 471 U.S. at 564 (noting that "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the

press").

As discussed above, in the light most favorable to Plaintiff's questionable quantitative analysis based on a chapter-heading-by-chapter-heading approach, Defendants have "copied" part of *Big League Sales* selection and arrangement of sales concepts and techniques in their course materials.[10] Even if this "copying" represents a substantial amount of the copyrightable portion of *Big League Sales*, which is itself open to considerable question, Defendants had no reasonable choice but to recreate the selection and organization of the sales techniques in order to teach them through their courses and drills. More generally speaking, there appears to be no other way to effectuate the purpose of Defendants' use than by the form and extent of their "copying."

As a result, Defendants' "copying" was entirely reasonable and expected in the context of their use of *Big League Sales*. Therefore, even when infringment is viewed in the light most favorable to Plaintiff, this factor also favors a finding of fair use.

> d.      Effect on the Market of the Copyrighted Work

The fourth statutory factor "requires courts to consider not only the extent of market harm caused by the particular actions of the infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation marks omitted). "This last factor is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 567. The Court must consider harm to the market for both the original work and derivative works. *See id.* at 568.

-------------------

[10]  With regard to the parties' contending quantitative analysis approaches, the Court is more persuaded by Defendants' contention that, at most, a *de minimis* portion of *Big League Sales* is copied in their course materials.

As an initial matter, the Court notes that Defendants have *contributed* to the market for *Big League Sales*, which must be purchased and read for Defendants' courses.[11]  More importantly, Plaintiff has stipulated that there is no actual or potential market for *Big League Sales* or derivative works.  In open court on July 26, 2005, Plaintiff agreed that "there is no existing market for the Dane related material that [Plaintiff has] a copy[right] to.  That there is no potential market for any of that material, i.e., that [Plaintiff has] never made a sale, and [it is] never going to make a sale."  July 26, 2005 Tr. at 22-23.  Plaintiff specifically entered into this stipulation for purposes of the fair use defense.  *See id.*  In effect, Plaintiff has stipulated away this fourth factor: without an existing or potential market, there can be no harm to it no matter how widespread Defendants' conduct is.

Even if Plaintiff were to attempt to sell Dane-related material in the future,[12] Defendants' use would not necessarily interfere with such efforts.  In fact, WISE has stated that it no longer sells the course materials pertaining to *Big League Sales*.  *See* Third Drader Aff. ¶ 13.[13]  Moreover, the relevant

---

[11]  On this basis and others, the Court finds the case on which Plaintiff primarily relies, *Addison-Wesley Publishing Company v. Brown*, 223 F. Supp. 219 (S.D.N.Y. 1963), to be distinguishable.  In *Addison-Wesley*, the court rejected the fair use defense where the defendant published a manual to plaintiff's physics textbook providing answers to all questions therein.  However, unlike here, there was evidence of adverse effects on plaintiff's competing market.  First, plaintiff produced its own manual but had withheld it from publication "mindful marketwise of the pedagogical attitudes of instructors."  *Id.* at 222.  Indeed, the "manual kills the host it feeds upon," as universities would be less likely to use plaintiff's textbooks if students could purchase defendant's manual of answers.  *Id.* at 228.  Here, by contrast, Defendant's courses require the purchase of *Big League Sales*, and can only increase its market and enhance its use.

[12]  In addition to the stipulation, Letterese elsewhere indicates that *Big League Sales* is not marketable today.  *See* Affidavit of Peter D. Letterese (D.E. # 414) ¶ 11 (*Big League Sales* "was popular in the 1980s, but is two decades out of date and has techniques that today would be considered hard sell and probably offensive and unethical.").

[13]  The fact that WISE no longer sells these materials also weighs against Plaintiff in seeking permanent injunctive relief.  Specifically, it is inconceivable that Plaintiff would suffer irreparable harm absent an injunction if the materials at issue are in fact no longer sold by

market effect is "that which stems from defendant's use of plaintiff's 'expression,' not that which stems from defendant's work as a whole." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991). *See also Arica Inst., Inc.*, 970 F.2d at 1078 (noting that "in cases such as this where a meaningful distinction may be drawn between the infringing portions of defendant's work and the work as a whole, we need only consider the market effect of the infringing portions"). Defendants' use of the (arguably) protected aspects of *Big League Sales* would have a negligible effect on Plaintiff's ability to market competing works or services. For example, Plaintiff could offer a competing course of entirely different substance with its own set of explanations, drills, and other means of teaching the sales techniques. The only overlap would be how *Big League Sales* is used to *structure* that portion of Defendants' courses which reference *Big League Sales*.

For all these reasons, this fourth factor overwhelmingly favors a finding of fair use.

