UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-61178-CIV-HUCK / SIMONTON



PETER LETTERESE AND ASSOCIATES, INC., a
Florida corporation,

               Plaintiff,

vs.

WORLD INSTITUTE OF SCIENTOLOGY
ENTERPRISES INTERNATIONAL, INC., *et al.,*

               Defendants.

_____/

## W.I.S.E. DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND EXPENSES

| | |
|---|---|
| Thomas Meeks, Esq. | Helena K. Kobrin, Esq. |
| Fla. Bar No. 314323 | Fla. Bar No. 0259713 |
| **ZUCKERMAN SPAEDER LLP** | **MOXON & KOBRIN** |
| Miami Center, Suite 900 | 3055 Wilshire Blvd., Suite 900 |
| 201 So. Biscayne Boulevard | Los Angeles, California 90010 |
| Miami, Florida 33131-4326 | Telephone: (213) 487-4468 |
| Telephone: (305) 358-5000 | Facsimile: (213) 487-5385 |
| Facsimile: (305) 579-9749 | |

Defendants World Institute of Scientology Enterprises ("W.I.S.E."), Church of Scientology International, Bridge Publications, Inc., Scientology Missions International, Church of Scientology Flag Service Organization, Inc., Church of Scientology of Florida, Inc., and Church of Scientology Mission of Fort Lauderdale, Inc. ("Defendants") move the Court for an order awarding the attorneys' fees and costs they have incurred in litigating this case, pursuant to 17 U.S.C. § 505, 15 U.S.C. § 1117(a), 28 U.S.C. § 1927, Federal Rules of Civil Procedure 26(g) and 37, and the inherent power of the Court to control the conduct of litigants appearing before it.

## I. INTRODUCTION

Defendants move the Court to order that Plaintiff reimburse them $474,262.10 in attorney fees and $41,948.53 in expenses[1] incurred in defending this unfounded and vexatious copyright and Lanham Act lawsuit. Defendants are without question prevailing parties in light of the Court's August 23, 2005 Omnibus Order on Motions for Summary Judgment ("Omnibus Order") [D.E. 455] and Omnibus Order on Defendants' Motions for Summary Judgment ("Omnibus Order on Defendants' Motions") [D.E. 456], and its August 24, 2005 Final Judgment [D.E. 457]. As such, they are entitled under 17 U.S.C. § 505 and 15 U.S.C. § 1117(a) to have this Court exercise its discretion and award their "full costs" and fees.

From the time that Peter Letterese & Associates ("PLA") first alleged copyright infringement by Defendants, Defendants' attorneys have informed PLA's counsel in no uncertain terms that Defendants' use of *Big League Sales Closing Techniques* was lawful, and that if PLA pursued any claims of copyright infringement, the consequences could be serious.[2] This case should never have been brought because Defendants were engaged in quintessential fair use — indeed, the Court termed their fair use showing a "grand slam" in its Omnibus Order.[3]

---

[1] The W.I.S.E. Defendants have filed a Bill of Costs for taxation of the basic costs permitted by 28 U.S.C. § 1920. They include in this motion a request for prevailing party expenses not taxable under § 1920, but nonetheless appropriate to a prevailing copyright litigant, or under sanctions provisions argued herein, such as Rule 37 and 28 U.S.C. § 1927.

[2] Copies of letters from Helena Kobrin, and from copyright specialist William M. Hart of Proskauer Rose LLP to Richard Marcus are filed as Composite Exhibit L to the affidavit of Helena K. Kobrin.

[3] Omnibus Order at 22. Surely it should never have been brought against Scientology Missions International ("SMI") and Church of Scientology Mission of Fort Lauderdale, Inc. ("Mission"),

Defendants' use of the book was long approved by Les Dane himself and known about and acquiesced in by Plaintiff's principal, Peter Letterese — a fact so compelling that the Court relied on it extensively in its ruling. (Omnibus Order at 12, 17.)

Although ill-conceived from the start, the case still could have been litigated in a straightforward fashion had PLA not acted in bad faith and multiplied the proceedings at every turn, with the willing assistance of its attorney. Instead, PLA sought to turn these proceedings into a circus through, among other things: repeatedly filing ill-founded, improperly timed, and unintelligible papers; pursuing an entire area of discovery that was calculated to support later lawsuits and had nothing to do with this case; and misconduct with respect to Defendants' discovery efforts.[4]  Had this action been litigated in a straightforward fashion, the fees and costs Defendants incurred would have been far less.

As a result of PLA's actions, including conduct not brought to the Court's attention before now, Defendants' right to seek fees and costs is not confined to the four walls of §§ 505 and 1117(a); an award of sanctions is appropriate as well under the discovery rules, as well as 28 U.S.C. § 1927 and the Court's inherent powers.  There is precedent for such an award against Plaintiff, and persuasive authority for awarding at least some portion of the fees and costs directly against Plaintiff's attorney, David Hoffman.[5]

## II. PERTINENT FACTS

The litigation of this matter has been an enormously and unnecessarily costly affair for Defendants for two primary reasons.  First, the case was not a legitimate complaint about copyright infringement or Lanham Act false advertising, but the latest in a series of suits filed by Plaintiff to exact concessions from Defendants.[6]  Second, because PLA's litigation strategy was

---

which do not copy, sell, or distribute any courses or course materials related to any book by Les Dane.

[4] In the Final Judgment, the Court ordered that World Institute of Scientology Enterprises could incorporate its arguments concerning Rule 26(g) and Rule 37 sanctions for discovery misconduct in its motion for fees and costs.  [D.E. 457.]

[5] Defendants do not request an award of fees against Plaintiff's local counsel, who did not participate in the behavior complained of, or against its California attorney, Richard Marcus, who appeared only briefly.

[6] *See* Defendants' Motion to Abate or Stay, December 28, 2004 [D.E. 25].  The instant case is the fourth lawsuit that PLA and Peter Letterese have brought against one or more of these

to oppress and harass rather than to seek data tending to prove its claims. PLA pursued irrelevant discovery solely for its *in terrorem* effect and to salt away evidence for another lawsuit which had no bearing on the instant case. At the same time, PLA did everything it could to prevent Defendants from pursuing their efforts to prove via discovery that PLA's copyright and trademark assertions were baseless.

### A. The Intensity of Litigation

This case required extensive litigation in a short time frame. Although PLA filed this action in September 2004, it did not serve any Defendant until December of that year, after the Court ruled that service had to be made or the matter would be dismissed. [D.E. 4]. Since December 28, 2004, Plaintiff has filed 37 motions to which Defendants had to respond, Defendants have filed 25 motions, and there have been 16 hearings before the Court and the Magistrate Judge. Each Defendant propounded document requests, totaling 369. certain Defendants propounded interrogatories totaling 26, and Defendants took six days of depositions of Plaintiff, its principals, and its licensors, and one of its attorneys who submitted an affidavit on summary judgment. Plaintiff propounded 12 subpoenas to third parties (most seeking discovery on its Internet attack theory), propounded multiple document requests containing nearly 900 individual requests on Defendants, and took seven depositions.

Defendants feel confident that despite its short life, this case has been the most troublesome on the Court's docket for most of this year. It was equally frustrating and toilsome for the Defendants. As shown below, these troubles can be laid at the feet of PLA and its counsel.

### B. Plaintiff's Improper Litigation of This Case

A review of the record shows that PLA pursued this case to harass Defendants, rather than to resolve a dispute over copyright. Throughout the litigation, Defendants have attempted to limit the case to those matters raised in the pleadings, but they were often unable to do so

---

Defendants. A prior California state action resulted in a standstill agreement requiring the parties for a period of one year to attempt to negotiate a settlement of all disputes among them. Less than two months after the agreement was signed PLA, represented by David Hoffman, sued CSI, Bridge, and W.I.S.E., claiming it did not know if it had entered into a settlement. It abandoned that suit rather than provide discovery. Then, in further violation of the standstill agreement, Plaintiff filed this action. *Id.*

because of Plaintiff's vexatious activities.[7]  The Fifth Affidavit of Neil Levin, filed herewith, lays out the chronology of these bad faith and vexatious activities.[8]  Many will be familiar to the Court. This record amply demonstrates that this action was pursued in bad faith.

### 1.  Filing of Frivolous and Meritless Papers

PLA often filed motions or oppositions that were frivolous.  For example, PLA moved for summary judgment before any discovery had been conducted.  Defendants had to respond, and the Court had to rule.  [D.E. 69.]  The Court properly denied the motion, stating in its Order that PLA's estoppel argument had "no merit" [D.E. 121 at 5], and questioned whether Mr. Hoffman's affidavit in support of the motion was based on any personal knowledge [*id.* at 4-5]. Nevertheless, PLA later refiled the *same* motion – months later – again relying on the Hoffman affidavit and again making the estoppel argument.  [D.E. 270].

When Defendants moved to dismiss PLA's 15 U.S.C. § 1125(a)(1)(A) Lanham Act claim pursuant to *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), PLA pretended to have brought the claim under § 1125(a)(1)(B), even though PLA knew that Exhibit G, which it alleged to be a false advertisement, was merely a page from W.I.S.E.'s Sales Course Pack.  In the last days of the case, when PLA was desperate to avoid discovery of its business records, it dropped the Lanham Act claim altogether.

Five months after filing its complaint and five years after it allegedly became aware of infringement, PLA belatedly filed a motion for a preliminary injunction.  [D.E. 116].  This, too, caused substantial effort by Defendants and the Court to no purpose.

PLA also sought "terminating sanctions" twice based on an unpleaded, far-fetched, and wholly irrelevant theory of Internet attacks.  [D.E. 131, 291].  PLA filed these motions before it had propounded any discovery and even though Defendants had violated no court orders.  Again, Defendants had to oppose, and the Court rule on, these meritless filings.

---

[7] As the Court noted in the August 16 hearing on summary judgment motions, as a result of Plaintiff's distractions, it had no opportunity to "look at the substance" before those motions because it was "dealing with all those other matters." [Exhibit A to this motion, at 38:5-8].

[8] Mr. Levin's affidavit is filed to provide a detailed reference to events in the case as a convenience to the Court.

## 2. **Offensive and Defensive Discovery Abuse**

Nearly all of PLA's and its counsel's efforts were focused on pursuing discovery from third parties unrelated to copyright infringement, while simultaneously preventing Defendants' discovery of PLA and its licensors. As part of this strategy, PLA: (1) filed its premature motion for summary judgment, hoping to moot discovery; (2) moved to stay all discovery while that motion was pending; (3) sought emergency hearings to prevent depositions of the Dane heirs; (4) ignored the Court's deadlines for protective order motions; and (5) demanded an emergency hearing to attempt to cancel the Dane depositions after counsel had already traveled to South Carolina to take them and after Defendants had offered a comprehensive stipulated protective order addressing PLA's stated concerns.  In all, PLA filed seven motions to stay discovery or for protective orders with respect to discovery of PLA, its principals, and its licensors.  [D.E. 96, 107, 129, 195, 199, 207, 300.]

Simultaneously, PLA and its counsel pursued discovery to prove so-called "attacks" — which the Court several times told PLA were irrelevant.  PLA's attorney served subpoenas on third parties, mainly Internet service providers, and also on individuals that it believed were involved in creating a particular web site.  PLA eventually convinced the Magistrate Judge that this discovery might have some marginal relevance to some issue in the case, and she allowed it to proceed.  However, she made numerous admonitions to PLA that its papers were confusing and stream-of-conscious, that it had provided no support for its scurrilous arguments of witness and jury tampering, that it had filed its protective order late, and that it was "getting far afield" while not meeting its own discovery obligations.  *See* Transcript of Hearing, May 25, 2005, at 31:16-32:19, 105 [D.E. 177].  The Court affirmed the Magistrate Judge's Order permitting this discovery, but warned that, if it turned out this discovery was being taken for the improper purpose of filing a new lawsuit, serious sanctions would be imposed.[9]

---

[9] At the June 22, 2005 hearing, the Court made it clear that the issue of taking discovery in the instant case in preparation for a separate litigation was a very serious one:

> Mr. Hoffman and Mr. Marcus, if it appears that you are abusing the process of this court by using this case to build a case for defamation or malicious interference with business relationships or any similar case … there will be sanctions. Not a maybe, there will be sanctions and very serious sanctions. I consider that to be abuse of the litigation process.

One of the third parties whom PLA subpoenaed was Anne Marie Griffin, an elderly widow.  PLA pursued her deposition even after her attorney confirmed she had neither documents nor information pertinent to this case, or even to PLA's "attack" theory.  When the Court ordered that PLA would pay her attorney's fees if her deposition proved her attorney's representations correct, PLA decided to abandon the deposition and instead harass her by demanding she provide an affidavit in lieu of being sued.  *See* Affidavit of Steven Samilow and Ex. A thereto, attached to this motion as Exhibit B.  Obviously, PLA sought discovery in the service of future litigation.  This was a blatant abuse of process and of Mrs. Griffin.

PLA also refused to produce responsive, relevant documents, and its principal Peter Letterese refused to answer numerous relevant and non-privileged questions at his deposition. Defendants moved to compel.  When PLA tried to dissuade Judge Simonton from ordering it to produce documents and claimed they were irrelevant, she asked Mr. Hoffman if PLA was willing to give up its damages claim.  PLA refused and she ordered PLA to produce the discovery.  After the Court affirmed the Magistrate Judge's order that PLA had to provide its financial documents to Defendants [D.E. 233], PLA attempted to forestall that discovery by dropping its Lanham Act claim and deleting its copyright claim for actual damages [D.E. 239].

But because PLA continued to claim statutory damages and because Defendants were asserting a fair use defense, PLA's business records were still discoverable.  Again, PLA tried to avoid producing these records by providing Defendants with a chart purporting to summarize the requested data instead.  PLA's subterfuge touched off a new round of motions, during which PLA refiled its meritless motion for judgment as a sanction, requiring yet another hearing. Under oath at that hearing, Peter Letterese claimed for the first time that PLA could not produce its financial records because they were locked up in storage units and the company could not afford the rental fee.  *See* Transcript of Hearing, July 26, 2005, at 11:4-15, attached as Exhibit E to Fifth Affidavit of Neil Levin.

When the Court nevertheless ordered PLA to produce the documents and warned of potential dismissal for non-compliance, PLA then stipulated that there was no past or future market for the Dane book.  Only by this last minute capitulation did PLA avoid having to produce its financial records.  The fees and costs sought by Defendants for having to attend three hearings to get to that stage were referred to Magistrate Judge Simonton [*id.* at 30], and then

---

Transcript of Hearing, June 22, 2005, at 34, 37 [D.E. 241].

taken off the calendar by the final judgment, with an invitation to seek them as part of this motion. [D.E. 457.]

### 3. **False Allegations Made on Many Occasions**

PLA also made numerous false and slanderous allegations in this case, including baseless claims of witness and jury tampering which had to be addressed by Defendants' counsel. These allegations were made both before and after Judge Simonton told Mr. Hoffman that nothing PLA alleged constituted evidence of any interference with either a juror or a witness. *See* D.E. 127 (Motion for "Terminating" Sanctions), at 3-4; D.E. 128 (Motion for Protective Order), at 6-7; D.E. 131; D.E. 171 (May 20, 2005 Hearing Transcript), at 52:25-53:13, 54:2-14; D.E. 177, at 32:14-16; D.E. 218; D.E. 291 and D.E. 292 (Renewed Motion for Sanctions).

PLA, through Mr. Hoffman, repeatedly filed motions based on the argument that two of the third-party deponents it subpoenaed had testified that they were involved with a web site that PLA complained about, although both of these persons actually stated under oath that they had nothing to do with it. *See* D.E. 218, at 14, relying on a Hoffman Affidavit that does not appear on the docket; D.E. 292, at 1; D.E. 298; D.E. 357, at 7-8 and Exhibits B and C thereto.

Furthermore, in connection with the summary judgment motions, PLA repeatedly argued, and Mr. Letterese and Mr. Hoffman stated under oath, that Defendant Religious Technology Center ("RTC") receives royalties for courses that use the Dane materials, despite the uncontroverted evidence this is simply not the case and has never been the case. *See* D.E. 365, at 8 ("RTC could not collect royalties but for CST's licensing of materials"); D.E. 422, ⁋ 15 (CSI "pays a portion of its incoming royalties to RTC"); D.E. 424 ("All tallies of organizations' reports showing royalties from [sic] paid to RTC"); D.E. 437 ("Lines 13-21 explain a flow of royalties to RTC"), later withdrawn by D.E. 447. As a substitute for evidence, PLA offered unsupported (and usually unsigned and unsworn) "affidavits" of its own principals and employees or of Mr. Hoffman.

### 4. **PLA's Baseless Recusal Motion**

PLA also filed a unique document entitled "Notice of Interested Relationships," containing assertions about Judge Huck, his son, who is a Florida Deputy Attorney General, the United States Attorney, and the Kenny Nachwalter firm. In its Notice, PLA expressly waived any issues of conflict or bias, and stated that its Notice was actually intended to estop *Defendants* from raising any conflict issues. Immediately thereafter, when the Court ordered PLA to

produce its financial records, PLA filed two simultaneous recusal motions on the same facts described in its "notice," requiring multiple hearings.[10]

### 5. The Summary Judgment Motions

July 6, 2005 was the cut-off for summary judgment motions. Defendants presented comprehensive motions based upon their merits discovery which enabled the Court to dispose of this case without trial. PLA, in contrast, merely recycled its earlier summary judgment motion (*see supra* at 4).

At the summary judgment hearing, the Court asked whether PLA intended to dismiss any of the Defendants, and PLA refused to do so. [Ex. B at 9:5-10:3.] Only after the hearing did PLA finally drop six of the nine Defendants, along with its claim for statutory damages.

### 6. Generally Vexatious Conduct

A pattern of vexatious conduct and bad faith typified PLA's approach to this action. Even putting aside Plaintiff's obstruction of mediation and the peculiar Internet attack theory which ultimately dominated PLA's filings, PLA made the litigation more difficult at every turn. It failed timely to file or serve papers or discovery and sought extensions of time, usually after the fact, at least six times [D.E. 155, 339, 343, 375, 379 and August 12 (not appearing on docket)], while necessitating emergency or expedited hearings on eight occasions [D.E. 32, 36, 106, 126, 160, 287, 305, 422], including two times after the Court admonished the parties on June 22, 2005 not to do so. [D.E. 241, at 12-13.] It filed motions for relief without conferring with counsel.[11] Overall, the activities of PLA in the action seemed calculated more to terrorize Defendants than to engage the actual claims asserted.

---

[10] Duplicate, overlapping, and substituted filings were PLA's pattern. At times, Defendants were served with papers, only to learn after beginning work on their responses that the papers had never been filed with the Court. *See* Fifth Levin Aff., ¶ 12.

[11] Numerous times, Mr. Hoffman certified that he had conferred with opposing counsel when he had not asked about the relief he was requesting. For example, on June 9, 2005, PLA sought to bar the videotaping of Mr. Letterese's deposition, and asked alternatively that PLA also be allowed to tape the deposition. [D.E. 199.] Mr. Hoffman never asked defense counsel about this relief. When Mr. Letterese arrived with his own videographer, Defendants did not object.

## III. ARGUMENT

Defendants are entitled to attorneys' fees on several different, complementary grounds.

### A.   A Prevailing Party Is Entitled to Fees Under 17 U.S.C. § 505

Four of PLA's five claims were brought under the Copyright Act. Section 505, Title 17, provides that "[i]n any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party . . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs."[12]

In *Fogerty v. Fantasy Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, 1033 (1994), the Supreme Court held that "[p]revailing plaintiffs and prevailing defendants are to be treated alike ...." Fees should be awarded where they "further the interests of the Copyright Act, *i.e.*, by encouraging the raising of objectively reasonable claims and defenses, which may serve not only to deter infringement but also to ensure 'that the boundaries of copyright law [are] demarcated as clearly as possible' in order to maximize the public exposure to valuable works." *Mitek Holdings, Inc. v. Arce Eng. Co., Inc.*, 198 F.3d 840, 842-43 (11th Cir. 1999), quoting *Fogerty*, 510 U.S. at 526-27, 114 S. Ct. at 1029-30. The court should consider "whether imposition of fees will further the goals of the Copyright Act." *Mitek*, 198 F.3d at 843.