*       *       *       *

The record in this case leads to only one reasonable conclusion: Defendants' use of *Big League Sales* constitutes fair use under 17 U.S.C. § 107. The facts support each of the four statutory factors, in addition to the Court's "fifth" factor underlying the "fair use" doctrine. "While defendant need not shut out her opponent on the four factor tally to prevail, if she does so, victory on the fair use playing field is assured." *Arica Inst. Inc.*, 970 F.2d at 1079 (internal citation and quotation marks omitted).

Indeed, with respect to *Big League Sales*, Defendants have hit a grand slam on the fair use playing field. Defendants's use supplements *Big League Sales* in good faith without commercial exploitation thereof, copies materials entitled to "thin" copyright protection, disseminates an already-published yet obscure out-of-print book of benefit to the public, and has no effect on any actual or

---

Defendants.

-22-

potential market of the book – all of this being accomplished with the knowledge, assent, and participation of both Dane and Plaintiff for decades. Therefore, Defendants are entitled to summary judgment based on the Court's finding of fair use.

### C.    *Laches*

The Court also finds that Plaintiff's claims of copyright infringement are barred by laches.[14] Laches applies upon a showing of "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961). In other words, a "defendant must prove both an unreasonable delay and prejudice to itself." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000).

"Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001). "One should look to the appropriate statute of limitations as a guide to determine whether the delay was reasonable." *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1236 (11th Cir. 2002) (Birch, J., concurring). *See also Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1326 (5th Cir. 1980) ("Where the plaintiff's delay has exceeded the statutory [limitations] period, the delay is presumed unreasonable, and the plaintiff has the burden of justifying the delay.").

---

[14] In open court on August 19, 2005, Plaintiff insinuated that its decision to drop its claim to statutory damages would eliminate the defense of laches. The Court finds no support for this legal argument. It is well-established that the equitable defense of laches applies to the claims for equitable relief remaining in this action. *See City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 125 S.Ct. 1478, 1491 (2005) ("It is well established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief."); *New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584-85 (2d Cir. 1989) (finding that "equitable considerations [of laches] dictate denial of injunctive relief in this action").

The limitations period applicable to Plaintiff's claims is three years. 17 U.S.C. § 507(b).

Plaintiff's delay far exceeds this amount of time. The record establishes that both Dane, Plaintiff's predecessor in interest, and Plaintiff knew of – and even condoned – Defendants' use of *Big League Sales* in the manner now alleged as copyright infringement. This knowledge goes as far back as the 1970s, when Letterese studied *Big League Sales* as part of one of his first Church courses after joining the Church in 1973. *See* Letterese Depo. Tr. at 239:15-19. Plaintiff contends that the clock should not start running until January 1994, when it attained exclusive rights to *Big League Sales* – including the right to enforcement.[15] Even then, Plaintiff waited more than ten years before filing the complaint in this action in September 2004 (D.E. #1). "By any calculation, this delay is more than enough." *Calhoun,* 298 F.3d at 1236 (Birch, J., concurring) (delay of at least 13 years). *See also Danjaq LLC*, 263 F.3d at 952 (delay of 19 years).

Defendant must show only "little prejudice" where, as here, Plaintiff's delay is inexcusable. *Stone v. Williams*, 873 F.2d 620, 625 (2d Cir. 1989). Prejudice may take numerous forms in this context, including "(1) important witnesses have died; (2) the memories of witnesses have been dulled; (3) relevant records have been destroyed or are missing; and (4) the loss of monetary investments which likely would have been prevented by earlier suit." *Calhoun*, 298 F.3d at 1237 (Birch, J., concurring). Defendants have made this showing given the death of potential witnesses, the memory loss of witnesses in this action, the destruction of relevant documents, and expenditures in creating, promoting, and using their study courses made in reliance on Plaintiff's lengthy inaction. *See* CSI

---

[15] While the Court cannot accept Plaintiff's contention because Plaintiff obtained the rights to *Big League Sales* with full knowledge that Dane knew and approved of its use by Defendants for approximately twenty years, for purposes of these motions, the Court will consider only the period when Plaintiff owned the rights to *Big League Sales*.

-24-

Reply (D.E. # 406) at 7-8.

      With no genuine issue of material fact in dispute on either prong, Defendants are also entitled to summary judgment on the defense of laches.

## CONCLUSION

      For the reasons stated above, it is hereby

      ORDERED that:

    (1)      W.I.S.E. Defendants' Motion for Summary Judgment is GRANTED.

    (2)      CSI's Motion for Summary Judgment is GRANTED.

    (3)      CST's Motion for Summary Judgment is GRANTED.

    (4)      Plaintiff's Motion for Summary Judgment is DENIED as moot.

      DONE AND ORDERED in Chambers, Miami, Florida, this 23rd day of August, 2005.

                                    Paul C. Huck
                                    United States District Judge

Copies furnished to:
Counsel of Record

-25-