"The law of this circuit is that 'the only preconditions to an award of fees [are] that the party receiving the fee be the "prevailing party" and that the fee be reasonable.'" *Original Appalachian Artworks, Inc. v. McCall Pattern Co.*, 825 F.2d 355, 356 (11th Cir. 1987) (citation omitted). "[P]revailing defendants who are seeking attorney's fees under the Copyright Act need not show that the plaintiff pursued the case in bad faith or that the claims were frivolous." *Id.* at 356-57, quoting *Donald Frederick Evans & Assoc. v. Continental Homes, Inc.*, 785 F.2d 897, 916 (11th Cir. 1986). The Supreme Court has approved consideration of factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence" in determining an award of fees. *Fogerty*, 510 U.S. at 535 n.19, 114 S. Ct. at 1033 n.19.

---

[12]  While the statute makes such fees discretionary, at least one circuit holds that such fee awards "are the rule rather than the exception and should be awarded routinely." *McGaughey v. Twentieth Century Fox Film Corp.* 12 F3d 62, 65 (5th Cir. 1994); *Hogan Sys., Inc. v. Cybresource Int'l, Inc.*, 158 F.3d 319, 325 (5th Cir. 1998).

Here, the Court found that "the record in this case leads to only one reasonable conclusion: Defendants' use of *Big League Sales* constitutes fair use under 17 U.S.C. § 107." Indeed, the Court ruled that "Defendants have hit a grand slam on the fair use playing field." [D.E. 455, at 22.] The Court considered the fact that Les Dane himself, and PLA's principal Peter Letterese, assented to and participated "for decades" in Defendants' use of *Big League Sales Closing Techniques. See id.* at 12-14. In addition, the Court found that PLA's infringement claims were barred by laches because both Dane and Letterese "knew of — and even condoned — Defendants' use of *Big League Sales* in the manner now alleged as copyright infringement ... as far back as the 1970s," yet PLA still waited until ten years after it acquired the rights to bring this action. *See id.* at 24.

It is important to bear this in mind. Mr. Letterese, a former Scientologist, was familiar with the precise manner in which the Dane book was used by Defendants, yet he and his counsel chose to bring the action anyway. This was not objectively reasonable. In point of fact, the motivation underlying the filing was something other than winning a copyright case. This is underscored by the way the case was litigated, from irrelevant discovery propounded to third parties, to abusive deposition practices (irrelevant and repetitious questions and asking parties for documents obviously belonging to others),[13] to willful non-compliance with court orders to provide business records. The Court encountered the same difficulties as Defendants in this case: having to sift through multiple versions of the same document, having to address unfounded claims and positions which were then withdrawn, having to deal with irrelevant discovery by PLA and the motion practice it engendered, and having to address claims against parties who never should have been named and who were only dropped at the eleventh hour.

Defendants submit that the Court should award them the fees and expenses they were forced to incur because doing so will deter PLA from repeating such conduct and because Defendants are entitled to compensation for having to repel a baseless attack on their lawful copyright use.[14] This will promote the purposes of the Copyright Act by warning copyright owners that they may not abuse their "limited monopoly" by extorting lawful users.

---

[13] *See, e.g.*, Fifth Affidavit of Neil Levin, ¶ 32, Ex. F.

[14] Defendants seek here all expenses that they believe should be reimbursed. To the extent these are duplicative of those granted on their Bills of Costs (under 28 U.S.C. § 1920) they should be subtracted here.

### B. Fees Should Be Awarded Under the Lanham Act

Section 1117(a), Title 15, provides that in exceptional cases, a court may award attorney fees to a prevailing party in a Lanham Act case. *Montgomery v. Noga*, 168 F.3d 1282, 1304-05 (11th Cir. 1999) (considering the significant benefit that the prevailing party achieved). This is such a case.

The Fifth Claim was brought for an alleged violation of 15 U.S.C. § 1125(a) as a claim for false designation of origin under § 1125(a)(1)(A). *See* First Amended Complaint, ¶ 92 ("WISE and RTC and/or CST ... falsely designated the origin of the Skills Sheets ....") However, because *Dastar* had clearly established that failure to attribute authorship is not actionable under that section, WISE and other Defendants moved to dismiss the claim. [D.E. 60.] PLA insisted that its claim should survive under § 1125(a)(1)(B) for false advertising, pointing to Exhibit G to the complaint as an advertisement. The Court dismissed the § 1125(a)(1)(A) claim, but found enough language in the complaint to permit a § 1125(a)(1)(B) claim to stand.

Because the context was a motion to dismiss, Defendants were precluded from submitting any evidence. The Court was therefore unaware at the time that Exhibit G was simply a single page from W.I.S.E.'s Sales Course Pack and was not an advertisement at all. Later affidavits submitted by W.I.S.E. made it clear that Exhibit G was not an advertisement [*e.g.*, Third Affidavit of Don Drader, filed under seal on July 6, 2005, ¶ 15 and Ex. D], and PLA was well aware of this.

Beyond the sham nature of the claim, from the outset of the case PLA was unwilling to produce the evidence of economic harm that it was required to show for damages. *See Rhone Poulenc-Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996). PLA refused to produce business records proving what its income was before and after the alleged damage occurred, or establishing the commercial interest with which Defendants were alleged to compete. *See Barrus v. Sylvania*, 55 F.3d 468, 470 (9th Cir. 1995). After Defendants obtained court orders requiring production, and the Court warned PLA that it would have to produce its documents or face sanctions, PLA abandoned its Lanham Act claim rather than provide the discovery. [D.E. 241, at 24:5-12; D.E. 239.]

Defendants submit that these are exceptional circumstances warranting that PLA, and not Defendants, should bear the cost of litigating this claim.

11

### C. The Vexatious and Bad Faith Litigation of This Case By PLA and Its Counsel Warrants an Imposition of Fees Against Both

As addressed *supra* at note 6, this case is only the latest harassing litigation by PLA against Defendants. This case has proceeded in the same fashion as the earlier ones, and is part of a single ongoing strategy to bludgeon Defendants by filing lawsuits against them in pursuit of a goal unrelated to the litigation itself. Judge Lenard of this Court has noted that, "[i]n the words of one court of appeals, '[s]uits are easy to file and hard to defend. The best way to control unjustified tactics in litigation is to ensure that those who create costs also bear them.'" *Norelus v. Denny's Inc.*, No. 94CV2680, 2000 WL 33541630, *10 (S.D. Fla. March 21, 2000), quoting *In re TCI Ltd.*, 769 F.2d 441, 446 (7th Cir. 1985). Even "[d]efense against a colorable claim . . . may be very costly." *TCI*, 769 F.2d at 446. Thus, "the bad faith exception to the American Rule is that in a system requiring each party to bear its own fees and costs, courts will ensure that each party really *does* bear the costs and does not foist expenses off on its adversaries." *Id.* (emphasis in original.)

### 1. PLA and Its Counsel Should Be Sanctioned for Their Discovery Abuse

On July 21, 2005, Defendants moved for sanctions because of PLA's refusal to comply with the discovery Orders issued by this Court and Judge Simonton. The dismissal sanction requested was mooted when PLA — in order to avoid that discovery — dropped its claims for actual damages. In its Final Judgment, the Court allowed the monetary sanctions argument from that motion to be included in Defendants' fees motion. [D.E. 457.]

PLA's discovery misconduct is summarized above, and the specific facts of PLA's refusals to produce discovery ordered by the Court, and its attempts to prevent relevant discovery, are laid out in Defendants' sanctions motion and supporting exhibits (filed under seal on July 21, 2005). As that motion recounts, PLA moved for a stay of all discovery based on a premature motion for summary judgment [Sanctions Motion at 3]; willfully disobeyed the Magistrate Judge's order to produce documents [*id.* at 5]; made a sham production of documents in willful disobedience of the Court's order; repeatedly refused to answer relevant deposition questions, despite the rulings of the Court and the Magistrate [*id.* at 5-6]; hid the ball regarding information relevant to the value of the copyright, giving shifting and contradictory versions of what documents existed, where they were maintained, and how documents that were produced had been created [*id.* at 8-10]; and failed to produce documents that it admittedly possessed. [*Id.*

at 6-8].  It applied for a discovery stay (which the Magistrate Judge had already disallowed) only after Defendants filed their motion for sanctions [D.E. 182] and Judge Simonton issued an order admonishing Plaintiff that willful disobedience of a Court order could result in civil or criminal contempt [D.E. 192; D.E. 195] [Sanctions Motion at 5].

All of this conduct, in which PLA and its attorney David Hoffman have actively collaborated, is subject to sanctions under Federal Rules of Civil Procedure 26(g) and 37(c)(2). *See Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993) *cert. den.* 510 U.S. 863, 114 S.Ct. 181 (1993) (Rule 26(g) "makes the imposition of 'an appropriate sanction' mandatory if a discovery request, response or objection is interposed for an improper purpose."). PLA, through its attorney, has submitted objections certified by counsel which were not made in good faith, but were "interposed for [an] improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed. R. Civ. P. 26(g)(2)(B).

In its own summary judgment motion, PLA confirmed the cynical and tactical game that it was playing when it argued for postponement of Defendants' fair use defense — the one that the Court was to find dispositive — to a later day:

> [A] finding of infringement is entirely consistent with leaving for another day a determination as to whether or not a defense of fair use that a book on sales in a course for a nonprofit religion's sales purposes is somehow a fair use. ***Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.***

[D.E. 270 at 16-17.]  At the same time that PLA was claiming Defendants did not have "favorable evidence about relevant markets" to meet their burden on fair use, PLA itself was withholding that evidence.  Only after the Court's July 26 admonition that it would face sanctions did PLA decide to moot the discovery by withdrawing all claims of economic harm from Defendants' use of the Dane book.  (Exhibit E to Fifth Affidavit of Neil Levin, at 21:1-8, 22:25-23:21.)

Fees under both rules are clearly appropriate. *Malautea*, 987 F.2d at 1545 (affirming fees and costs against party and its counsel under Rule 26(g) because "discovery responses and objections were interposed for the improper purposes of 'caus[ing] unnecessary delay, [increasing] the cost of litigation for the Plaintiff,'" and depriving her of discovery she needed); *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1519-20, 1522-23 (11th Cir. 1986) (affirming Rule 37 sanctions against party and counsel in "yet another case of attorneys having

'sold out to the client'"); *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1447-48 (11th Cir. 1985) (affirming Rule 37 fees against counsel who made no good faith effort to comply with discovery orders, made conflicting representations to the court, and otherwise abused discovery).

### 2. Fees Should Be Awarded Against Mr. Hoffman Under 28 U.S.C. § 1927

Section 1927 "was designed to curb exactly the kinds of abuses that [counsel] committed in this case. It allows district courts to 'assess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith.'" *Malautea*, 987 F.2d at 1544 (affirming fees awarded against counsel who participated in withholding of court-ordered productions, unreasonably objected to discovery requests, "and provided incomplete answers as part of their campaign to obfuscate the truth," all requiring excess hearings and briefings and otherwise imposing on other parties and the court), quoting *Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991); *Norelus*, 2000 WL 33641630, at *9-10. Where counsel's litigation of a case has been improper from the outset, a court may award "fees and costs for the duration of the lawsuit." *Id.* at *10 (holding such an award proper where "the allegations were shown to be irresponsible, untruthful, outrageous, scandalous, and slanderous at times, evidencing a callous regard for the truth or the rights of the parties"), quoting *Beard v. Annis*, 730 F.2d 741, 744 (11th Cir. 1984).

Under the standards followed by this Court and the Eleventh Circuit, § 1927 sanctions should be awarded against Mr. Hoffman personally. Leaving aside the confusing papers he filed throughout the action (which his co-counsel Richard Marcus attributed to Mr. Hoffman's failure to control his client),[15] Mr. Hoffman made false representations to the Court. On July 26, 2005 Mr. Hoffman explicitly represented, as an officer of the Court, that PLA had no financial records beyond the limited documents it had produced. (Exhibit E to Fifth Affidavit of Neil Levin, at 9:2-22.) Immediately thereafter, the Court asked Mr. Letterese to take the stand, and he testified that PLA had anywhere from <u>thirty to several hundred boxes</u> containing responsive financial records. [*Id.* at 11:4-12:12.] Mr. Hoffman also swore under oath and argued in papers that RTC

---

[15]  Mr. Marcus told the Court:

> I think part of the problem is there needs to be more of a better filtering system between what the plaintiff wants communicated and what Mr. Hoffman puts in his papers.... I am frustrated myself a lot of times by things that get put in papers.

[D.E. 362, at 34:13-21.]

(see page 7, *supra*) receives royalties when he knew all evidence adduced in discovery was to the contrary.

Additionally, Mr. Hoffman supported his numerous and voluminous filings with "affidavits" concerning matters about which he had no personal knowledge. *See, e.g.,* D.E. 73; D.E. 75; D.E. 97; D.E. 181.

Mr. Hoffman's conduct exemplifies what the court deplored in *Malautea:* "[t]oo many attorneys … have allowed the objectives of the client to override their ancient duties as officers of the court. In short, they have sold out to the client." *Malautea,* 987 F.2d at 1547. Furthermore, "[a]ll attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly." *Id.* at 1546.

Section 1927 sanctions are warranted in light of the vexatious multiplication of this litigation which occurred as a result of Mr. Hoffman's failure to exercise independent professional judgment, and his implementation of his client's improper strategy.

### 3. Sanctions Should Also Be Awarded Under the Court's Inherent Powers

Similar considerations make an award of sanctions against both PLA and its counsel appropriate under the Court's inherent powers. While inherent power should be used with restraint, "[a] court may appropriately sanction a party or attorney who 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Malautea,* 987 F.2d at 1545-46 (affirming fines awarded under inherent power for willful misconduct); *Allapattah Services, Inc. v. Exxon Corp.,* 372 F. Supp. 2d 1344, 1373-74 (S.D. Fla. 2005) ("Sanctions authorized under the court's inherent powers include … disciplining lawyers, punishing for contempt, [and] assessment of attorney's fees …."), citing *Malautea* and *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-45, 111 S. Ct. 2123, 2132 (1991).

Where there has been bad faith, sanctions under the inherent power are warranted. Bad faith may be found where "the court finds that a fraud has been practiced upon it … or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah,* at 1373 (citing the same cases).

All of these indicia of bad faith exist here. Frivolous arguments were made, and numerous inappropriate actions taken, including the premature motion for summary judgment, the dilatory motion for preliminary injunction, the pursuit of distracting, irrelevant discovery, and the obstruction of court-ordered discovery. The fees Defendants are requesting should therefore be awarded under the Court's inherent power jointly and severally against PLA and Mr. Hoffman.

### D. The Fees and Expenses Sought Are Reasonable

Under any of the standards articulated above for granting an award of fees and expenses, the amount granted must be reasonable. *See* 15 U.S.C. § 1117(a); 17 U.S.C. § 505; *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994), citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983). In this Circuit, courts are guided in both contingency and hourly cases by the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), in determining whether fees are reasonable. *See Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829, 852, 853 (11th Cir. 1990); *United Feature Film Syndicate, Inc. v. Sunrise Mold Co., Inc.*, 569 F. Supp. 1475, 1481 (S.D. Fla. 1983). Reasonableness is determined in the first instance by multiplying an appropriate number of hours expended by a reasonable hourly rate, the product of which is referred to as the lodestar amount. *Loranger*, 10 F.3d at 781.

The *Johnson* factors to be considered in determining the reasonable amount to award, as adopted in *Cable/Home*, 902 F.2d at 853 & n.37, are addressed below. Summaries of the fees claimed by the W.I.S.E. Defendants, broken down by hours and the hourly rates, are attached as Exhibit D to the Affidavit of Thomas Meeks and Exhibit E to the Affidavit of Helena Kobrin. The Affidavit of Alan Greer, Esq., evaluating these hours and rates is filed concurrently.

1. "The time and labor required": The time required to address the issues in this case is set forth in the time sheets of counsel. Filed concurrently are the Affidavits of Thomas Meeks and Helena Kobrin which attach the time sheets showing the time expended on issues herein.

This case has required extensive labor. The discovery, motion, and pretrial phases all occurred in a compressed time frame. PLA and its attorney generated constant and extensive distractions, requiring many hours of attention on a nearly daily basis to issues that were a diversion and departure from the normal course of the litigation. Frequently, counsel had to deal with multiple versions of the same paper or motions that should not have been filed. Though in

16

some instances these filings appeared unworthy of response, it would have been negligent for defense counsel to ignore them. Even actions by PLA that were not facially improper created far more work than they should have. For example, PLA's document requests were repetitious, incomprehensible, and asked each party for documents that had nothing to do with it. PLA also often pursued issues only to drop them after Defendants had briefed and argued them. Throughout, Defendants' counsel have worked cooperatively, often dividing up tasks, such as drafting of motions among different attorneys so that a particular attorney had primary responsibility and work was not duplicated. *See* Kobrin Aff., ¶ 12.

2. "The novelty and difficulty of the questions": The instant case should not have been difficult to litigate. However, some of the theories advanced by PLA were so novel as to be bizarre. An example is the attempt by Mr. Hoffman to fit the use of the Dane book into the largely discredited line of cases dealing with "remounting" visual works in order to argue that the use was derivative [D.E. 69, at 19-20]. Still another is the estoppel argument put forth in PLA's first and reprised summary judgment motions. [D.E. 69, at 12; D.E. 270, at 9.] These and other actions by PLA made the case more difficult. *See* Meeks Aff., ¶¶ 6-7.

3. "The skill requisite to perform the legal service properly": Defendants' attorneys have considerable skill in litigation and in copyright law. The Defendants' Miami attorneys are experienced litigators with copyright experience. *See* Meeks Aff., ¶ 4 & Exhibits A-B thereto. Ms. Kobrin and Mr. Moxon have been involved in copyright litigation for 15 years. *See* Kobrin Aff., ¶¶ 5, 9. A high degree of skill was required to deal with the often incomprehensible material PLA and its counsel placed before the Court. The team that represented the Defendants possessed that skill. *See* Greer Aff., ¶¶ 12, 20-21.

4. "The preclusion of other employment by the attorney due to the acceptance of the case": Work on this case consumed extreme amounts of time for the attorneys involved. For Ms. Kobrin, it prevented her from being able to work on almost any other matters. For certain of her clients, it meant that they had to engage other counsel at higher rates to do other work that they would ordinarily have asked her to perform. The case was time-consuming for all the attorneys involved for the defense. *See* Kobrin Aff., ¶ 12.

5. "The customary fee": The Affidavits of Mr. Meeks and Ms. Kobrin lay out the fees charged by their firms. The fees charged by Mr. Meeks's firm were customary for the type of work performed and for the Miami area. *See* Greer Aff., ¶ 14. The fees charged by the Moxon

& Kobrin firm for this representation are substantially lower than the customary fees for attorneys of their experience. *See id.,* ¶ 15.

The credentials of Ms. Kobrin, who was the principal Moxon & Kobrin attorney on the case, and her partner, Kendrick Moxon, who assisted with discovery, are contained in Ms. Kobrin's Affidavit. They have represented some or all of these Defendants at various times over the last 20 years. In order to support the Defendants' non-profit and charitable mission, Moxon & Kobrin have special retainer arrangements. Church of Scientology Flag Service Organization pays a flat $1,725 per week for Ms. Kobrin's work and Church of Scientology International pays $4,500 per week for Mr. Moxon's services. As further explained in Ms. Kobrin's Affidavit, as a result of this arrangement, if the hours included in this motion under flat rate billings were calculated on an hourly basis, they would range from $48.90 to $230.70 per hour. Because of the extensive flat rate work performed by these attorneys, their fees are far lower than those of hourly counsel for the Defendants, and the overall fees are substantially lower than they otherwise would have been. In addition, much of the paralegal work was shouldered in-house by CSI's client representative, Neil Levin, and the paralegals that work for him. *See* Kobrin Aff., ¶12.]

Mr. Moxon and Ms. Kobrin also represented certain Defendants on a *pro bono* basis, and are entitled to a reasonable hourly rate for that time. *See Blum v. Stenson,* 465 U.S. 886, 895, 104 S. Ct. 1541 (1984) (reasonable fee to be awarded regardless of whether attorney is from a private firm or a nonprofit legal services entity); *Bond v. Blum,* 317 F.3d 385, 399-400 (4th Cir. 2003); *Mayson v. Pierce,* 806 F.2d 1556, 1565 (11th Cir. 1987), citing *Copeland v. Marshall,* 641 F.2d 880 (D.C. Cir. 1980) (*en banc*). They seek for this work $250 per hour, which is entirely reasonable for attorneys of their experience and ability.

6. "Time limitations imposed by the client or the circumstances": Time limitations here were a significant factor in the present case. On March 2, 2005 [D.E. 64], the Court scheduled the case for a September trial, with accelerated dates for discovery and dispositive motions. Everything was done on a fast track. The Court made clear that it was not going to disrupt the schedule it had set and that the parties needed to comply with it, which Defendants did in every respect. Unlike Plaintiff, Defendants sought *no* extensions of time.

7. "The amount involved and the results obtained": In its initial disclosures and in response to interrogatories, PLA claimed this case was worth $12.9 billion in statutory damages

or $20,160,000 in recoverable royalties. [Exhibit C, at 3-4.] PLA also argued that it was entitled to $60.3 million as a percentage of all income of all Scientology churches around the world because, it claimed, that income was all derived from Defendants' use of Les Dane's sales techniques. [*Id.* at 4-5.] PLA also sought to enjoin Defendants from using *Big League Sales Closing Techniques* in any courses, something that some of them and their predecessors had been doing for over thirty years. *See* Second Amended Complaint [D.E. 443], at 22-23. Defendants could hardly take PLA's threat lightly; they had to ensure that they addressed all issues raised. By doing so, they achieved total victory; not only was PLA prevented from reaping any monetary recovery, but Defendants received a judicial pronouncement about their fair use which will prevent future claims.

8. "The experience, reputation and ability of the attorneys and the nature and length of their professional relationship with the client": Defendants discuss these two factors together. The Zuckerman Spaeder attorneys enjoy an excellent reputation and have long experience in the Miami legal community and the federal court. Their credentials are set forth in the Meeks Affidavit and its exhibits, and the Affidavit of Alan Greer affirms their excellent reputation. Different offices of Zuckerman Spaeder have represented certain of these Defendants or related entities in different matters in the past. [Meeks Aff., ¶ 2.] The Moxon & Kobrin firm is based in Los Angeles. Ms. Kobrin is a California and Florida-licensed attorney, and worked closely with the Miami-based attorneys on this case. She has been admitted to the Florida Bar since 1978, and has, for nearly 20 years, represented the various Defendants in this case; for the last 15 years she has been involved in copyright matters for certain of those clients, including litigation. Her partner, Kendrick Moxon, who participated primarily in discovery-related matters in this case, has been a member of the District of Columbia Bar since 1984 and of the California Bar since 1987. He is an experienced litigator and trial attorney who has represented these same clients for more than 20 years. [Kobrin Aff., ¶¶ 5-8.] Both Mr. Moxon and Ms. Kobrin have been involved in several cases in Pinellas and Hillsborough Counties over the last several years, and they submit the Affidavit of F. Wallace Pope, a partner in the firm of Johnson, Pope, Bokor, Ruppel & Burns, P.A, who has worked closely with both of them, as to their experience and ability. Mr. Greer is familiar with Mr. Pope and has relied in part on his affidavit. *See* Greer Aff., ¶ 21.

9. "Awards in similar cases": This case bears a number of similarities to *Compaq v. Ergonome*, 387 F.3d 403 (5th Cir. 2004). The plaintiff in that case held the copyright in a book

on ergonomically correct hand positions for computer users and sued Compaq over a booklet it included with the computers it sold. *Id.* at 406. Through a combination of a jury verdict and court rulings finding *de minimis* copying, fair use, laches, and equitable estoppel, Compaq prevailed. *Id.* at 406. The court awarded $2,765,026.90 in attorneys' fees. The Fifth Circuit upheld the award, noting the district court had relied on several factors, including the plaintiff's continual failure to comply with discovery orders, its filing of numerous non-meritorious motions, and the fact that defendants were seeking a recovery of $800 million. *Id.* at 411. The appellate panel deemed the award well founded based on considerations of motivation, objective unreasonableness, and compensation. *Id.* at 412.

The final two *Johnson* factors — whether the fee is fixed or contingent and the "undesirability" of the case — do not apply. The aggregation of the other factors strongly favors a finding that the fees requested by Defendants are reasonable.

### E. Defendants Should Also Be Awarded Their Expenses

In a non-fee-shifting case, a prevailing party ordinarily may be awarded costs pursuant to 28 U.S.C. § 1920. However, when a fee-shifting statute provides that a prevailing party may be awarded attorney fees, the Eleventh Circuit has ruled that it is also appropriate to award that party additional expenses beyond those enumerated in § 1920. *Dowdell v. Apopka*, 698 F.2d 1181, 1188-89, 1190 (11th Cir. 1983) ("Where cost-shifting is expressly authorized by statute, the traditional limitations of Rule 54(d) and 28 U.S.C. §§ 1920 and 1923(a) do not apply."). Defendants should therefore be awarded their expenses, including those which may not be taxable by the Bill of Costs they have submitted. Those expenses total $41,948.53, and are summarized in Exhibit E to the Affidavit of Thomas Meeks and Exhibit F to the Affidavit of Helena Kobrin. They are further explained in the affidavits of Mr. Meeks and Ms. Kobrin.

### IV.    CONCLUSION

For the reasons set forth herein, Defendants should be awarded the fees and expenses they request. (Defendants are entitled to recover their fees incurred in seeking fees as well. *See King v. McCord*, 707 F.2d 466, 468 (11th Cir. 1983); *Johnson v. Mississippi*, 606 F.2d 635, 637-38 (5th Cir. 1979). These have yet to be tallied because of the billing cycle and the schedule of this motion, but Defendants will submit appropriate supplements when available.)

Respectfully submitted,

Thomas Meeks, Esq.
Fla. Bar No. 314323
**ZUCKERMAN SPAEDER LLP**
Miami Center, Suite 900
201 So. Biscayne Boulevard
Miami, Florida 33131-4326
Telephone: (305) 358-5000
Facsimile: (305) 579-9749

Helena K. Kobrin, Esq.
Fla. Bar No. 0259713
**MOXON & KOBRIN**
3055 Wilshire Blvd., Suite 900
Los Angeles, California 90010
Telephone: (213) 487-4468
Facsimile: (213) 487-5385

*Attorneys for Defendants World Institute of Scientology Enterprises,*
*Church of Scientology International, Bridge Publications, Inc.,*
*Scientology Missions International, Church of Scientology Flag*
*Service Organization, Inc., Church of Scientology of Florida, and*
*Church of Scientology Mission of Fort Lauderdale*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by mail, this 6th day of October, 2005, on counsel for plaintiff: Dale Paul DiMaggio, Esq., Malin Haley & DiMaggio, 1936 S. Andrews Avenue, Fort Lauderdale, Florida 33316, and David L. Hoffman, Esq., Law Offices, 27023 McBean Parkway, Suite 422, Valencia, California 91355; and on counsel for Religious Technology Center and the Church of Spiritual Technology: Michael Nachwalter, Esq., Kenny Nachwalter, P.A., 1100 Miami Center, 201 South Biscayne Blvd., Miami, Florida 33131.

Thomas Meeks

Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-61178

PETER LETTERESE
AND ASSOCIATES,

Plaintiff

vs.

WORLD INSTITUTE OF
SCIENTOLOGY, et al

Defendants

- - -

HEARING HELD 8-16-05

BEFORE THE HONORABLE PAUL C. HUCK

- - -

APPEARANCES:

FOR THE PLAINTIFF:

DAVID L. HOFFMAN, ESQ.

BARRY HALEY, ESQ.

FOR DEFENDANTS:

THOMAS MEEKS, ESQ.

HELENA KOBRIN, ESQ.

MATTHEW DAVIDSON, ESQ.

---

**Page 2**

1  APPEARANCES CONTD

2  MICHAEL NACHWALTER, ESQ.

3  ELIZABETH HONKONEN, ESQ.

4

5  REPORTED BY:

6  PATRICIA SANDERS, RPR

7  OFFICIAL COURT REPORTER

---

**Page 3**

1  THE COURT: We're here on Peter Letterese and Associates

2  versus World Institute of Scientology, et al. Let me have appearances

3  of counsel, please.

4  MR. HOFFMAN: David Hoffman on behalf of plaintiff Peter

5  Letterese.

6  MR. HALEY: Barry Haley, local counsel. Barry Greenberg

7  with Fowler White will be up momentarily.

8  THE COURT: All right.

9  MR. MEEKS: Thomas Meeks along with Helena Kobrin for the

10  WISE defendants.

11  MR. DAVIDSON: Matt Davidson for the WISE defendants.

12  MR. NACHWALTER: Michael Nachwalter on behalf of RTC.

13  MS. HONKONEN: Elizabeth Honkonen for Religious Technology

14  Center and Church of Spiritual Technology.

15  THE COURT: Welcome. I saw something come in this week

16  about substitution of counsel for the plaintiff.

17  MR. HOFFMAN: I'm sorry, Your Honor.

18  THE COURT: I thought I saw something about changing local

19  counsel and Mr. Markus withdrawing. Is that the case?

20  MR. HOFFMAN: Yes, Your Honor. We have not yet filed the

21  paper. It will be filed shortly.

22  THE COURT: I thought I saw something that suggested you

23  would be doing that.

24  MR. GREENBERG: Good afternoon. Barry Greenberg, Your

25  Honor.

---

**Page 4**

1  THE COURT: Welcome. We're here for the various motions

2  for summary judgment that have been filed. I have a few other

3  matters to take up before we get to the summary judgment motion.

4  Plaintiff's motion for enlargement of time that was filed

5  August the eighth with regard to pretrial motions and also to

6  respond I think I have already entered an order on that.

7  MR. HOFFMAN: That's correct.

8  THE COURT: This case is difficult enough as it is because

9  we have a lot of parties and a lot of issues without confusing

10  documents.

11  In this case when I got the motion I read through it, I

12  read the affidavit in support of it and the certificate of

13  conferring with opposing counsel, I had Mr. Cook help me figure it

14  out, it turns out on the motion for enlargement of time that was

15  filed on August the tenth that there's an affidavit that was

16  attached to it that related to some discovery matters that you had

17  misfiled some dates for discovery.

18  It had nothing to do with the motion for enlargement of

19  time with regard to pretrial motions and the other subject matter.

20  In addition, the certificate of conferring with regard to

21  the August tenth motion for enlargement of time seems to relate to a

22  discovery motion.

23  Are you aware of that? I raise this because you are making

24  my life more difficult. I am going to ask you one more time to be a

25  little more careful about your filings.

**5**

1    We don't want copies of things filed unnecessarily. Try to
2    give some thought to what you are filing before you file it.
3        Then we have defendant SMI Mission's motion to file a third
4    party affidavit of John Voorhies motion out of time.
5        MR. MEEKS: I apologize, Your Honor. My secretary is on
6    vacation. We would like to have it in the record for this hearing.
7    That's why we filed the motion.
8        THE COURT: That has to do with contributory infringement
9    only, correct?
10       MR. MEEKS: Mr. Voorhies is with the Fort Lauderdale
11   Mission. The essence of it is they don't give those courses.
12       THE COURT: Do you have a view on this motion, Mr. Hoffman?
13       MR. HOFFMAN: I don't have a copy of the affidavit.
14   However, I have a couple of affidavits I was going to file myself
15   today. So I don't have any objection to it being filed out of time.
16       MR. MEEKS: I thought it was served and not filed. If Mr.
17   Hoffman did not get it I very much apologize. I thought it was a
18   filing problem.
19       THE COURT: I have a copy of it. It was pursuant to the
20   motion for leave to file.
21       MR. MEEKS: Which we served on Mr. Hoffman. It should have
22   been attached. I apologize for that.
23       THE COURT: If it relates to that entity's involvement in
24   the alleged infringement then we can set that aside for the moment
25       MR. MEEKS: It does.

**6**

1        THE COURT: Assuming you get a copy of it what is the
2    plaintiff's position on the filing of Mr. Voorhies' affidavit out of
3    time?
4        MR. HOFFMAN: I don't have a problem with it. I have some
5    affidavits that I would like to hand up as well.
6        It's my understanding they can be filed up to the day
7    before the hearing -- served up to the day before the hearing.
8        THE COURT: Not according to me. I have gotten a couple
9    thousand pages on this. I spent a lot of time preparing for the
10   hearing trying to identify the issues.
11       I assumed the parties had given everything they needed so I
12   could prepare ahead of time. It does not do me any good to do that
13   work and then have both sides come in with affidavits at the last
14   minute.
15       I am not so concerned about Mr. Voorhies because that's an
16   issue we may not get to today. If we get to infringement or the
17   fair use issue then it is of some consequence.
18       Why don't you give me some general idea what you want to
19   file.
20       MR. HOFFMAN: It's primarily as to case law which it's my
21   understanding I can cite here in any event.
22       THE COURT: So it is an affidavit as to case law?
23       MR. HOFFMAN: It contains a lot of cases that is correct.
24       THE COURT: I would assume the case law would be contained
25   in the memorandum of law or supplemental memorandum of law. We'll

**7**

1    look at the cases I guess if we get the opportunity. So it's in the
2    nature of a memo really?
3        MR. HOFFMAN: It's in the nature of a list of cases with a
4    very brief description of the issues.
5        THE COURT: All right. What is the next one?
6        MR. HOFFMAN: Mr. Letterese had done some graphics that
7    show the relationship between the parties.
8        THE COURT: Could you be a little more specific?
9        MR. HOFFMAN: It's a pie chart with nine slices, each slice
10   representing one of the defendants. It's for purposes of explaining
11   the arguments we made in our papers with respect to how the
12   defendants operate together as a group.
13       THE COURT: Do the defendants have any objection?
14       MR. NACHWALTER: We got them last night at eight. However,
15   I think it would be imprudent for us to object at this point.
16       THE COURT: If it informs the Court so much the better. I
17   will look at it. I have looked at most if not all the cases that
18   plaintiff has cited. If there are some additional cases so much the
19   better.
20       I am going to grant the defendant SMI Mission's motion to
21   file Mr. Voorhies' affidavit out of time.
22       Have you filed a motion with regard to your affidavits?
23       MR. HOFFMAN: I did not because 56 C of the Federal Rules
24   allows an affidavit up to one day before -- the service of an
25   affidavit up to one day before the hearing.

**8**

1        MR. NACHWALTER: Well, I would object to that. This came in
2    the office between nine and eleven last night --
3        THE COURT: I was not in the office either last night. I
4    did not receive the copy until now. But if it's useful we'll get to
5    it eventually.
6        Anything else anyone wants to bring to the Court's
7    attention?
8        MR. NACHWALTER: If I might, Your Honor, we got something
9    else last night. As I said, these faxes came in between nine and
10   eleven last night.
11       THE COURT: You were there I am sure waiting. All right.
12   What is it?
13       MR. NACHWALTER: It's a motion -- it's some kind of a
14   motion to compel. It's out of time. Discovery was supposed to
15   close in this case August first.
16       This does not comply with the Local Rules. It did not have
17   the proper certification --
18       THE COURT: That's not dealing with the summary judgment
19   motions. We'll deal with that later on if we can or Judge Simonton
20   will at a later date.
21       MR. NACHWALTER: I think Your Honor mentioned something
22   about the secondary liability and you did not know if you would get
23   to it today.
24       I flew in for the hearing today. I am supposed to be on
25   vacation. This was an important hearing and I thought I should be

9

1  here. I have a flight back tonight. It depends on your schedule.
2  Obviously I would ask Your Honor to address that today if you could.
3      THE COURT: Don't get too nervous yet. Let's take it one
4  step at a time. We may be able to deal with it today.
5      All right. One of the preliminary matters I wanted to
6  bring up, I note in the last version of the complaint that there
7  were a lot of on inform and belief allegations.
8      I know those were made before all the discovery was taken.
9  I know much of the discovery relating to the various defendants'
10  participation or relationship to the alleged infringing documents
11  were probably based on the -- certain assumptions.
12      After completing discovery I wonder if the plaintiff agrees
13  that certain of the defendants should be dismissed because they are
14  not contributorily infringing and the premise on which those
15  allegations were made turned out not to be the case?
16      MR. HOFFMAN: By way of example, with respect to defendants
17  SMI and the Church of Scientology Mission of Fort Lauderdale, I
18  believe they are saying we don't deliver any of the courses.
19      What they do is they have their staff trained on the
20  courses, then the staff helps make money. They have parishioners
21  that they send to take the courses elsewhere. That is contributory
22  infringement --
23      THE COURT: By taking the course, by being a student of the
24  course?
25      MR. HOFFMAN: By sending the parishioners there.

10

1      THE COURT: So the answer is, no, there are no defendants
2  you wish to dismiss?
3      MR. HOFFMAN: No.
4      THE COURT: All right. Are there any other claims that you
5  want to now withdraw with regard to what you have alleged in the
6  complaint?
7      MR. HOFFMAN: No, Your Honor.
8      THE COURT: All right. Let's proceed then.
9      As I RAOED the complaint there is one count, I think this
10  is in error, there is one count that still alleges statutory
11  damages, that's count three of the complaint.
12      However in the prayer for relief there is no claim, I am
13  referring to the handwritten revised first amended complaint and the
14  prayer for relief, there is no claim for damages of any kind; is
15  that correct?
16      MR. HOFFMAN: I don't believe that's correct. There should
17  be a claim for statutory damages. The damages that were deleted from
18  the complaint were with respect to the fifth count, which was
19  deleted with respect to damages related to defendants' profits.
20      THE COURT: If you turn to page 29 -- excuse me, I guess
21  it's 28 through 30, which is the prayer for relief, maybe I missed
22  it, I don't see any claim for damages.
23      I see a claim for declaratory judgment. I see a claim for
24  injunction. I see a claim for costs, fees and disbursements of
25  course delivery of any infringing material. I don't see anything in

11

1  the prayer for damages -- I see where there was one. You asked for
2  an award of actual and/or statutory damages and/or disgorgement of
3  profits. That's been stricken; has it not?
4      MR. HOFFMAN: With respect to the statutory damages, if
5  that's not in there that was inadvertent, we would like to add that
6  by interlineation. It's elsewhere in the complaint.
7      THE COURT: I thought we had a discussion about damages and
8  that the defendants filed a motion with regard to damages, a motion
9  to limit statutory damages.
10      Is it the defendant's view statutory damages are still in
11  the case?
12      MR. MEEKS: Our understanding was actual damages would be
13  deleted in every respect and therefore 504 and 505 of the copyright
14  Act are statutory damages and fees respectively. They have not left
15  in a claim for actual damages. That was our concern.
16      THE COURT: All right. That was an inadvertent striking out
17  in paragraph E of the prayer for damages?
18      MR. MEEKS: Yes, sir.
19      THE COURT: It should read awarding statutory damages?
20      MR. MEEKS: Not actual and/or but just statutory.
21      THE COURT: All right. What do I have to do with regard to
22  your motion to limit statutory damages?
23      MR. MEEKS: Nothing today. That's a motion for trial. We
24  just filed it because there was a pretrial motion deadline on the
25  tenth.

12

1      THE COURT: All right. What was the deadline that the
2  defendant asked for pursuant to its motion for enlargement of time
3  to file pretrial motions?
4      MR. HOFFMAN: You mean the plaintiff?
5      THE COURT: Yes.
6      MR. HOFFMAN: We filed two motions and asked for the 15th,
7  which was yesterday.
8      THE COURT: Did you file any --
9      MR. HOFFMAN: We served them. It's my understanding we're
10  entitled to file them -- we're entitled to stick it in the overnight
11  mail.
12      THE COURT: It was filed this morning.
13      MR. HOFFMAN: It's being filed today.
14      THE COURT: I don't think that's the rule but I am not sure
15  if it makes a whole lot of difference.
16      All right. Let's get down to what brings us all together
17  and that is the parties' motion for summary judgment.
18      MR. NACHWALTER: If I might, Your Honor, Miss Honoken says
19  she thought you gave them until Friday to file pretrial motions.
20      THE COURT: There's an additional motion that would take it
21  to Monday.
22      MR. NACHWALTER: We got it late last night. I don't know if
23  that's compliance with filing them on the fifteenth.
24      THE COURT: All right. Let's move forward. Do any of the
25  defendants still sell or use the various documents which are the

**13**

1  subject of the alleged infringement, that is the drills, the skill
2  sheets, the course materials?
3      MR. MEEKS: Yes, Your Honor. I should clarify, we filed
4  older ones as well. They are substantially similar. There are some
5  in the record that are older for the purpose of historical
6  completeness.
7      THE COURT: All right. We have a difference of opinion
8  with regard to, even assuming defendant takes the position that it's
9  not infringing material, that it's less than one tenth of one
10  percent. I think they take the position it's 0.4 percent to 0.8
11  percent; is that correct?
12     MR. MEEKS: With respect to the professional registration
13  course, which is the Church of Scientology International course,
14  there are only 63 words that come from the BLS, that's 0.8. The
15  executive course 0.3 percent of the book in the BLS box are used
16  with respect to WISE. It's less than one percent.
17     THE COURT: Your methodology has been to go through and
18  compare word for word what is found in the various -- and I'm going
19  to use Scientology as a generic term for the defendants.
20     You have taken word for word and compared it to the Big
21  League Sales, what I will call the Book. I think both parties have
22  referred to it as the book from time to time.
23     MR. MEEKS: Correct. Even if they are not words or phrases
24  protected by copyright we put them in any way. A couple of your
25  exhibits actually highlight those.

**14**

1      THE COURT: And the plaintiff takes the view it is at least
2  fifty percent. How did you come to that fifty percent?
3      MR. HOFFMAN: We came to the fifty percent because we
4  looked at the selection of material. I looked at the arrangement for
5  purposes of that.
6      I copied in the table of contents of book that has 13
7  chapters. 13 is a summary, twelve are substantive. Each chapter has
8  a number of sub chapters, approximately eight to ten.
9      If you look at that as an aggregate, approximately a
10  hundred sub chapters, I took the defendants' material -- and there
11  are two types.
12     With respect to the type that is sold or offered by the
13  Church of Scientology International and its entities I compared the
14  outline in their check sheets to the outline of the table of
15  contents and found the table -- their outline goes in order through
16  our table. I found approximately half of their outline is from our
17  table, using the same words or very similar words.
18     THE COURT: On the titles?
19     MR. HOFFMAN: On the titles and the sub titles.
20     THE COURT: The first page under I guess chapter one, the
21  brick overcoat, there are several sub headings, looks like about a
22  dozen.
23     You went through and said in the course materials or the
24  skill drills there's something about Scaredy Cat, how to distinguish
25  the Scaredy Cat from the legitimate objector?

**15**

1      MR. HOFFMAN: That's correct.
2      THE COURT: So you put in the infringing column the Scaredy
3  Cat in the whole section?
4      MR. HOFFMAN: That's correct.
5      THE COURT: Without regard to comparing the actual section
6  with what is in the course materials?
7      MR. HOFFMAN: For the Church of Scientology International
8  side of materials that's correct. Without a specific comparison of
9  the drills, material to what was in our book correct.
10     THE COURT: So you went through and said, I am checking off
11  on the index table of contents Scaredy Cat is one, legitimate
12  objector is one. Shopper stopper, that's one, you would check that
13  off, then you would take the check off headings or sub headings and
14  compare that to the total headings or sub headings and you come up
15  with about 50 percent or more?
16     MR. HOFFMAN: Correct.
17     THE COURT: Is there any authority for that approach?
18     MR. HOFFMAN: The compilation authority cited in our brief.
19  We cited the Southern Bell case. There's another case cited. I
20  believe the case is from the Fourth circuit.
21     Those are exemplary compilation cases that say the
22  underlying facts are not necessarily copyrightable materials. They
23  don't compare the underlying facts.
24     The copyrightability comes from the selection and the
25  arrangement. You can have copyrightability from the selection or

**16**

1  from the arrangement or you can have it from both. The Church's
2  materials the arrangement is the same and the selection is
3  approximately 50 percent of our materials.
4      There's two ways to look at it. A comparison of materials
5  to the Book and there's another way to look at it which is the Book
6  is part of a course, the course is the materials plus the Book and
7  that course is a derivative work of our book as well.
8      When you look at it the book of courses matches the Book
9  because the Book is part of the course. It's identical to the core.
10     The authority for that comes from the Mirage case and some
11  other cases. In the Mirage case the defendants took a picture from
12  a book, remounted it on the tile and the Court said even though you
13  did not copy the picture you remounted it on a tile, and that's a
14  derivative work --
15     THE COURT: Do you think that is comparable to what we have
16  here, remounting a photograph on a tile is comparable to what we
17  have here?
18     MR. HOFFMAN: I think it's comparable that the Book is
19  remounted by virtue of the course.
20     THE COURT: I don't follow that argument.
21     MR. HOFFMAN: What they are doing is -- it's a derivative
22  work of the book. Let's say they went around and gave a speech based
23  upon the Book, that's a derivative work from the book. The course is
24  set up only because of the Book. That's all that is relevant. The
25  Book has to be part of the course. Otherwise there is no course.

17

1       THE COURT: You mean the Book has to be part of the course?
2       MR. HOFFMAN: Correct. You can't teach the course without
3   the Book. The student taking the course, the parishioner taking the
4   course has to have the Book.
5       THE COURT: I admit I am not an intellectual property
6   expert. I have had very few cases in my career in this area. Forgive
7   me if I am not conversant in all the factors, but it seems to me
8   throughout recent history when we have had writings that we have had
9   law schools and colleges and professional schools and what have you
10  using materials in their course of study.
11      I remember when I was in law school, I would be assigned at
12  the beginning of the year three books. Contracts would be one of
13  them. We would get assignments. They would say, today we're going
14  to talk about offer and acceptance.
15      The reading assignment is Corbin chapter one and three. Be
16  prepared to discuss offer and acceptance in class. Then part of the
17  materials was organized. It would have some examples of things you
18  would discuss, Some of the things that were in the Corbin contract
19  for example.
20      That's a pretty standard way of putting together a course
21  outline. Seems to me what is happening in this case is they have
22  assigned a number of books, at least one or two books, one which of
23  is the Book that Mr. Dane wrote, another book that he wrote that is
24  not part of the lawsuit, some materials that Mr. Hubbard wrote and
25  there's some other things that I can't quite identify, some other

18

1   materials to read or to refer to. Are you suggesting, is it your
2   general argument, that by assigning as reading materials the Book
3   and then referring to the contents of the book in order to discuss
4   or utilize what is found in the book that that is infringement?
5       MR. HOFFMAN: In the way the defendants do it, yes. It's
6   very different from a law school textbook that is written for the
7   sole purpose of being used in the classroom. That's the whole idea
8   of Corbin or the whole idea of another law school text.
9       THE COURT: Are you saying because it's in an educational
10  institution --
11      MR. HOFFMAN: It's because it's an educational institution.
12  The courses are not licensed to other people. You are not making
13  money off of teaching one course to the students the way the
14  defendants do it.
15      It's a traditional educational use. This is very different.
16  It's not a textbook. It's not written with the intent it be inside
17  a course. When you write a textbook --
18      THE COURT: Why not? What if this were instead of the
19  University of Miami Law School teaching Corbin, let's say this was
20  Bollettieri's Tennis Academy that is going to teach tennis 101.
21      Mr. Bollettieri at the beginning of the course says, I'm
22  going to assign to all my students John McEnroe's Ten Easy Steps to
23  learn to play tennis.
24      I am going to assign my own book, Tennis for Idiots. The
25  course outline says the first week you will read the first chapter.

19

1   Let's say you read the first chapter in McEnroe's book, which is
2   keeping your eye on the ball. You are instructed to go out and hit
3   tennis balls, keeping your eye on the ball the way he tells you to
4   do it. Are you suggesting that would be infringement of Mr.
5   McEnroe's book?
6       MR. HOFFMAN: The one chapter probably not.
7       THE COURT: That's just the first week. The second week
8   we're going to read Mr. McEnroe's second chapter and that will be,
9   get your racquet back. So you go back and practice getting the
10  racquet back, in the ready position, you go back out and hit a
11  hundred tennis balls but you concentrate on getting your racquet
12  back.
13      You come back and the next week is foot work, get in
14  position. Course outline says, referring to McEnroe's book, how to
15  get your feet positioned and has you go through that book.
16      He goes through those ten steps in ten weeks. You refer to
17  them in your syllabus. You do Bollettieri's book and maybe
18  something else, plus whatever else beginning tennis players do.
19      Are you suggesting that is infringement of McEnroe's book?
20  You are referring to it in your title, McEnroe, Keep Your Eye on the
21  Ball, chapter number one.
22      You talk in your outline about what Mr. McEnroe says about
23  keeping your eye on the ball and whatever the subject is each week
24  thereafter. Is that infringement?
25      MR. HOFFMAN: Yes, I believe that would be infringement. It

20

1   might be a fair use, I don't believe so based upon what you said,
2   but it might be fair use.
3       THE COURT: Let me ask Mr. Meek, the number one attorney,
4   not necessarily the best lawyer but you are the one that basically
5   has been carrying the ball, what I have just outlined, is that
6   infringement?
7       MR. MEEKS: No.
8       THE COURT: I gave an example of the use of Mr. McEnroe's
9   book, how that was used by Mr. Bollettieri in his tennis 101 course.
10      Let's assume in this case, worse case scenario for your
11  client, let's say they took verbatim from the Book the outline for
12  their course of study.
13      Let's say you take the Book and rather than assigning the
14  Book, you take page after page and make it part of the syllabus.
15  Can you do that? I'm not saying you did, but can you do that?
16      MR. MEEKS: Can't do that. It would then be substantially
17  similar to the original book. That would be copyright infringement.
18      THE COURT: In this case you refer to the book. In my
19  example Mr. Bollettieri assigned the book for reading, referred to
20  the various chapters and had the person use that book to go through
21  the various steps to learn how to play tennis.
22      I used that example because it's not in a traditional
23  educational setting. To me the concept is kind of difficult to
24  accept, that that is infringement. In thinking about this it seems
25  to me this case should first be resolved on an analysis of fair use.

21

1  That to me is a pretty straightforward relatively simple analysis.
2  Why shouldn't the Court go directly to that? Let's assume for the
3  purposes of fair use analysis there is some, not a whole lot, but
4  some infringement.
5      Maybe it's because of what Mr. Hoffman said, the
6  compilation and organization, the structure, maybe because some
7  passages are so similar it would be considered to be infringement.
8      Doesn't it make sense to deal with the issue of fair use,
9  get that out of the way first? The more I think about it the more I
10 think that is the way we should handle it.
11     MR. MEEKS: There are a lot of reasons I would not
12 recommend the Court do that. You could of course and we would win
13 anyway. I don't think you get to fair use.
14     What they are talking about is compilation -- this is in
15 their combined opposition to the WISE papers. They say they have in
16 the BLS book a compilation and that compilation is protected, even
17 though we have not taken the whole thing the work as a whole is
18 protected.
19     I think you first have to look at whether you get to fair
20 use on a compilation theory. Clearly you don't on their other
21 theories --
22     THE COURT: I agree with that. You look at most of the
23 opinions, they go through an analysis of whether there's
24 infringement. If they find infringement they obviously then go to
25 fair use. Sometimes they find no infringement, they still go to

22

1  fair use, they say we will give you the suspenders to the belt. So,
2  even if the Court is wrong on infringement if there is infringement
3  I find there's fair use.
4      There are numerous categories that the defendants raise to
5  show there's not infringement. I note in your papers after you go
6  through the analysis you say most of the items -- I can't remember
7  whether you say are not protectable or if you say most of them are
8  not protectable and/or similar.
9      That requires almost an item by item analysis. Which
10 obviously you spent a lot of time, Mr. Levin has spent a lot of time
11 doing that. I have gone through quite a bit of it as well.
12     I have not read every single example you have given in this
13 Exhibit Twelve, which is a mammoth piece of work. Obviously a lot
14 of time and effort went into it.
15     I went through at least 50 percent of it. I went through
16 most of Mr. Levin's affidavit and attachments, particularly nine
17 through twelve and I see what you have done.
18     But then I went further and started looking at the fair use
19 law and I started analyzing what this case appears to be. Seems to
20 me this is a fairly clear cut case of fair use.
21     To me it's not a close question, Mr. Hoffman. When you go
22 through the four factors that the Courts and statutes say -- plus I
23 think at least one other factor, since those four factors are not
24 exclusive.
25

23

1  MR. MEEKS: Your Honor asked is it appropriate to go to
2  fair use first. I think if that's the most efficient way to do it
3  then the defendant's would not have a problem with that procedure.
4      However, I would not want to relinquish our argument there
5  is no infringement. I think we have shown that ideas are not
6  copyrightable, individual work are not, tables of contents are not.
7      THE COURT: You have about four or five different
8  categories. You have painstakingly done that I know because I have
9  painstakingly reviewed that.
10     Mr. Hoffman said in response to one of my questions, well,
11 Judge that is infringement, it may be fair use but in my view it's
12 infringement.
13     Which then triggered what has been actually in the front of
14 my mind the past couple days in reviewing these materials. As I
15 said, I think the case will turn on fair use.
16     Certainly in my view I think the defendants have by far the
17 better argument on fair use. I have considered each of the four
18 factors, maybe one that does not fall within those four generally
19 considered factors, and have come to a preliminary determination
20 that there is fair use here.
21     If there's not fair use there is a lot more infringing
22 going on out there than one would anticipate in the world.
23     It strikes me as a very efficient way to handle this. It
24 takes care of infringement. You are not giving up the issue. I
25 think most of what the defendant says with regard to infringement is

24

1  true, there are a number of items that fall into the categories that
2  defendants have put together that show it's not original, that it's
3  diminimus, it's not copying, etcetera.
4      There is I think a fairly good argument that plaintiff
5  makes about the way it's been organized and put together, these
6  unoriginal salesmen tricks of the trade, so to speak, principles
7  that have been proffered by Mr. Dane as the way to close a sale.
8      I don't think he was the first person to come up with some
9  of these ideas. You don't irritate your customer, those of course
10 are my words, there is some discussion, but don't tell him he
11 doesn't know what he's talking about.
12     Some of these principals, I think it's been admitted by Mr.
13 Letterese, were adopted by Mr. Dane from other sources.
14     However, there are cases out there that seem to protect the
15 selection and arrangement of such preexisting concepts. I think
16 plaintiff can make the argument it's not the originality but it's
17 the gathering together, the culling out and the organizing of those
18 preexisting concepts that make this copyrightable.
19     I am not sure I buy into that but I think that's probably
20 the plaintiff's strongest argument. Even if that is the case, Mr.
21 Cook and I have discussed this, every time I go through another
22 three or four cases and look at these materials I keep saying, why
23 not go right to fair use?
24     Mr. Hoffman, you have my thinking, which is not
25 particularly optimistic from your perspective, why not go directly

25

1  to fair use and resolve this case? That eliminates category by
2  category discussion.
3      MR. HOFFMAN: I don't have a problem going to fair use, to
4  consider that first.
5      THE COURT: All right.
6      MR. HOFFMAN: Fair use takes into account a number of
7  things. The first thing it takes into account is whether it's --
8      THE COURT: Let me stop you a minute. Mr. Meeks, you don't
9  have a problem going directly to fair use?
10     MR. MEEKS: No, sir, I think it makes sense.
11     THE COURT: For the other defendants?
12     MR. NACHWALTER: No, sir.
13     MR. MEEKS: It's our affirmative defense. I don't know who
14  you want to go first?
15     THE COURT: Before you begin, I think we all agree there
16  are four factors. Everyone has at least one case that has that list.
17  In addition to that I have what I consider to be maybe even a fifth
18  factor. It may be subsumed in one of the four.
19     Here we have a history of the Scientology entities using
20  Dane's book going back to 74, 81, whatever the date was and no
21  argument was made or no complaint was made.
22     Seems to me that is a factor the Court should consider as
23  well. If the author of the book for ten, fifteen, twenty years knew
24  that his book was being used and touted, he was given credit for his
25  book being used, there's no question about that, and then the

26

1  plaintiff comes along and purchases those rights upon Mr. Dane's
2  passing and continues -- knows about the prior use by the
3  Scientology entities and then allows it to continue a while and then
4  in 2004 files this lawsuit, does that factor into fair use?
5      MR. MEEKS: It factors into fair use, yes. Arguably it
6  could go to nature of the use, that factor.
7      Perhaps I should let Mr. Hoffman go first, that way I can
8  respond to the argument they put forward.
9      THE COURT: Let's do that.
10     Mr. Hoffman, let's go down the list of factors. Let's
11  start with the first one, the purpose and character.
12     MR. HOFFMAN: The purpose and character, is it commercial
13  or non commercial is an important aspect of the first factor. The
14  Sony case, United States Supreme Court case, specifically says
15  commercial use is a very important factor as to whether or not
16  something is a fair use.
17     Here we have a commercial use. The use is to finance --
18  number one, it teaches staff how to sell so the Church can raise
19  funds. And number two, it's a commercial use because the course in
20  some versions is taught to the public to directly raise funds.
21     Because the defendants are all non profit and because the
22  defendants are all related to this religious organization the Court
23  may be inclined -- the defendants I believe certainly argue that
24  means it's more of a fair use or that factor tips towards fair use.
25  It does not.

27

1      The case of the Worldwide Church of God versus Philadelphia
2  Church of God is a Ninth Circuit case that specifically held --
3      THE COURT: Is that one of the new cases you presented in
4  affidavit form?
5      MR. HOFFMAN: Yes.
6      THE COURT: All right. I did not recognize that case.
7      MR. HOFFMAN: That case specifically held a non profit
8  religious group's Church of allegedly infringing material in
9  determining fair use was a commercial or profitable use because the
10  group grew in size after it used the materials.
11     So you don't necessarily even need to make money. You don't
12  necessarily need to do other things. The group grew in size because
13  of that. That's a value of the materials that is in essence what
14  the materials brought to the Church.
15     THE COURT: What was the factual situation there?
16     MR. HOFFMAN: Some religious publishings as in this case --
17     THE COURT: Seems like our whole world is based on sales of
18  some kind, including saving souls apparently.
19     MR. HOFFMAN: Also what we have here is a use that is very
20  similar to the use that the materials were originally made for,
21  which is teaching sales.
22     It's not a use saying Les Dane says that, but we don't
23  think it's the right thing to do this or Les Dane is an example of
24  what was thought of in the seventies or eighties about selling,
25  let's look at some other examples of selling.

28

1      This use is what the materials were intended to be used
2  for. The defendants say, Les Dane gave seminars about this, so the
3  use is exactly the same or very close to the same use that the Book
4  was made for. That's what the cases talk about when they talk about
5  transformative use --
6      THE COURT: Is this a transformative use? The defendants
7  say you acknowledge it's a transformative use.
8      MR. HOFFMAN: If it's transformative it's a very small
9  change from the use. There are two types of transformative uses.
10     When you talk about whether something is a derivative work
11  the course and the materials are a derivative work. Then there's
12  transformative in the use of fair use, are you putting the materials
13  to a different use than what they were originally for.
14     Here the use is very similar in the use -- it's for
15  teaching sales skills. The difference is they have transformed it
16  from a book into a course. I see that as a small difference.
17     THE COURT: Is that a productive use, the way the
18  Scientology people use it?
19     MR. HOFFMAN: I am not sure what you mean.
20     THE COURT: The course says a productive use is one that
21  results in some added benefit to the public beyond that produced by
22  the first authorized work.
23     So by incorporating the Book into the drills or wherever
24  else you talk about it does that add to the benefit to the public?
25  In other words, because a lot of this is public policy and by

29

1   adopting the Book into a course and making that available to other
2   people does that make it a productive use?
3       MR. HOFFMAN: I don't think it's a productive use in the --
4   the productive use of the fair use is really a critical use of what
5   I would call a more general educational use, not the specifics of
6   learning how to sell but in terms of a comparison of style, how
7   sales changed over time, something of that nature.
8       When you change the way the materials are used a lot then
9   you can get a more productive use in a societal sense. If you don't
10  change it very much you don't get much of a productive change in a
11  societal sense.
12      THE COURT: As I understand it, tell me if I am wrong, the
13  Book is not being actively published and sold.
14      MR. HOFFMAN: For purposes of this case we have stipulated
15  to that.
16      THE COURT: Okay.
17      MR. HOFFMAN: The Book in its exact form.
18      THE COURT: More than that, we will get to that, more than
19  that, this has not been a book actively marketed in the past years,
20  correct?
21      MR. HOFFMAN: Yes, as the Book is.
22      THE COURT: Wouldn't any dissemination of the concepts in
23  the book to the public, or in this case kind of a limited public,
24  that is those people associated with Scientology entities, wouldn't
25  that be productive use of the book then?

30

1       MR. HOFFMAN: No.
2       THE COURT: Seems like anything would be somewhat more
3   productive --
4       MR. HOFFMAN: In the general sense, not in the fair use.
5   The case law says the author has the right to put it out there or a
6   right to keep it to themselves.
7       THE COURT: That's normally in the context of published
8   versus non published. The author can decide when and if he or she
9   wants to publish.
10      Obviously if it's not published then it favors non fair
11  use. If it's published it tends towards the fair use determination.
12      This has been published so it falls under the category, I
13  would think, which slightly favors fair use.
14      MR. HOFFMAN: The author has the right to put it out there.
15  The copyright holder has the right to pull it back. To me this would
16  cut against fair use as putting it out there more than the copyright
17  holder who wants to pull it back.
18      THE COURT: I did not mean to shift into published and non
19  published. I am referring to product use, does it add to the
20  public's benefit.
21      MR. HOFFMAN: I would have to say no because the change in
22  the use of the materials is very small. It's not a change in the
23  sense of a use in terms of a different type of use a contract, A
24  critical use or stylistic use. It's not that kind of change or
25  public benefit.

31

1       For example, if I sell -- the Napster case is an example,
2   which was the Ninth Circuit, where users uploaded music to the
3   Napster site and others came along and download the copy and said
4   the public benefited by the distribution of music. It's the same
5   usage as the copyright holders of the music. The usage was to play
6   the music --
7       THE COURT: We're talking about a different kind of
8   material here. We're not talking about fiction, we're talking about
9   non fiction, that has less protection.
10      Music, in my view, would fall within non fiction. It's
11  more creative than -- pulling together and organizing a number of
12  sales concepts.
13      But by this use it seems you are disseminating -- probably
14  the only way it's being disseminated, these concepts, to the public.
15      I am going to ask Mr. Meeks, or whoever on the defense
16  side wants to address that. Let's talk for a minute about
17  commercial use.
18      MR. HOFFMAN: The Courts are a little bit nervous about
19  giving a total presumption. But the Sony case if you have a
20  commercial use you have to think long and hard about finding that to
21  be a fair use.
22      I think that still runs through the case law. The case law
23  may say we don't see it as implementing a bright line rule. We
24  don't see it as saying well you have to stand on your head to prove
25  it's not a fair use but if you have a commercial use that in and of

32

1   itself should take it to the jury.
2       THE COURT: Let's talk about one of the others, nature of
3   the use. Aren't some of the cases talking about -- kind of goes to
4   the alleged infringer's state of mind or intent where they say if
5   they are trying to avoid paying a license or doing it without the
6   contents, things of that nature.
7       Maybe this is where the years and years of use, of accepted
8   use by Mr. Dane, comes into play. They're not trying to -- the
9   Scientology defendants are not trying to hide the fact this is
10  Dane's work. They are saying, read Dane's book on Big League Sales.
11      So they're attributing to Mr. Dane his work, saying we
12  think you will be a better sales person or better member of the
13  Church by learning these materials. Doesn't that mitigate in favor
14  of fair use?
15      MR. HOFFMAN: Not in this case. The two big reasons --
16  number one, when Les Dane gave an implied license back in the
17  eighties he did not have the full rights. Prentice Hall had those
18  rights, minus anything he gave back.
19      You can't give an implied license if you don't have the
20  rights. Renewal is the most powerful --
21      THE COURT: Let me stop you. Who held the rights during
22  the timeframe he did not have full rights? I didn't quite
23  understand.
24      MR. HOFFMAN: Prentice Hall during that timeframe held the
25  rights until 1987 when they gave Les Dane the cloth rights, which

33

1  are hard cover rights, because they no longer publish in hard cover.
2  Les Dane turned around and gave a license to New Era Publication, a
3  Church entity that publishes overseas.
4      He gave cloth rights to them not for the renewal period but
5  until the end of the period.  Renewal cuts off all rights.  That's
6  the Stewart versus Abend case.  Even if Les Dane had the rights to
7  give to the Church, even if he said, do what you want, renewal in
8  1999 said that's it.
9      THE COURT:  Whoever had the rights didn't do anything for
10  20 years. Isn't there a concept, certainly there is one in trademark
11  cases, that if you know about an infringement on your trademark and
12  you don't do anything about it, you give up certain of your rights.
13      I don't know if that carries over as a principle of law in
14  copyright cases.  But, you see it all the time, lawyers that are
15  constantly monitoring their trademark, sending out letters saying,
16  cease and desist.
17      Many of you sitting in this room have written those
18  letters, saying, you can't use this trademark.  One of the reasons
19  they do it is to stop the infringing, but the other reason is to
20  avoid having -- abandoned is not a good word but allowing it to be a
21  part of the public domain.  Isn't that concept applicable here?
22      MR. HOFFMAN:  That concept as you are describing it, not
23  the concept of latches, it's a concept more -- if you think of a
24  trademark as having a circle, if you let people come into the circle
25  the circle can get smaller over time. That does work in the

34

1  trademark field.  You have to enforce those trademark rights.
2  In the copyright field that's a very different thing, there's a
3  concept of latches.  For that you need to do three things.  For
4  example, you need to send a letter to the defendants saying, knock
5  it off and do nothing for three or four years.
6      You need to have the defendants increase their usage after
7  you send the letter.  They sometimes rely on the fact you have not
8  done anything for three or four years.
9      You obviously need to be aware of the specific
10  infringement.  Also, you have to have the right to stop it.  Mr.
11  Letterese did not have exclusive rights until renewal.
12      THE COURT:  Apparently there are a lot of rights that arise
13  out of the copyright. None of the owners -- during that 20 year
14  period none of those people owning the combined bundle of rights did
15  anything.
16      MR. HOFFMAN:  Prentice Hall did not know.  There was no
17  indication that Mr. Hall knew. I have seen correspondence from the
18  defendant Bridge.  Maryland Pasani wrote to Prentice Hall in 94 or
19  95. That was put in our many affidavits.
20      She was asking about whether this might conflict with work
21  book rights Peter Letterese had at that point in time.
22      They sent Prentice Hall a proposed agreement that excluded
23  seminars and lectures.  Prentice Hall could not enter into it.  They
24  did not have all the rights at that point in time either. At the
25  renewal that is where you find the evidence in the record where the

35

1  defendants have gone to the Dane family in 2001, 2002 and 2003 to
2  get rights.  They never came to Mr. Letterese.  That started the
3  inquiry after renewal because that is when he had the ability to
4  sue.  He inquired after renewal.
5      We got into a very kind of slow negotiation that culminated
6  in the February 2004 letter.
7      THE COURT:  The bottomline is Mr. Dane, who had some rights
8  and based on what I think the record shows, knew about this and
9  basically supported the use of his book in these course materials.
10      Then for a period of time Mr. Letterese was aware of it and
11  did nothing and presumably was supportive of the use. The reason I
12  raise this -- some of the cases talk about this -- is the propriety
13  of the use.
14      I don't know if it's said it's done in good faith or not,
15  something along those lines. Seems to me for 20 years or so the
16  propriety of use was certainly not challenged.
17      MR. HOFFMAN:  It does not look like that, from their
18  writing to Prentice Hall and to the Dane family in trying to get the
19  rights from the Dane people in 2001 and 2003.
20      I think they recognized the Church is -- Mr. Hubbard has a
21  significant number of writings, so the Church understands copyright.
22  They understood at renewal all the rights went to Peter Letterese.
23      They did not write him because they made him leave the
24  Church.  They knew he had the rights after renewal, and what they did
25  is tried to go behind his back.

36

1      To me that's a factor that is against fair use, it's bad
2  faith. I recognize Your Honor is reluctant because of the amount of
3  time and because Les Dane was loathe to try to upset the status quo.
4      I think Courts uniformly look at the status quo and they
5  don't want to upset it. If you look at the Stewart versus Abend
6  case, someone had a contract, they had rights, it caused a
7  tremendous amount of money to put together a movie and at renewal
8  they had to start.
9      That's what the case is about, bringing the rights back to
10  the heirs and here the heirs have given the rights to Mr. Letterese
11  to pursue.
12      THE COURT:  Let me hear from the defendants on the first
13  factor, the purpose and character of the use. Obviously the one I
14  think creates the most problem for the defendants, whether it's
15  commercial use, that's an important facet of the first factor.
16      MR. MEEKS:  I don't think the use is commercial, first of
17  all. Even if it were, in the Sony versus Universal case they say you
18  have to prove that the use is harmful or if the use became wide
19  spread it would adversely affect the potential for the copyright
20  work that's their market.  They don't have a market.  They have
21  already stipulated to that.
22      There's another case that follows Sony, that is the 2 Live
23  Crew case. It discusses the Sony case. They say the fact that a use
24  may be commercial does not mean the first factor of fair use cannot
25  be satisfied.

**37**

1     They found that the Court of Appeals in that case had erred
2 in giving virtually dispositive weight to the commercial nature of
3 parody, which was a rap song parody of the old Roy Orbison song,
4 Pretty Woman.
5     They say you can't presume every commercial use is wrong.
6 The Supreme Court said in the Campbell case the work's commercial
7 nature is only one element of the inquiry --
8     THE COURT: Let me stop you there. Let me ask you, is it
9 transformative or not?
10     MR. MEEKS: It is.
11     THE COURT: Tell me why.
12     MR. MEEKS: Because the courses given adds something new
13 for the further purpose --
14     THE COURT: Now you are talking about what the standard is.
15 Tell me how it does that.
16     MR. MEEKS: There are drills and concepts. We have sort of
17 gone over the basic explanation. There is no teacher. There's a
18 check sheet, the Book, you work your way through it.
19     When you get to a drill you get a coach or partner and the
20 person running the room, and I have not seen this it was explained
21 to me, then appoints someone as the person that you drill on the
22 exercises.
23     It's a way of putting into practice the concept in the Big
24 League Sales book. So it's transformative in that sense. It's a
25 better way of learning the concepts than reading it.

**38**

1     It is transformative. It does not supplant the words in the
2 book, which is the key of whether it transforms or supplants it. The
3 more transformative something is the less -- the more that weighs in
4 favor of a finding of fair use.
5     THE COURT: This has been kind of bothering me. For a long
6 time I did not look at the substance. I was dealing with all these
7 other matters. I finally got around to looking at the substance of
8 it.
9     What struck me is this is pretty typical of the way you
10 teach a course, where someone is assigned the course study,
11 someone's book, you use that as a basis for the continuing study.
12     Why aren't their many decisions saying whether this is or
13 is not fair use? Seems to me there would be decisions out there.
14     MR. MEEKS: There's no need to. It's obvious.
15     THE COURT: I'm sure somewhere along the line before this
16 someone did something similar to this. There must be some similar
17 cases.
18     MR. MEEKS: There's a line of cases involving answers to
19 questions in text books.
20     THE COURT: That's a little different. The Penelope case is
21 fairly close.
22     MR. MEEKS: I don't know that one.
23     THE COURT: I'm sorry, that's one of the ones we came up
24 with. Penelope versus Brown 792 Fed Supp 132. I suggest you look at
25 the case. I found it relatively close.

**39**

1     MR. MEEKS: If I could give Your Honor an example. My son
2 goes to school at a private school in Coconut Grove. I pay that
3 school, they give him a syllabus, they give him a textbook, they say
4 read these chapters, do these exercises.
5     They go through the books. The textbook author does not
6 have a claim. This year they're reading the Hound of Baskerville.
7 He has a whole outline that goes through and follows the
8 organization of the Hound of Baskerville. They have to write an
9 essay.
10     I pay that school money, far too much I might add, to get
11 that training. It's not commercial use, it's not an unremarkable
12 use, it's a use protected as fair use.
13     THE COURT: As I said, I am surprised there are not a
14 number of cases right on point.
15     MR. MEEKS: I know of one. I know why there's such a
16 fundamental difference between the parties. This is not so much
17 particular to fair use, it's as to what a copyright is.
18     They think a copyright is a patent. They think they have
19 the right to restrict the use of this book, which is legally
20 published. They have the right to protect the copying of the
21 expression in the book.
22     That's the fundamental misconception giving rise to this
23 case. That's why you don't see many cases because most people
24 recognize this.
25     THE COURT: Let's go to the nature of the copyright work,

**40**

1 unless you want to respond to any particular point.
2     MR. HOFFMAN: Mr. Meeks made the point that we don't
3 commercialize and the commercial factor of number one does not
4 apply.
5     If you accept for purposes of the case -- we won't talk
6 about what we do -- you have to treat us for fair use the same way,
7 that, hey, we are unpublished.
8     We don't sell this thing, we are unpublished. If you are
9 an unpublished work it's very hard to get fair use. So we have to
10 be treated consistently.
11     If we're going to be treated that way for factor number
12 four and somehow it affects factor number one then we're
13 unpublished, you have to treated it as an unpublished work.
14     THE COURT: Your view is even though it was published at
15 one time and there are copies floating around -- I assume if I went
16 down to the Coral Gables library I could check out a copy.
17     MR. HOFFMAN: We treat it as the copyright holder making
18 the decision not to publish any more.
19     THE COURT: That's like closing the barn door. It's now in
20 the public domain.
21     MR. HOFFMAN: It's the copyright holder's right -- the
22 derivative works are the copyright holder's rights.
23     Maybe it was a mistake to go to fair use first.
24     THE COURT: Do you have any authority for that? I have not
25 seen anything close to that. What I've seen says it's either

41

1  published, printed, sold or disseminated or the author kept it --
2  the writer decided to put it out in the public domain. I see that
3  distinction very clearly.
4      I don't see where you can produce it and sell it for ten
5  years and because the market is not there and for whatever reason
6  you can't continue to publish it how that can take it back to when
7  it was unpublished.
8      MR. HOFFMAN:  In the mythical world of the stipulation of
9  this case we're treated as if we did not do anything.
10     The case law that talks about whether you are published or
11 unpublished talks about what the authors wanted.  If the author
12 wants to stop the derivative works or if the author wants to stop
13 publishing they can do that as well.
14     THE COURT:  The stipulation I thought had to do with if
15 there had been or there is a market. It seems to me this is a
16 published book -- you agree this is not a fiction?
17     MR. HOFFMAN:  We agree it's not a fiction.
18     THE COURT:  It's not math or some scientific story but it's
19 not fiction, so it falls on the non fiction side.
20     MR. HOFFMAN:  It's closer to the middle but on the non
21 fiction side.
22     THE COURT:  This book is probably going to get more
23 notoriety, more dissemination, more use.  It will contribute more by
24 virtue of the fact it's part of the syllabus.  Otherwise it's like a
25 tree that falls in the forest that no one hears.

42

1      MR. HOFFMAN:  That would be fine if we had a license and
2  they renumerated the copyright holder.  That's not the case here.
3      The nature of the work, if you look at the second factor,
4  if it's a textbook it's specifically made -- there's almost an
5  implied license by making a textbook that it will be used in course
6  work.  That's what the textbook holder hopes.  It would be used in a
7  course so they can sell it.  This is a different situation.
8      THE COURT:  Why is it different?  If there's a big demand
9  among the Scientologists for the book and there are only so many
10 books they have been able to purchase in the past because they can't
11 go down to Barnes and Noble and get a copy, that's your market, that
12 increases your client's ability to create a market.
13     MR. HOFFMAN:  The client has a better market by virtue of
14 the book and selling the consulting and services surrounding that
15 book.  So the teaching of a course around that book -- we have not
16 claimed they're competitive, so I won't go down that road.
17     The point is with the textbooks, by virtue of making it a
18 textbook, you understand it will be used in a book.  I don't think
19 there's anyone that can say Les Dane allowed this book to be used in
20 a course.  What he intended was to write the Book and that people
21 would go out and buy it in the stores.  That's probably what he
22 intended.
23     THE COURT:  I am not sure I agree with that.  Any
24 reasonable person who is proud of a book and wants it to be well
25 known, well read and well renown would give almost anything to have

43

1  it made part of a curriculum. I can't imagine anyone that would not
2  want that.
3      MR. HOFFMAN:  That is in a school setting. If you are a
4  professor in a school setting and you take a book, the nature of the
5  use is you use it in your classroom and you create a curriculum for
6  your classroom.  You don't sell that to your students in class
7  normally.
8      Here we have the Church entity selling it and licensing it
9  to hundreds and thousands of entities, selling check sheets,
10 sometimes reselling the Book, selling the course.
11     The course has a value assigned to it.  So the staff makes
12 a commitment as to how long they were going to work for the Church.
13 They sign a promissory note for the value of the course, some for a
14 thousand dollars, some for five thousand --
15     THE COURT:  Let me stop you there.  Isn't this book just --
16 you say it's over a thousand dollars.  The Book isn't sold for a
17 thousand dollars.  The course is being sold for a thousand dollars
18 and the book is a part of the course --
19     MR. HOFFMAN:  Without the Book the professional
20 registration course would be nothing, the WISE sales course would be
21 nothing.  It's all about the Book.  If they want to use the other
22 half they claim are the materials and not use the Book, that's fine.
23     If they wanted to use one chapter we don't have a problem
24 with that.  If they want to use ten books and discuss one or two
25 concepts from Mr. Dane's books that's fine.  They have taken the

44

1  Book and put it into the course.  They are profiting off of Les
2  Dane's work in a way that is a derivative work.  That's very
3  different from saying, here, read this and let's just discuss
4  chapter one or half of it and let's discuss chapter one from a
5  different book.
6      THE COURT:  We have put the fair use cart in front of the
7  horse so to speak.  I don't think I can agree with your concept that
8  they have taken the whole book.
9      I think in general the defendants are correct, there's
10 little if any actual infringement, when you go through the analysis.
11     When you say they have taken our book, I don't think they
12 have done that.  In the course materials they have taken the Book as
13 something for a student to read.  I don't think they have taken and
14 copied it is my point.
15     Part of the copyright claim is you have to own a copyright
16 and you have to show it was copied.  I don't think you have shown it
17 was copied, except maybe diminimusly.
18     Let's move forward.  I would like to hear from the
19 defendants on the nature of the copyrighted work.
20     MR. MEEKS:  I don't think there's a tremendous amount to
21 say.  It's not a work of fiction.  While it's not purely factual
22 it's not as creative as a novel, which entitles it to a lesser
23 degree of protection.
24     We cited the new Ness case for that proposition.  They have
25 admitted it's a published non fiction work and Les Dane took some

45

1  techniques from others and some of the items are therefore
2  unoriginal. That's in their disputed facts pages four to six and
3  eight. That's an admission which we're relying on as well. The Dane
4  book was intended as a how to book about selling. It's a training
5  book. That's fair use. The concepts and ideas are not copyrightable.
6        THE COURT: It's not as nebulous as some of the other
7  concepts. Let's go to the third factor, amount and substantiality
8  of the portions used in relation to the copyrighted work as a whole.
9        MR. HOFFMAN: I think that, with all due respect, I think
10  Your Honor has a misconception of what copying can be. Copying does
11  not necessarily have to be photocopying or copying the words.
12        You have the Seinfeld case where facts about the series,
13  things that happened, were copied. In fact, they were answers to
14  questions. The questions themselves were not a copy of anything,
15  the answers were.
16        That's part of the problem here and why we may need to
17  address infringement. Because unless you concede that 50 percent of
18  the book is taken, 50 percent of the selection and/or arrangement is
19  taken, you will look at the amount of copying as very small and that
20  will affect the fair use decision.
21        If you look at the infringement and say, it's half the
22  Book, in terms of the selection and arrangement then the fair use
23  analysis is very different. On the third factor this weighs heavily
24  for us because they have taken 50 percent of the book.
25

46

1        They want to teach in a course and say we have had it for
2  20 years, but they have an expert opinion that says the Book is
3  outdated, it will hurt your selling if you continue to use it.
4        So the reality of the matter is that the defendants really
5  do want to use the Book. They really don't think there's a
6  substitute for it. That's why they have taken 50 percent of the
7  selection and arrangement of the book.
8        THE COURT: In some respects I agree we have to talk a
9  little bit about whether some or all of it is infringed. Looking at
10  exhibit nine to the third affidavit of Neil Levin.
11        This is the professional registration course, which is one
12  of the items you say infringes. This strikes me as nothing out of
13  the ordinary of a syllabus outline. It talks about the books you
14  should read, Mr. Hubbard's book, Big League Sales and Strike It
15  Rich.
16        It goes through a number of assignments and has Big League
17  Sales. It instructs students to read chapters in the book, has
18  practical skills. It says for example, the brick overcoat
19  resistance of sales.
20        Is it your view that is a copying from the Book?
21        MR. HOFFMAN: Yes, it is. Because it says, brick overcoat
22  of resistance. That's close paraphrase.
23        THE COURT: Then underneath there demo, Scaredy Cat, and
24  how to close it. Scaredy Cat and legitimate objection are phrases
25  that come from the Book. They're sub-titles I believe.

47

1        MR. HOFFMAN: Yes, sir.
2        THE COURT: How would you not use this kind of terminology
3  if your program is having your students read the Book and then
4  discuss concepts of the Book.
5        Let's go to my silly example of Tennis 101. How could you
6  ever have a discussion about the principals in John McEnroe's book
7  without saying keep your eye on the ball? How could you teach the
8  course without using the chapter titles or some phrase to draw
9  attention to it?
10        MR. HOFFMAN: You would have to refer to something if you
11  are teaching a course.
12        THE COURT: How would you put it together and not?
13        MR. HOFFMAN: How would I put it together? I would take
14  one or two chapters and one or two concepts from each chapter.
15        THE COURT: Would that not then be infringing on the
16  copyright?
17        MR. HOFFMAN: That would be on the selection and
18  arrangement. If we have two sub-chapters or three sub-chapters out
19  of a hundred sub chapters that would be the two or three percent
20  that the cases are talking about.
21        THE COURT: You are not making your own product the
22  arrangement as you do in the directory cases and some of the other
23  cases where they talk about organization being creative enough to
24  get copyright protection. What you are doing is saying -- you are
25  attributing to Dane these concepts, Scaredy Cat and how you overcome

48

1  the Scaredy Cat, and you put it down in the syllabus, Scaredy Cat,
2  that's part of the drills. And you work through how you overcome
3  the Scaredy Cat.
4        It would be different if they were writing a book and
5  adopting for purposes of the book as their own, but they are not,
6  they are mentioning them as part of the drill, which is part of the
7  bigger course outline.
8        MR. HOFFMAN: They have taken his selection. They have
9  said, you have a lot of it right, we're taking 50 percent of the
10  selection and we're going to take your arrangement minus the fifty
11  percent but we're going to take your arrangement in the order you
12  did it.
13        THE COURT: That's where I have a fundamental problem with
14  your general focus of the case. I don't think they're copying it in
15  the sense that copyright law contemplates copying. I think they're
16  referring to it out of the book.
17        MR. HOFFMAN: That's part of where you have to look at the
18  infringement being the organization. They have organized their
19  class in the same way the Book has. They have organized facts and
20  concepts in the same way the Book has.
21        THE COURT: If that's all you have to do in your outline of
22  the course, all you have to show is you have gone through the course
23  outline, you have listed all the chapters of Mr. McEnroe's book in
24  my example, if that's copyright infringement -- I just don't think
25  that is what the cases are talking about.

---

49

1   MR. HOFFMAN: I think if Mr. McEnroe knew that he would
2   have a problem with that.
3   I think if you wanted to refer to a chapter then you would
4   use a chapter title. But here you have half the chapters, you have
5   half the sub-chapters -- you have all the chapters, you have half
6   the sub-chapters. So you have a substantial taking. You have the
7   course organized around it.
8   THE COURT: Let me hear from the defendants.
9   MR. MEEKS: You will never get their on fair use. If I can
10  hand it up.
11  THE COURT: All right.
12  MR. MEEKS: Mere listing of ingredients or table of
13  contents are not subject to copyright. This is the kind of thing
14  the copyright Act does not protect. It does not protect words and
15  short phrases or ideas.
16  What a lot of these cases have done, they have applied
17  the copyright act as a filter to the material --
18  THE COURT: Let me stop you. I am looking at this. Where
19  does it say table of contents?
20  MR. MEEKS: Mere listing of ingredients or contents --
21  THE COURT: Is that table of contents?
22  MR. MEEKS: I think so.
23  THE COURT: Listing of ingredients could be something you
24  would find on a can of soup.
25  MR. MEEKS: Listing of contents you would find on the cover

---

50

1   of Mr. Dane's books. Every syllabus in the world does what these
2   courses do.
3   THE COURT: I can't keep that out of my mind. It strikes
4   me so fundamental here.
5   All right. We have been going at this for quite a while.
6   Let's take about a ten minute break.
7   RECESS TAKEN
8   THE COURT: Please be seated. I would like to finish with
9   fair use, which the Courts say is the most important of the four.
10  We'll talk a little about infringement and a little bit about
11  contributory infringement.
12  Mr. Hoffman, if you would like to address the fourth and
13  final factor.
14  MR. HOFFMAN: The fourth factor, the value of the copyright
15  or the affect on the potential market, that has to do with
16  traditionally looking at the defendants usage and basically saying
17  is this something that the plaintiff could have -- even though we
18  have stipulated we're not going to commercialize, we have to look at
19  the defendants' actions.
20  They license, they teach staff this. They have eight or
21  nine courses, at least that we have identified. There may be more.
22  They have licensed the WISE side. WISE teaches through the Hubbard
23  College of Administration Courses. It also licenses what they call
24  WISE consultants. They have 150, according to their website.
25  The WISE consultants can teach courses such as the WISE sales

---

51

1   course. There are WISE members, hundreds if not thousands, that then
2   can take the course and use it for their staff. On the Church staff
3   there are several hundred missions.
4   There are approximately a hundred Churches of Scientology.
5   The Churches of Scientology can teach the courses. The missions
6   have their staff go take the courses to learn how to sell.
7   Every organization in the Church and every mission is to
8   have a book seller or a registrar, the person that signs up the
9   public or signs up the parishioners, to take courses.
10  THE COURT: So this is used to do what, to get new people
11  to join the Church?
12  MR. HOFFMAN: To take the course, to train on the
13  materials.
14  THE COURT: Even though they are not going to be
15  Scientologists?
16  MR. HOFFMAN: This is for the staff, not talking about the
17  public, training the staff on Big League Sales.
18  THE COURT: I thought one of the memos said they were
19  selling not only to the Church members but to others?
20  MR. HOFFMAN: They sell to others, the public, that could
21  then -- they may become a parishioner at the time they take the
22  first course or they may already be a parishioner.
23  I believe once the Church uses the term public -- at least
24  when I am using it that's what I mean. Staff is something separate.
25  Staff is someone that has a contract with their Church or mission to

---

52

1   work for them just as an employee.
2   THE COURT: Is that an attempt to bring people into the
3   Church and part of the indoctrination is the course or could they
4   sell it to you or to me just because I may want to be a better sales
5   person?
6   MR. HOFFMAN: I think it is both of those things. Probably
7   more -- certainly with WISE it's more number two. One of WISE's
8   purposes is to get people to buy courses and then talk to them about
9   Scientology and sign them up for Scientology.
10  They're both goals. It's hard to say which one would be
11  primary. At any given time the sales course is not necessarily the
12  first thing you would get to do. You may try to get them to do
13  something a little more general about Scientology.
14  THE COURT: Let me ask Mr. Meeks or someone on the defense
15  side to comment.
16  MR. HOFFMAN: They can. My major point here is that every
17  organization, according to the founder and the Church policies, is
18  supposed to use the -- take the sales course and use it to help
19  bring parishioners in and use it to help sell books and other
20  courses.
21  And it's licensed out by the CST organization to all of the
22  organizations. May be licensed directly or licensed through WISE or
23  through the Church of Scientology International.
24  THE COURT: Does that adversely affect your client in any
25  way?

53

1    MR. HOFFMAN:  We have stipulated --

2    THE COURT:  So it is not relevant?

3    MR. HOFFMAN:  I don't think it's relevant to the potential

4  market factor. I think that's a factor which is more relevant under

5  number one.

6    Under the potential market, looking at the defendant's

7  usage, their usage is very extensive. They have used it for a long

8  time and raised a lot of money using those techniques for the

9  Church.

10    Conservative estimates would be up to thirty billion

11  dollars. They have not produced the information we have asked for.

12    I know the Court is somewhat moved by what it says with

13  respect to the length of time the Church has used this material, but

14  if it's not that valuable to the Church then it shouldn't be any

15  skin off the apple not to use it.

16    It's a derivative work that belongs to the family and Mr.

17  Letterese as their agent to decide who can and cannot use it.

18    THE COURT:  All right. Mr. Meeks.

19    MR. MEEKS:  If anything the fact this book is used in

20  courses, if they sold it, would only help them, could not hurt them.

21  The point of fair use, number four, is does it deprive them

22  of the market?  It does exactly the opposite. It's not an issue

23  because of the stipulation they made. There's no potential market

24  for any of their material. They have never made a sale, they're

25  never going to make a sale. It's been stipulated out of the case.

54

1    I don't have anything else to add on that unless Your Honor

2  has one question.

3    THE COURT:  Who comprises your market?

4    MR. MEEKS:  It is mainly internal training. There are some

5  WISE members that purchase courses. A lot of the course is L Ron

6  Hubbard material. It's exaggerated that there is this market --

7    THE COURT:  Do you sell to members of the Church?

8    MR. MEEKS:  Both.

9    THE COURT:  Is it sold to people on the street that may

10  want to buy it?

11    MR. MEEKS:  They have book stores -- am I wrong?  I'm

12  checking with co-counsel here. Not to people on the street, Church

13  members that are not staff members.

14    THE COURT:  So it's not sold to non Scientologists?

15    MR. MEEKS:  Correct. That is what the record says.

16    THE COURT:  Mr. Hoffman, do you have any reason to disagree

17  with that or anything in the record?

18    MR. HOFFMAN:  With respect to the WISE consultants and

19  members they don't have to be parishioners, they are not necessarily

20  parishioners but they're associated with the -- one of the

21  Scientology groups. Their consultants can sell it to the public and

22  they do.

23    THE COURT:  Is that in the record?

24    MR. HOFFMAN:  I believe it's in the record, yes.

25    THE COURT:  Where is that in the record?

55

1    MR. HOFFMAN:  That WISE consultants sell to the public?

2    THE COURT:  To someone that is not a parishioner or member

3  of one of the Scientology entities.

4    MR. HOFFMAN:  There is a copy of Sterling Management

5  website and that same affidavit I believe it's discussed consultants

6  sell the course -- that WISE sells to Sterling, Sterling sells to

7  dentists. They sell to CPAs, to a lot of different professions.

8    THE COURT:  It may be irrelevant. Maybe I should not have

9  brought it up. I think it probably is irrelevant because of the

10  stipulation.

11    Let me ask defendants. You could not use this course, as I

12  understand it, by just using the syllabus and using the headings, or

13  whatever you call it, from the Book. You could not teach the

14  course, there is not enough there.

15    MR. MEEKS:  Exactly right.

16    THE COURT:  Mr. Hoffman, would you agree with that?

17    MR. HOFFMAN:  If you taught about the lecture you could,

18  Your Honor.

19    THE COURT:  If you were to say, I am not going to use the

20  Book because I can't find a copy of it, you could not simply read

21  the outline or the syllabus, what I call the syllabus, you could not

22  get the essence of the various sales principles without the book,

23  could you?

24    MR. HOFFMAN:  I think you could get some concepts of

25  reading some of the drills of the outline. Would you get what you

56

1  could get out of the book?  You could not get anywhere near it. That

2  is the point, the course marries the Book and the materials. The

3  materials are dependent upon the Book. It's an adaptation under the

4  guise of derivative work.

5    MR. MEEKS:  If you look at Mr. Drader's third affidavit

6  filed in support of the motions, at paragraph 17 it describes the

7  WISE courses. There are no courses, it's a self directed study.

8  Mr. Levin's third affidavit talks about it.

9    For Church of Scientology International and the other

10  courses it said they must have a copy of BLS to read from and refer

11  to.

12    THE COURT:  I am looking at Exhibit Nine, which is the

13  professional registration course. Section C, Big League Sales.

14  Identifying the Scaredy Cat and how to close him.

15    How would I know how to identify a Scaredy Cat and how to

16  close him by just reading that phrase?  Same with the legitimate

17  objection. How would I know that?

18    MR. HOFFMAN:  You would not know what the Book says. You

19  would know it's how you would deal with someone that is afraid to

20  make a purchase.

21    I am not sure why we're arguing this point. The materials

22  are married to the Book. That's the whole point. This is making

23  more my point of the infringement is the course as well. It's

24  interdependent upon the Book.

25    THE COURT:  What is your best case for that proposition?

57

1    MR. HOFFMAN: Probably the Addison Wesley case. That is a
2 textbook case from the Southern District of New York. It's from
3 1961. There's a textbook used in a course. The book was written by
4 a physics professor. This adaptation that just had drills directed
5 to some of the drills in the book -- or directed to some of the
6 materials in the chapter of the book and that was an infringement.
7    THE COURT: It provided answers?
8    MR. HOFFMAN: It provided answers, yes.
9    THE COURT: I can see how providing the answers and giving
10 a shortcut kind of destroys the aim of the original work. I can see
11 how a university, there was a university and college version
12 depending on difficulty, I could see how they would not want to buy
13 it for their students if the student could go to an off campus book
14 store and buy the answers. That's what the Addison Wesley Company
15 was afraid of.
16    MR. MEEKS: Putting that aside, Your Honor, I think they
17 are bound by the stipulation they made that market is not an issue.
18 Here the Addison Wesley case is a very different case in the final
19 form.
20    The fact the Addison Wesley case addressed a book that was
21 intended for use with a particular book and the Scientology courses
22 are intended for use with a particular book therefore the
23 Scientology sources infringed the BLS book, that's far too tenuous.
24    There are many factual differences between that case and
25 this one. There was a substantial amount of literal copying in that

58

1 case, as the decision shows. It was a very scholarly opinion. The
2 Court made it clear there was substantial copying. We don't have
3 that here.
4    THE COURT: All right. Let's close the door on fair use
5 and give you all some time to talk about infringement. Even if we
6 don't deal with it directly I think we need to deal with it in terms
7 of the third factor.
8    Anything you would like to say on the infringement aspect,
9 which is the horse before the cart?
10    MR. MEEKS: I would like to talk about compilation.
11    THE COURT: He has compilation from time to time but I
12 think he's really talking about organization.
13    MR. MEEKS: Right.
14    THE COURT: Compilation I think is a concept we find in the
15 yellow pages or some kind of directory. I don't think it's really
16 applicable here.
17    I think the argument, even though he does use the term
18 compilation, is there may be some unoriginal concepts but what we
19 have done is we have culled those out, we have organized them, we
20 have presented them in this format and that took at least the
21 minimum creativity that is required to comply with the copyright
22 laws.
23    MR. MEEKS: That's still called a compilation. If you have
24 the best hits of Roy Orbison for example, the publisher has a
25 copyright. The fact they have Pretty Woman and six other songs in a

59

1 particular --
2    THE COURT: Can you name six other Roy Orbison songs?
3    MR. MEEKS: I can't. I should have picked the Beatles.
4    THE COURT: I can so just be careful.
5    MR. MEEKS: A compilation where the copyright extends to
6 the organization. It extends to the order in which things are there
7 and the particular choice of what is there.
8    It does not extend to the underlying pieces. If I published
9 let's say the six best short stories of Edgar Allen Poe, and I could
10 probably name those, I am entitled to my copyright in the
11 compilation as I published it.
12    It's a limited copyright. It's a very limited protection
13 compared to the protection given to the actual owner of the content,
14 the underlying stories or songs that make it up, it's entitled to
15 minimal copyright protection.
16    The argument they are making is a compilation argument. If
17 you look at the Warren publishing case, it makes it clear you only
18 get minimal copyright protection in a compilation.
19    They are relying to some extent on telephone directory
20 cases. The Eleventh Circuit has said telephone directory cases are
21 in a class by themselves.
22    THE COURT: That's not what we're talking about here.
23    MR. MEEKS: But the compilation cases still say the same
24 thing, you get minimal copyright protection because there's minimal
25 creativity involved.

60

1    THE COURT: There's more creativity in the book than there
2 is putting together Roy Orbison top ten hits.
3    MR. MEEKS: Remember, they're not talking about what Les
4 Dane wrote in the book within each of the headings, they're talking
5 about the headings and the order in which he chose to do it, not the
6 actual content.
7    That is just a compilation argument. That's minimally
8 protected. Compilation protection only extends to the work as a
9 whole. We cited the Mytac (phonetic) case, Eleventh Circuit case.
10    We have not copied the whole book. We have done table of
11 contents. We have tracked some of the short words and phrases. You
12 cannot look at the course materials and see the content of the book.
13    There's no infringement unless the works are virtually
14 identical. It's just a ridiculous argument.
15    Selection of topics, selection and arrangement does not
16 help the plaintiff. The topics are not original. The fact of
17 registration alone they are saying gives them the presumption of
18 copyrightability.
19    That's only true of the whole work, not the individual
20 components. It's a rebuttable presumption. We cited the Bateman
21 case, Eleventh Circuit 1996.
22    It's easily rebuttable because we're talking about so much
23 material that is unoriginal, quoted from other people, preexisting
24 in the sales literature, prosaic words, common place expressions.
25 In Bateman the burden shifts back to them to show why it is

61

1  protected to the limited extent of their arrangement. The portions
2  upon which they are making their claim is not protected. That's our
3  argument on that.
4        THE COURT: Mr. Hoffman, do you want to respond briefly on
5  that?
6        MR. HOFFMAN: I think the main issue to me is really that a
7  work can have a number of copyrightable elements. We in no way have
8  ever claimed that any single word, any single title or any single
9  sentence is a protected element in itself.
10       The Book is now called Sales Closing Techniques, Sure Fire
11 Sales Closing Techniques.  When it was originally named it was Big
12 League Sales Closing Techniques.
13       That's what the Book is about.  It's a collection and
14 arrangement of techniques. It spells it out in plain English.
15 That's what the defendants have taken.
16       THE COURT: The techniques are not original.
17       MR. HOFFMAN: It's the selection and the arrangement.
18 That's why I cited the compilation case as an extreme example.  In
19 the phone book case the people's addresses and phone numbers are not
20 original. Alphabetical order is not original. You can have
21 copyrightability in the collection of simple facts and data.
22       THE COURT: Defendants' point is that if you travel that
23 road the level of protection is low.
24       MR. HOFFMAN: If you look at the infringement you are not
25 concerned about the level of protection.  The level of protection

62

1  you have decided by what you are going to compare to, which is
2  selection and/or arrangement.
3        THE COURT: The protection is low because you have to show
4  virtually identical compilations, which would have --
5        MR. HOFFMAN: That again, as Your Honor has noticed, is an
6  extreme case of a compilation. Here we have a compilation of
7  techniques among all of the sales techniques and we have an
8  arrangement. That compilation and arrangement is followed.
9        The ultimate testament to that is the defendants put it in
10 the course so they can teach it in that order and teach fifty
11 percent of the items in that book.
12       The Book -- again, it's the heart of the book. The Book is
13 about techniques. The case law talks about taking the heart. It's
14 straight forward copyright law. We're not waiving any smoking
15 mirrors here. They take the heart of the book and the selection and
16 the arrangement.  They take fifty percent.
17       THE COURT: All right. Let's close the discussion on those
18 items. I don't want to demean anyone by saying they're the
19 peripheral defendants but there are some defendants that are not
20 WISE defendants.
21       Mr. Nachwalter came back here, left his vacation, so let's
22 talk a little bit about those defendants.
23       I don't want to spend a lot of time.  But give me kind of
24 your overview. I have not spent much time on these issues, quite
25 frankly. I have not had the opportunity or the time to do it.

63

1        MR. NACHWALTER: Thank you, Your Honor. I did get in a bit
2  of trouble because I came back on my fortieth anniversary.
3        THE COURT: She's probably going to write me a thank you
4  note.
5        MR. NACHWALTER: One of the things that came out a little
6  bit in the hearing is there is a big difference in what is stated by
7  counsel for the plaintiff and what is in the record.
8        We did not give you anything in our papers that we did not
9  give you a record cite for. We pointed you to affidavits and
10 documentation.
11       There are just so many statements in the plaintiff's
12 statements that are not supported by the record. The Court has to be
13 careful obviously in reading those papers and listening to the
14 presentation as to what is in the record and what is being said.
15       I represent RTC.  The plaintiff has said at least three or
16 four times in the record that RTC gets royalties, that RTC holds the
17 trademark.
18       There is no evidence in the record of that.  In fact, there
19 is deposition testimony that RTC gets no royalties.
20       Our clients RTC and CST are being sued for secondary
21 liability.  There are two theories, either contributory liability or
22 vicarious liability. Contributory liability someone has to know or
23 should have known that the material directly infringes and the
24 defendant had to adduce cause or materially contribute to the
25 infringing conduct.   RTC did not induce, cause or materially

64

1  contribute to any infringement so it cannot be liable for
2  contributory infringement.
3        As to vicarious liability they would have to show that RTC
4  has the right and ability to control the alleged direct infringer's
5  acts and that RTC received a direct financial benefit from the
6  alleged infringement.
7        That is not the case.  The record evidence is quite the
8  contrary.  We have provided Mr. McShane's affidavit where he states
9  that RTC does not own, license or receive any royalties from the
10 alleged infringing course materials.
11       In the Mini Maid case the Eleventh Circuit spoke to this
12 issue and said that a licensor is not responsible for its licensee's
13 alleged infringement of another entity's trademark.
14       THE COURT: I am looking for the Sony case. The case you
15 are now referring to, Mini Maid, is a trademark case.
16       MR. NACHWALTER: Sony versus Universal, is that what you
17 are looking for?
18       THE COURT: Just a second. I found it. I thought there was
19 a statement in the Sony case that said the trademark clause doesn't
20 carry over to copyright.
21       MR. NACHWALTER: I don't think that's true, and I'll tell
22 you why, because these concepts are really compilation concepts. I
23 don't think they're particular to trademark or copyright law.  What
24 they are trying to do is make someone liable for acts of a third
25 party.

65

1   THE COURT: Just a second. Mr. Cook brought this to my
2   attention. I am looking at part of the decision. There's a footnote
3   that says, this is referring to copyright law and trademark law,
4   this is footnote 19, the two areas of law naturally are not
5   identical twins and we exercise the caution which we have expressed
6   in the past in applying doctrine formulated in one area to the
7   others.
8       We have consistently rejected the proposition that a
9   similar kinship exists between copyright law and trademark law and
10  in the process of doing so have recognized the basic similarities
11  between copyright and patents.
12      The same footnote cites McLean versus Fleming. It goes on
13  to say, given the fundamental differences between copyright and
14  trademark law, in this copyright case we do not look to the standard
15  for contributory infringement set forth in Inwood Laboratories,
16  which was crafted for application in trademark cases. They refer to
17  the contributory trademark infringement as a narrow standard.
18      MR. NACHWALTER: You as a trademark holder have a duty to
19  protect your trademark, otherwise you can lose it. So that is the
20  distinction between trademark law and copyright law.
21      If you look at the principle the Eleventh Circuit sets
22  forth you don't need to put it in a trademark context or copyright
23  context, what the Eleventh Circuit is really saying -- it really
24  talks in terms of a franchisor/franchisee. It says that if I have a
25  relationship with you and you go out and violate some third party's

66

1   rights I am not responsible for your acts unless I know about it and
2   I materially am involved in the violation of that third party's
3   rights.
4       THE COURT: Let me stop you there and ask Mr. Hoffman.
5   What is your theory of vicarious or indirect liability and then what
6   is the evidence of that?
7       MR. HOFFMAN: On the vicarious liability, Mr. Levin says
8   that the churches pay a portion of their royalties to the Church of
9   Scientology.
10      THE COURT: Time out. We're talking now about RTC and the
11  other -- CST. What's the evidence as to the RTC and CST defendants?
12      MR. HOFFMAN: With respect to CST, Mr. Levin's deposition
13  where he said royalties go to CST and to RTC. And with respect to
14  CST, CST gains by virtue of -- RTC and CST cooperate together.
15      CST controls the copyright, RTC controls the trademark.
16  They both license and they both listed on some of the same licenses
17  who are enforcing those rights, copyright and trademark. Now CST --
18      THE COURT: That was in an affidavit you filed yesterday or
19  today, I am not sure which. I don't understand how that brings them
20  into the infringement.
21      MR. HOFFMAN: CST in its intellectual property, one of the
22  things it licenses are courses -- the check sheets, the L Ron
23  Hubbard organization executive course volumes. It licenses the very
24  materials that they are accused of infringing.
25      THE COURT: You are saying they have control by virtue of

67

1   licensing --
2       MR. HOFFMAN: Yes.
3       THE COURT: They license that to WISE for example?
4       MR. HOFFMAN: Correct.
5       MR. NACHWALTER: If I might, Your Honor. RTC owns the
6   trademarks. What he is accusing -- the involvement of RTC in this
7   case is as a trademark holder, not a copyright holder. I don't think
8   that the principles of Mini Maid were limited to trademark
9   situations.
10      THE COURT: Time out. Mr. Hoffman said that your clients,
11  at least one of your clients, RTC owns the rights to for example the
12  drill or the check sheets.
13      MR. NACHWALTER: It owns trademarks.
14      THE COURT: Show me in the record where RTC owns the rights
15  to the drill or the course or the check sheets.
16      MR. HOFFMAN: I need a few minutes to go through the
17  affidavits. But by virtue of the license that RTC specifically has
18  a right to enforce. One of the things RTC enforces are the courses.
19  Here the very thing that is trademarked --
20      THE COURT: I am looking for a record citation. Maybe after
21  we finish up you can go to the record and cite to that. Mr.
22  Nachwalter says that's not true, you say it is true, that they not
23  only control the trademarks but they also control copyrights of the
24  various documents at issue here. I just need to know which one of
25  you is correct.

68

1       MR. HOFFMAN: I am not saying RTC controls the copyright.
2   CST owns them. They are both on the same license agreement. They
3   both have rights of control over the usage of the materials.
4       CST over the copyright, RTC over the trademark. One of the
5   rights the trademarks rights give you is the right to control the
6   quality. The trademark is used through the courses. And the
7   agreements give RTC the right to control the quality of the courses.
8   RTC has a different control than CST.
9       THE COURT: All right. I will give you until noon tomorrow
10  to submit those record citations.
11      MR. NACHWALTER: I will hand up Mr. Levin's testimony. I
12  will hand my copy up to the Court. It does not have a word about
13  royalties in it. This is an affidavit filed last night. It does not
14  have one thing about royalties in it.
15      We filed affidavits with all the people from RTC. William
16  McShane who is the president of RTC says we don't get royalties.
17      They have made this statement three or four times in the
18  papers. They don't have one piece of record evidence. They should
19  not be standing before a Federal Judge making a representation like
20  that.
21      THE COURT: Mr. Hoffman will have the opportunity to show
22  present it if that is indeed the case.
23      You may recall I started this hearing off, after I got some
24  of the preliminary matters out of the way, by asking whether the
25  plaintiff had, after getting all the discovery, had determined it

69

1   might be appropriate to dismiss one or more defendants. This looks
2   to me like kind of overkill. I have not counted all the listed
3   defendants. There are twelve to fifteen listed entities, plus one
4   through thirty-two hundred, which I guess are no longer in the case.
5   I had assumed that these entities were added as defendants
6   in an abundance of caution because there was some belief they were
7   interconnected.
8   I assumed once discovery was taken these questions would be
9   answered and I also assumed that out of the twelve or fifteen at
10  least one or two did not belong in here because they are
11  subsidiaries or doing something on the side.
12  I asked that question because I wanted to give plaintiff
13  the opportunity, if there were one or more entities that did not
14  belong here after discovery had disclosed that, to give them the
15  opportunity to voluntarily drop those parties.
16  Mr. Hoffman said he did not wish to drop any of them. If
17  it turns out there was no basis for that there may be sanctions as a
18  result, fees, etcetera.
19  That was the reasoning behind that inquiry. Plus, if I
20  could simplify it so much the better. However, that was not done.
21  All right. What about CST?
22  MR. NACHWALTER: There is an affidavit from someone on
23  behalf of CST. He explains that the only rights -- the copyrights
24  were from L Ron Hubbard in 1983, almost 20 years after these courses
25  being used. The copyrights it has are to L Ron Hubbard's work, not

70

1   these sales drills that the alleged infringers created. They have
2   a copyright for L Ron Hubbard's work. The man's name is Rilen
3   Hawkins. He gave his affidavit.
4   They have no function, CST has no function, in the
5   operations of the other Scientology churches. Does not participate
6   in the day-to-day operation of the defendants in the case.
7   Not a parent subsidiary, has no control. Does not publish,
8   sell or have any control over the alleged infringing materials.
9   Never received it, never reviewed it, never knew there was any claim
10  for an infringement until this lawsuit was filed.
11  THE COURT: Let me ask Mr. Meeks, do you have any clients
12  you think are similarly situated or have the same kind of record?
13  MR. MEEKS: It is slightly different but I do have a motion
14  for SMI as well as the Fort Lauderdale Mission, the Church of
15  Scientology Mission of Fort Lauderdale Inc. --
16  THE COURT: And I am only talking about those entities
17  similar to the argument that has been made by Mr. Nachwalter that
18  they are being sued as to some kind of vicarious or contributory
19  infringement, where you claim the record shows they are not in
20  control, etcetera.
21  MR. MEEKS: Yes, Your Honor.
22  THE COURT: Go ahead.
23  MR. MEEKS: Yes, Your Honor the director of missions, what
24  they call the mother church of the mission, stated it runs the
25  missions -- that they make no use of any materials that use any of

71

1   the work of Les Dane. They have no courses of any kind. That's
2   paragraph five and six. That's for SMI. The affiant for the Fort
3   Lauderdale mission -- the only evidence is what Mr. Letterese thinks
4   he remembers from 20 years ago.
5   They took a deposition of Clara Edwards. We have filed it.
6   She confirmed what SMI's information says on the Fort Lauderdale
7   Mission.
8   John Voorhies says, this is in paragraph three, they don't
9   offer any courses based on anything by Les Dane. This again is
10  un rebutted by any competent evidence. As with Mr. Nachwalter's
11  clients, I think they ought to be out of here.
12  THE COURT: We have four entities that claim they were
13  brought into this lawsuit inappropriately.
14  What record evidence do you have that would counter those
15  affidavits that seem to indicate that?
16  MR. HOFFMAN: With respect to SMI and the Mission, we have
17  Mr. Letterese's affidavit that explains how the Church entities
18  train their staff. We have the defendants' own affidavits that
19  explain these courses are used to train staff.
20  THE COURT: But that's not infringing.
21  MR. HOFFMAN: What happens is these entities tell staff to
22  take the course, tell them where to take the course.
23  THE COURT: That's the basis for --
24  MR. HOFFMAN: That's a contributory infringement. They're
25  aiding and abetting the infringing.

72

1   THE COURT: That's the only basis, the fact their employees
2   and their staff are required or encouraged to take the course?
3   MR. HOFFMAN: The basis is these Church entities work
4   as a whole. They split up the test in ways that make sense. RTC
5   could not exist if the rest of the entities did not exist. RTC
6   licenses the trademarks.
7   CST could not exist if the other entities did not exist.
8   There would be no one to license the materials. They all cooperate
9   to do the work as a whole, which is to bring in parishioners and
10  sell courses.
11  THE COURT: You are throwing your net awfully broadly.
12  Frankly, I don't know why you want to make this case that more
13  complex by adding people at best that are periphery actors.
14  All right. As I said, I am going to give you the
15  opportunity to submit any citations supporting your claims against
16  those four entities. Why don't you have those in by say Thursday at
17  four o'clock. I would ask you to fax that to all the parties as
18  well.
19  Anything else either side would like to present before we
20  bring this to a close?
21  MR. NACHWALTER: If I could make one more point.
22  THE COURT: Certainly.
23  MR. NACHWALTER: He talked about the fact there were
24  license agreements. For example, CST has certain rights over its
25  licensees, just like in the Mini Maid case, the trademark holder had

73

1  certain rights, contractual rights, with its franchisee. That is not
2  the control that they talk about in the vicarious liability cases.
3  The fact I have a trademark license or copyright license and as a
4  result of that have some control over my own materials and -- the
5  control my client has control over are L Ron Hubbard's materials.
6      When you talk about vicarious liability, I know Your Honor
7  has probably had a number of cases that involve vicarious liability,
8  when you talk about vicarious liability, you are talking about
9  control over the day-to-day operations of another company or person.
10 For example, if you have a personal injury case with --
11     THE COURT: I know the general concept.
12     MR. NACHWALTER: It's a different kind of control.
13     THE COURT: All right. I will wait to see what the
14 evidence is.
15     MR. NACHWALTER: With respect to that evidence, can it be
16 made clear this is not an opportunity to create new evidence but to
17 point out where in the existing record --
18     THE COURT: The record is closed.
19     MR. MEEKS: I have a question for the Court. We are now in
20 the throes of getting ready for trial. We have an extensive
21 pretrial stipulation to work out with the other side. We have
22 people coming from California. I wonder is there in way in which the
23 Court can give us any guidance if we should keep preparing for
24 trial?
25     THE COURT: Trial is scheduled sometime in September. I

74

1  normally set my summary judgment deadlines far enough out from the
2  trial to have oral argument if I need it, then have sufficient time
3  to make my ruling so the parties can get prepared for trial. Was
4  there an enlargement of time, anything of that nature?
5      MR. HOFFMAN: We did ask for an enlargement on the summary
6  judgment. You gave us part of the enlargement.
7      THE COURT: Probably the easiest thing is to move the trial
8  date back.
9      MR. MEEKS: I did not want to ask Your Honor for that, but
10 we would appreciate some additional time.
11     THE COURT: Mr. Hoffman?
12     MR. HOFFMAN: That would be fine, Your Honor.
13     THE COURT: As you know, I don't like to move the trial
14 dates. However, I don't like to have lawyers working, preparing for
15 trial not knowing what the issues are. There may be some issues
16 left, there may not be, I don't know.
17     MR. NACHWALTER: If you do move it, I don't know what kind
18 of timeframe you are looking at, I do have something in January --
19     THE COURT: Believe me, it won't be postponed that long.
20     MR. NACHWALTER: My fortieth anniversay was one thing but
21 this would really get me in trouble.
22     THE COURT: I am reluctantly granting this so it will be
23 the shortest period of time necessary for all concerned.
24     I think that's all -- oh, yes, on implied license. There
25 was a statement about implied license but there was never any

75

1  argument. Is that something you are abandoning?
2      MR. MEEKS: I don't think we have put that forward. We
3  have made the latches argument. Miss Kobrin is prepared to address
4  that if you would like, Your Honor.
5      THE COURT: All right.
6      MS. KOBRIN: Your Honor, latches is a little bit different
7  in the copyright context. The point here is --
8      THE COURT: Different than it would be in what respect?
9      MS. KOBRIN: In general.
10     THE COURT: Latches is a time bar issue.
11     MS. KOBRIN: In copyright it does not also bar something
12 entirely. You may just have a statute of limitations argument,
13 anything before that period would be -- damages would be barred.
14     There are instances, and we have cited a couple of cases,
15 one is the Danlak (phonetic) case out of the Ninth Circuit where the
16 Court said, enough is enough, you wait twenty years, you don't do
17 anything, then there's a bar.
18     Calhoon versus La Lanis (phonetic) Publishing the Court
19 laid out in a concurring opinion -- the main decision did not rely
20 on latches. The concurring opinion said, by the way, I think
21 there's an alternate ground, these people waited 13 to 16 years to
22 bring their claim --
23     THE COURT: Let me stop you there. I thought about the
24 latches claim. I guess it's somewhat in the nature of estoppel and
25 waiver in this context.

76

1      MS. KOBRIN: Similar.
2      THE COURT: What about the argument while, yes, there might
3  have been -- assuming there is infringement there may have been use
4  of the infringing materials and violation of the copyright material
5  going back 25 years, however, that was Mr. Dane, it was Prentice
6  Hall, it was not Peter Lettarese and Associates?
7      MS. KOBRIN: We have covered that in our reply. I will give
8  you that information briefly. Mr. Letterese in his testimony -- it's
9  clear he knew about the use by the Church as far back as the early
10 seventies because he was one of the people that was studying the
11 materials in the early seventies.
12     He acquired rights at the end of 93 from Mrs. Dane and her
13 children, who all signed the agreement because they as the heirs all
14 have renewal rights.
15     At that point they said, we give you a license for life of
16 copyright through the renewal period and you will have the rights
17 that we have. Then a few months later he got another agreement from
18 Prentice Hall giving them all the rights he had.
19     THE COURT: This is 93?
20     MS. KOBRIN: 94. As of 94 he had agreements from anyone
21 that had any claims to the rights. At that point with the knowledge
22 he had he had testified in deposition at the point he left the Church he
23 was actually studying one of these courses. So he had the knowledge
24 at that point of what the use was. For years he did not do
25 anything. Then he claimed the penny dropped in 2000. He's put

77

1  nothing in the record to show --

2       THE COURT: I am not familiar with that expression.

3       MS. KOBRIN: That simply means something happened, it made

4  him realize that something was the case. He doesn't really have

5  anything in the record to support that.

6       He says in the affidavit that he learned in settlement

7  negotiations with his former attorney Dan Dashman there was

8  something we were doing that suddenly made him realize that.

9       When we propounded discovery asking for what Mr. Dashman

10 gave he refused to give it to us, so it should be excluded for that

11 reason. You can't use something as a sword and a shield, obviously.

12      And there's nothing he's said that shows that that is

13 really the case. He knew all along and for 30 years he did not file

14 suit. Granted, he did not have the rights until 94 --

15      THE COURT: Is your argument then I should only look back

16 to 94 since that's when he acquired the rights or do you argue at

17 the very least it was 94 but because he stepped into the shoes of

18 his predecessors he should be tied to those prior years?

19      MS. KOBRIN: We have not argued that it goes back before

20 94, but I think that's an argument that could be made.

21      If you go back to 94, he did nothing for ten years. It's

22 not like he came on the scene in 94 and knew nothing about the use.

23 He knew or had twenty years worth of knowledge at that point. I

24 think it's a good case for the applicability of latches.

25      THE COURT: Mr. Hoffman.

78

1       MR. HOFFMAN: In order to have latches you have to do

2  something. In the patent world you say, hey, knock it off and do

3  nothing for four years. You threaten to bring suit, whatever it is,

4  you have to do something.

5       Mr. Letterese did not do anything. There's no evidence he

6  did anything. The burden is on the defendants to show that.

7       THE COURT: You all agree that is the law, the copyright

8  owner has to take an affirmative action to make a threat of the

9  lawsuit? That seems to me an odd principle.

10      Do you have a case that says something to that effect?

11      MR. HOFFMAN: We cited a latches case in our brief.

12      THE COURT: Something in the nature of, he, I am going to

13 file a lawsuit, and stop it --

14      MR. HOFFMAN: That's the usual sense in which it is done.

15 That you have sent a cease and desist letter or you send something

16 that causes the other side to say, okay, and then you wait four

17 years and do nothing.

18      In that sense you see the copyright or trademark owner has

19 done nothing for those four years. You also need to have a change in

20 position.

21      THE COURT: By the alleged infringer?

22      MR. HOFFMAN: Yes.

23      THE COURT: I have not researched this. But it strikes me

24 as something I would not expect the law to require, that is in order

25 to be guilty of latches that the owner of the copyright has to take

79

1  some affirmative action to say I am going to enforce my rights and

2  then back away as opposed to sitting on someone's rights knowing

3  there's a violation out there.

4       MR. HOFFMAN: I think what you would be saying is that the

5  so called action is that he knew and did not do anything. But the

6  point is he did not have all of the rights. He could not sue until

7  Renewal since he did not have all the rights. He could not sue at

8  that point. In 73 when he took the course he did not have the

9  rights.

10      THE COURT: How about 94?

11      MR. HOFFMAN: In 94 when he took it he had the license but

12 there were other licenses that existed and other rights that existed

13 so he did not have exclusive rights. You have to be an exclusive

14 right holder to bring suit.

15      THE COURT: Do you have some authority that suggests that

16 because there might have been some limited rights out there that

17 Peter Letterese and Associates could not enforce the rights it had?

18      MR. HOFFMAN: Under the copyright code it has to have

19 exclusive rights to bring suit.

20      THE COURT: All right. Miss Kobrin.

21      MS. KOBRIN: I think that the statements of law you have

22 just heard are as loose as some of the factual things that have been

23 said and are not supported by anything.

24      In the complaint, whoever wrote the complaint wrote the

25 following language: On or about December 31, 1993 PL&A entered into

80

1  a contract with Lois Dane as the owner of the right, title and

2  interest in the copyrights of certain materials, which encompassed

3  the complete body of literary and other works created by the author

4  Les Dane and wherein PL&A received the exclusive license of all

5  rights of every nature during the life of the copyrights and renewal

6  copyrights.

7       THE COURT: I am looking for my complaint, which I can't

8  seem to locate. Is that what you say in the complaint, Mr. Hoffman?

9       MR. HOFFMAN: The complaint says what it says. I don't

10 have it in front of me.

11      MS. KOBRIN: It's paragraph 22 at the bottom of page six of

12 the complaint, Your Honor.

13      MR. HOFFMAN: It sounds like the way it's being interpreted

14 is in error. If that is the case it needs to be corrected.

15      THE COURT: What is in error?

16      MR. HOFFMAN: The allegation.

17      THE COURT: Time out. This is your complaint. I think you

18 probably made the same allegation in the original complaint.

19      MR. HOFFMAN: The agreement gives whatever the Danes had,

20 but they didn't have the Prentice Hall rights, they didn't have the

21 cloth rights from another agreement. I believe there were two other

22 agreements that were lacking, although I can't point that out to you

23 right now.

24      THE COURT: That's not what your complaint says, Mr.

25 Hoffman --

81

1        MR. HOFFMAN: I would need to amend that allegation --

2        THE COURT: I don't want to seem unsympathetic with you,

3    Mr. Hoffman, but we have been down this road so many times. I am

4    not sure I will allow you to amend.

5        This is a representation that has been made to the Court,

6    to the parties and everyone has relied on that. Frankly, I did not

7    focus on it that much before because I was dealing with all these

8    other issues.

9        The argument has been made as to latches and you now want

10   to come up and say -- to defeat an argument based on latches -- that

11   you want to amend your complaint.

12       That would run counter to the general law which is you

13   can't amend the complaint to defeat a summary judgment motion.

14   That's pretty much settled law.

15       It's not an absolute standard but it's the standard,

16   certainly in the Eleventh Circuit, that the Courts generally do not

17   allow amendments to complaints in order to defeat summary judgment.

18       MR. HOFFMAN: Our standing was challenged, it's still being

19   challenged. I don't see how the defendants can make that claim

20   based on our complaint. There's no prejudice at all to the

21   defendants.

22       THE COURT: I think the papers conceded that you have the

23   license -- you have all right, title and interest. Isn't that what

24   you all said?

25       MR. MEEKS: That's correct.

82

1        THE COURT: I thought that's what they did. The only issue

2    then was infringement.

3        MR. HOFFMAN: At this point in time, yes.

4        THE COURT: It's my recollection there were preliminary

5    depositions of the Dane family and once they satisfied themselves

6    they announced that was not an issue any more.

7        THE COURT: What about the point you were not really

8    prejudiced? You listed a number of things. None of them seemed to

9    be earth shattering.

10       MS. KOBRIN: There are witnesses that are deceased. Mrs.

11   Dane, they argued against our deposing her because they said she's

12   now fairly well senile.

13       THE COURT: How would that prejudice you, someone who was

14   not available? That would seem to help you on infringement or fair

15   use.

16       MS. KOBRIN: There could be witnesses to that we don't even

17   know about because of the length of time this has gone on. We don't

18   have all the people who originally worked with Les Dane, who Les

19   Dane knew, the people that might have corresponded with Mr. Dane.

20   We don't have specifics of any of that.

21       THE COURT: All right. I'm going to let Mr. Hoffman have

22   the last word before we bring this to a close.

23       MR. HOFFMAN: Your Honor, it is plaintiff's position those

24   witnesses do not have anything at all to do with the copyright

25   infringement. And at this stage it would probably be more

83

1    prejudicial to us than the defendants on that issue.

2        THE COURT: It might be. I don't know.

3        All right. I think we're going to have to bring this to a

4    close. If you will get your papers to me with regard to the four

5    defendants that were referred to and provide that to the defense

6    attorneys as well.

7        MR. HOFFMAN: Yes, Your Honor.

8        THE COURT: I appreciate the presentations. Thank you all.

9            H EARING CONCLUDED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

84

1

2

3            C E R T I F I C A T E

4

5

6        I hereby certify that the foregoing is an accurate

7    transcription of proceedings in the above-entitled matter.

8

9

10

11   _____            _____

12   DATE FILED            PA TRICIA SANDERS, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

STATE OF FLORIDA          )

COUNTY OF BROWARD    )

### AFFIDAVIT OF STEVEN F. SAMILOW

Steven F. Samilow, having been duly sworn, deposes and says:

1. I am an attorney licensed to practice in the State of Florida. I am a member of the general and trial bars of the United States District Court for the Southern District of Florida.

2. I am making this affidavit on personal knowledge.

3. I represented non-party witness Anne-Marie Griffin in the matter styled, Letterese v. W. I. S. E. et al., Case No. 04-61178-CIV-HUCK (S. D. Fla.).

4. I maintain my law office in the City of Weston, Broward County, Florida. My office telephone number is 954-349-6555. My office has a voice mail answering system. I solely control the password and user identification for my office's voice mail. The voice mail system identifies the date and time of each voice mail message.

5. On August 10, 2005, after 7:27 p. m., I retrieved a voice mail message from my voice mail. The voice mail system advised that the message had been left on August 10, 2005 at 7:27 p. m. I listened to the message. The caller identified himself as David Hoffman. Aside from the caller's self-identification, I recognized Mr. Hoffman's voice from the several telephone conversations that I previously had with him and other voice mail messages that he had left for me before August 10, 2005.

6. Attached to this affidavit is a transcript of the August 10, 2005 voice mail which Mr. Hoffman left. I personally compared the transcript to the recording on my voice mail. The transcript is an accurate transcription of that recording.

FURTHER AFFIANT SAYETH NAUGHT.

Steven F. Samilow

The foregoing instrument was acknowledged before me this 23rd day of September 2005, by Steven F. Samilow, who is personally known to me (or who has produced _____ as identification) and who did take an oath.

Notary Public, State of Florida

My Commission Expires:

BARBARA MAHAFFEY
Notary Public - State of Florida
My Commission Expires Aug 3, 2008
Commission # DD 416409
Bonded By National Notary Assn.

2

## TAPE TRANSCRIPT OF HOFFMAN CALL TO SAMILOW

The tape starts off with a female voice message saying, "Saved message, Wednesday August 10th at 7:27 pm"

HOFFMAN: Hi Steven, this is Dave Hoffman. I am responding to your fax of August 5, Friday, declining the affidavit. I understand where you are going, you know I understand why you wouldn't do it. I do need to talk to you though, I think its in Mrs. Griffin's best interest to give us an affidavit. If she were to do that, we would absolve her of any liability. I wouldn't even take her deposition with respect to the defamation/destruction of our business – attempted destruction of our business by the Church and its agents. Otherwise, we have got to include her in an action or include the estate potentially both when we bring that action. So, I think it would be a good idea to do it. Based on what you guys - how you have responded so far I wouldn't expect it, I won't hold my breath, but if you want to do that please give me a call back soon and we will get it squared away. My number is on the cell its (310) 266-8390. That's probably the best place to reach me. Thanks. Bye Bye.

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-61178-CIV-HUCK / TURNOFF

PETER LETTERESE AND                          )
ASSOCIATES, INC.,                            )
a Florida corporation,                       )
                                             )
              Plaintiff,                      )
                                             )
    vs.                                      )
                                             )
WORLD INSTITUTE OF SCIENTOLOGY               )
ENTERPRISES INTERNATIONAL, INC., RELIGIOUS   )
TECHNOLOGY CENTER, INC., CHURCH OF           )
SCIENTOLOGY INTERNATIONAL, INC., and BRIDGE  )
PUBLICATIONS INCORPORATED, all California     )
corporations, CHURCH OF SCIENTOLOGY FLAG     )
SERVICE ORGANIZATION, a Florida corporation, NEW )
ERA PUBLICATIONS INTERNATIONAL, a foreign    )
corporation, CHURCH OF SCIENTOLOGY, MISSION  )
OF FORT LAUDERDALE, INC., AND CHURCH OF      )
SCIENTOLOGY OF FLORIDA, both Florida corporations, )
SCIENTOLOGY MISSIONS INTERNATIONAL, INC.,    )
CHURCH OF SPIRITUAL TECHNOLOGY and DOES 1-   )
3200,                                        )
                                             )
              Defendants.

---

## <u>PLAINTIFF PETER LETTERESE AND ASSOCIATES, INC.'S INITIAL DISCLOSURES UNDER FRCP 26</u>

Plaintiff Peter Letterese and Associates, Inc. ("PL&A") hereby provides the

following initial disclosures pursuant to FRCP 26 and agreement of counsel:

- 1 -

1. LISTING OF DOCUMENT TYPES AND LOCATIONS

| DOCUMENT TYPE | LOCATION |
| --- | --- |
| Copyright certificates and recordation documents | PC (Plaintiff's counsel) And attached to amended complaint |
| Exclusive License Agreement 1993/94 and on | PC And attached to amended complaint |
| Limited Power of Attorney 1994 and on | PC and attached to amended complaint |
| Copyright purchase from Publisher | PL&A |
| Copyrighted books and derivative works | PL&A and PC and Big League Sales attached to Plaintiff's Motion for Summary Judgment |
| Relating to Scientology courses and/or Scientology's use of Big League Sales | PC and PL&A and attached to Plaintiff's Motion for Summary Judgment |
| Relating to Scientology organizations and their connections and/or personnel | PC and PL&A and attached to Plaintiff's Motion for Summary Judgment |
| Relating to correspondence between PL&A and Scientology organizations | PC and PL&A |
| Relating to comparisons of Big League Sales book and Scientology course materials | PC and PL&A and attached to amended complaint, and in Plaintiff's Motion for Summary Judgment |
| Relating to prior lawsuits between PL&A and/or PC and Bridge or other Scientology organizations | Moxon & Kobrin; Wasserman, Comden et al; PC and PL&A control; attached to Motion for Summary Judgment |
| Relating to Scientology attack on PL&A and Letterese, et al | PC and PL&A and attached to Plaintiff's Opposition to Motion to Abate and Plaintiff's Request for Telephonic Hearing, and other papers in this case |
| Relating to Scientology use of Les Dane works | PC and PL&A, and attached to amended complaint, and in Plaintiff's Motion for Summary Judgment |
| Relating to Damages | PC and PL&A |
| Relating to Scientology organizations enforcement of copyright, assertion of lack of fair use, and related issues | PC |

2. LISTING OF POTENTIAL WITNESSES AND ADDRESSES

Peter D. Letterese, 4919 SW 148th Avenue, Davie, Florida 33330

Barbara Fawcett, 5000 Volunteer Road, Davie, Florida 33330

Thomas Karas, 25625 Jefferson Avenue, St. Clair Shores, MI 48081

3.  Damage Calculations:

There are multiple ways to calculate damages.

First, under copyright, statutory damages can range up to $150,000.00 for willful infringement.[1]  Plaintiff contends that infringement was willful and therefore the amount of $150,000.00 is appropriate, per infringement.  In addition, some of Defendants are liable for the infringement of all Scientology organizations (at least 3200 according to Scientology sources), both U.S. and abroad because the materials were created here in the U.S., and royalties flow back to the U.S.  Each different course[2] given involving the Les Dane book, Big League Sales Closing Techniques, given by each different organization, within at least the three year period prior to the day suit was filed, September 8, 2004, is an infringement for purposes of counting statutory damages.  Accordingly, damages amount to $150,000.00 times as many as 27 versions of courses with Big League Sales Closing Techniques enmeshed in various for-staff as well as for-public checksheets, times 3200 organizations yields:

$12.9 BILLION.

---

[1] Willfulness exists given the "fair game" attack on PL&A, admitted approach of the Dane family re copyright, Scientology's decades-long knowledge of copyright and enforcement thereof, especially with respect to their own internationally-observed, continual and relentless defense of their own intellectual property, and other factors.

[2] Sid & Marty Krofft Television Productions, Inc., et al. v. McDonald's Corporation et al.,1983 U.S. Dist. LEXIS 20074; 221 U.S.P.Q. (BNA) 114; Copy. L. Rep. (CCH) P25,572 (C.D.Ca. 1983)(counting each version of a commercial and other items as an infringement); MCA TELEVISION LTD. a Delaware Corporation v. C. Elvin FELTNER, Jr., J. Clifford Curley, et al., 89 F.3d 766; 1996 U.S. App. LEXIS 18373; 39 U.S.P.Q.2D (BNA) 1586; Copy. L. Rep. (CCH) P27,558; 10 Fla. L. Weekly Fed. C 191(11th Cir. 1996)(Acknowledged that each version of an infringing work was a separate infringement for statutory damages).

- 3 -

Merely for purposes of illustration and not an admission, even if only 300 organizations infringe with at least 15 versions, times $150,000.00 this is $675 MILLION.

Merely for purposes of illustration and not an admission, if infringement is merely "knowing," a statutory damage amount of $50,000 or more is still reasonable. Using this amount of statutory damages, the amounts achieved are one third of the above amounts.

Second, under copyright law, Plaintiff is entitled to Defendants' profits. One measure is by reasonable royalty. The Scientology organizations charge approximately $3000 for the average course. The number of courses given by Scientology organizations over the last year can conservatively be estimated at five per month per organization. $3000.00 per course times 12 per year (one per month) times 3200 organizations times 3.5 years is $201,600,000.00. It is up to Defendants to prove costs. Since the courses involve a lot of self study, much of the gross profit amount will be net profit. Alternatively, even if a reasonable royalty of ten percent for a license fee is used, this yields $20,160,000.00. A reasonable royalty of ten percent is selected for purposes of illustration and not for purposes of admission.

Another method of calculation of damages is a royalty percentage of all income of all organizations using the Sales book, because all posts involving sales are trained using the Sales book, per the Founder's directions. The material is valuable and the model for royalty of all income is, for example, provided by WISE which licenses the WISE Sales Course to its members to train others. A reasonable royalty would be, e.g., six percent, merely for purposes of illustration and not for purposes of admission. If the income of

Scientology organizations is $300 million annually on average, then $300 million times six percent times 3.5 years is $60.3 million.  This amounts are provided merely for purposes of illustration and not for purposes of admission.

A damage calculation on Count V of the First Amended Complaint, concerning the misrepresentation, initially is taken as comparable to at least the infringing profits calculated above.

The above disclosures are preliminary in nature, and are not admissions of fact or law.  They are subject to revision and/or correction as discovery and/or further investigation reveals additional information, and for other reasons.

Dated:  April 5, 2005

Respectfully submitted,

David L. Hoffman (adm. Pro hac vice 11/18/04)
LAW OFFICES OF DAVID L. HOFFMAN
27023 McBean Parkway, Suite 422
Valencia, California 91355
Tel. (661) 775-0300
Fax (661) 259-1255
dlhpatent@sbcglobal.net

MALIN, HALEY & DiMAGGIO, P.A.
Dale Paul DiMaggio
Florida Bar No. 395,803
dpd@mhdpatents.com
Joseph R. Englander
Florida Bar No. 935565
jre@mhdpatents.com
Local Counsel for Plaintiff
1936 South Andrews Ave.
Ft. Lauderdale, FL 33316

- 5 -

# HILL SCHUMER
### ATTORNEYS AT LAW

HILL SCHUMER LLP
AVENTURA CORPORATE CENTER
20801 BISCAYNE BLVD
SUITE 307
AVENTURA, FL 33180

T 305 466 1475
305 374 3400
F 305 466 1476

October 4, 2005

<u>HAND DELIVERED</u>
Jennifer Coberly, Esq.
Zuckerman Spaeder LLP
201 S. Biscayne Blvd.
Suite 900
Miami, FL 33131

   Re:  Imoberdorf v. Allen et al.

Dear Jennifer:

   It was a pleasure meeting you yesterday.  George Allen is my long time friend and former partner, and I look forward to assisting your firm in any way possible in completing his case.

   In addition to the files you picked up yesterday, I have in my office copies of all discovery that has been delivered to opposing counsel.  I do not need copies to be made of these items. I will have them delivered to your office, if that is your preference.

   Also, enclosed please find a group of copies, including partial bank and financial records.  I believe we have already delivered these documents to opposing counsel, and I do not believe they are of particular importance.  As we have some uncertainty whether they were separated in the copying process, however, we had them recopied and intended to deliver them as a supplemental response.

   On a related subject, please note Plaintiff has filed notice of intent to subpoena bank records from various institutions (I do not have my file at this moment to cite more exactly.)  <u>According to my calendar, any objections to these subpoenas must be raised by next Monday, October 10, 2005</u>.

   Finally, I will send under separate cover an invoice for the enclosed copies, to be submitted to opposing counsel, together with a copy of a previous invoice for copies ($251.00) which remains unpaid by opposing counsel.

Jennifer Coberly, Esq.
October 4, 2005
Page 2 of 2


I hope you will feel free to contact me at any time to discuss any questions you may have concerning the case.

Very truly yours,

Michael E. Hill