# United States Court of Appeals

Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

REC'D by D.C.
SEP 22 2008
STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

September 18, 2008

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1813

FILED by D.C.
SEP 22 2008
STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**Appeal Number: 05-15129-HH**
Case Style: Peter Letterese & Assoc. v. World Institute
District Court Number: 04-61178 CV-PCH

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

# United States Court of Appeals
For the Eleventh Circuit

No. 05-15129

District Court Docket No.
04-61178-CV-PCH

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Jul 8, 2008
THOMAS K. KAHN
CLERK

PETER LETTERESE AND ASSOCIATES, INC.,
a Florida corporation,

Plaintiff-Appellant,

versus

WORLD INSTITUTE OF SCIENTOLOGY ENTERPRISES INTERNATIONAL,
RELIGIOUS TECHNOLOGY CENTER, INC.,
CHURCH OF SCIENTOLOGY INTERNATIONAL, INC.,
all California corporations,
CHURCH OF SPIRITUAL TECHNOLOGY,

Defendants-Appellees,

RELIGIOUS TECHNOLOGY CENTER, INC., a California coorporation, et al.,

Defendants.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit
By: [signature]
Deputy Clerk
Atlanta, Georgia

Appeal from the United States District Court
for the Southern District of Florida

JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
SEP 18 2008
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered: July 8, 2008
For the Court: Thomas K. Kahn, Clerk
By: Gilman, Nancy

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 08, 2008
THOMAS K. KAHN
CLERK

---

No. 05-15129

---

D.C. Docket No. 04-61178-CV-PCH

PETER LETTERESE AND ASSOCIATES, INC.,
a Florida corporation,

Plaintiff-Appellant,

versus

WORLD INSTITUTE OF SCIENTOLOGY ENTERPRISES, INTERNATIONAL,
RELIGIOUS TECHNOLOGY CENTER, INC.,
CHURCH OF SCIENTOLOGY INTERNATIONAL, INC.,
all California corporations,
CHURCH OF SPIRITUAL TECHNOLOGY,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Florida

---

**(July 8, 2008)**

Before TJOFLAT, HULL and BOWMAN,* Circuit Judges.

---

* Honorable Pasco M. Bowman II, United States Circuit Judge for the Eighth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

The parties in this case disagree over the scope of copyright protection in a book about sales techniques authored by the late Leslie Achilles "Les" Dane. Peter Letterese & Associates, Inc. ("PL&A"), the exclusive licensee of the copyright in Dane's book, claims that three entities affiliated with the Church of Scientology have been infringing its copyright by incorporating portions of the book into their instructional course materials, and seeks declaratory and injunctive relief. On cross-motions for summary judgment, the district court assumed that the infringement was occurring as alleged but ruled for defendants. The court did so on two alternative grounds: the infringement was permissible under the fair use doctrine; and PL&A's suit was barred by laches.

PL&A now appeals. We uphold the district court's decision as to three claims, but find error in the court's application of the fair use doctrine and the laches defense to a remaining claim. We therefore affirm, in part, and vacate and remand, in part.

The organization of this opinion proceeds as follows. Part I presents the factual background and procedural history of the case. Part II affirms the grant of summary judgment with respect to two claims alleging that defendants' instructional courses – in and of themselves – constitute infringing derivative

works, but concludes with respect to two remaining claims that there is a general issue of material fact as to whether the course materials are substantially similar to Dane's book. Part III explains the contours of fair use, and concludes that it is merited as to some, but not all, of defendants' uses of the book. Part IV considers the applicability of the defense of laches in a copyright infringement suit, a question of first impression in this circuit. Part V concludes.

I.

A.

The copyrighted work in question is a book by Les Dane entitled Big League Sales Closing Techniques ("Big League Sales"). The introduction to the book claims that its descriptions of "specific techniques and true cases" collectively "pinpoint[] the most effective, miracle closes" in sales. The balance of the book presents these sales techniques through Les Dane's recounting of personal anecdotes, from which the titles of techniques (both good and bad) are drawn. The book repeatedly returns to the "one basic theme" that each sales prospect is clad in a "brick overcoat" of fear, and that the well-prepared salesman will know how to identify different "bricks" (sources of sales resistance) and eliminate them.

The book was originally published in 1971 by the Parker Publishing

Company[1] and duly registered in April 1971 in compliance with the formalities of the Copyright Act of 1909, 35 Stat. 1075, 17 U.S.C. § 1 et seq. (1976 ed.). Under the copyright law then in effect, Les Dane was entitled to an initial 28-year term of copyright protection and the right to renew for an additional 28-year term. 17 U.S.C. § 24.

Shortly thereafter, L. Ron Hubbard, the founder of the Church of Scientology ("the Church") and a prolific writer in his own right, took a shine to Big League Sales and recommended that it be used to train Scientology "registrars," who sell Scientology books and services to Church members. The Hubbard Communications Office disseminated a number of policy letters regarding the teaching of salesmanship techniques and skills from the book, and in 1972 the Church began to create a number of courses for training registrars.

The Church developed materials for use in these courses, including "checksheets" and "drill sheets." A checksheet is a step-by-step list of the actions that a student is required to take to complete a course, such as the completion of reading assignments and the performance of various practical exercises, including sales drills. Students form pairs, or "twins," to perform the sales drills – generally involving some form of roleplay – which are described on drill sheets

---

[1] Parker Publishing was later taken over by Prentice Hall.

accompanying the checksheet. While these courses assigned readings from Big League Sales (among other writings), the Church did not make copies of the book itself; students would either borrow or purchase the book for their study.

It is undisputed that Les Dane knew of the Church's use of Big League Sales and participated in such use. Beginning in the mid-1980s, the Church hired Les Dane to travel to Scientology churches in the United States and abroad to deliver seminars to registrars and others on the application of the sales techniques in his book. In these seminars, Les Dane occasionally referred to the sales drills and supervised the practice of those drills.

Defendants in this action are three entities affiliated with the Church: the Church of Scientology International, Inc. ("CSI"), the World Institute of Scientology Enterprises International, Inc. ("WISE"), and the Church of Spiritual Technology ("CST"). CSI has been the mother church of Scientology since 1981.[2] Among other duties, CSI creates materials for use in staff training courses. Of these courses, there are two main types which include the study of Big League Sales; courses typified by the Professional Registration Course and the Organization Executive Course, which were both compiled in 1991. CSI

---

[2] For a thorough description of the complex organizational structure of Scientology, see generally Church of Spiritual Technology v. United States, 26 Cl. Ct. 713, 715–20 (1992).

encourages Church staff members to take these courses as part of their training for certain positions in Church organizations.[3] The staff members complete the courses at their own pace in course rooms provided by CSI, and their progress is monitored and assisted by a course supervisor. However, the course supervisor does not lecture or add to the substantive material of the course. In exchange for taking one of these courses, each staff member signs a promissory note for the "donation amount of the course." In the event that the staff member subsequently fails to serve out the duration of his staff contract, the promissory note becomes due to the Church organization as "a debt for the services that he took while on staff."

WISE, also formed in 1981, is a membership organization for businessmen and professionals who seek to apply Hubbard's administrative technologies to secular organizations. WISE creates and sells packs of course material on this subject, and licenses some of its members to provide business consulting services using WISE materials. From 1983 until June 2004, WISE sold for a flat price of $75 a Sales Course pack which taught the sales techniques from Big League Sales. The relevant sections of the checksheets and drills used in the Sales Course vary somewhat in content and organization from the corresponding materials used in

---

[3] CSI does not advertise or market these courses outside of Church membership.

the Professional Registration Course and the Organization Executive Course.[4]

CST was created in 1982 to receive the bulk of the estate of Hubbard, including his intellectual property rights. (Hubbard died in 1986.) Its mission is to preserve Scientology scriptures, which consist of the written and spoken word of Hubbard as well as films concerning religious training and the administration of Scientology services. CST acquired the copyrights to Hubbard's works in 1993 and has since licensed the rights to use those works to CSI, WISE, and other affiliated entities. Though CST has claimed not to have reviewed any of WISE and CSI's course materials, it had the right to review the WISE materials pursuant to the license agreement.

Peter Letterese, a principal of PL&A, was an off-and-on member of the Church for approximately two decades beginning in 1973. In addition to serving as a registrar, Letterese held several positions in Church organizations. He accordingly studied Big League Sales in several courses, including the Organization Executive Course. During the late 1980s and early 1990s, Letterese was also a member of WISE; as such, he was licensed to sell WISE courses.

On December 31, 1993, while Letterese was still a member in good standing

---

[4] We explore the relevant distinctions between the Sales Course pack and the CSI course materials, and provide extensive examples of the alleged infringing material, infra at part II.C.

in the Church, PL&A acquired the exclusive rights to Les Dane's literary works (including the right of enforcement) through a written contract with the heirs of the Dane estate, including Les Dane's widow, Lois "Betty" Dane. These rights extended through the renewal term. PL&A also purchased the outstanding rights of Prentice Hall in 1994. PL&A subsequently withdrew Big League Sales from the market; it has been out of print since 1994.

The Church "declared," or excommunicated, Letterese in July 1994 for violating certain Church policies. Nonetheless, Letterese continued to regard himself as a Scientologist. In July 1995, Marilyn Pisani, then the legal affairs director of Bridge Publications, Inc. (the North American publisher of Scientology works), wrote a letter to Prentice Hall seeking certain non-exclusive rights in Big League Sales. Later that month, Prentice Hall notified Bridge Publications that PL&A had purchased its rights. Pisani then contacted PL&A in late November 1995 seeking the right to republish the book. In response, Daniel Dashman, who was then the general counsel of PL&A, attempted several times to call Pisani back. Finally, in August 1996, Dashman sent Pisani a letter stating that PL&A had acquired Big League Sales with the intention of "making its own use" of the book as well as "keeping it available to the Church." The letter explained: "It was not our intention in 1993, nor is it now, nor will it ever be in the future to prevent [L.

Ron Hubbard's] intention with regard to Mr. Dane's work to be thwarted or stopped." In spite of PL&A's declared wish to ensure the continued availability of Big League Sales to the Church, however, Dashman made clear that "[n]o statements made in this letter are intended nor should they be construed as a granting of any rights to the work of Mr. Les Dane and specifically is not a granting of the right to republish [Big League Sales]." No agreement was reached at that time.

The copyright in Big League Sales was duly renewed and re-registered on January 4, 1999. During 1999 and 2000, PL&A became embroiled in litigation with the Dane family over the license agreement. In 2000, Bridge Publications contacted the Dane family directly to seek rights relating to the book, but was unsuccessful. Later that year, PL&A and Bridge Publications resumed negotiations concerning Bridge Publications' desire to publish hard cover versions of the book for the internal use of Church organizations. Periodically from 2000 to 2003, PL&A corresponded with Bridge Publications in an attempt to ascertain the scope of Bridge Publications' intended use of the book.

In 2003, PL&A sued Bridge Publications in the Superior Court of Los Angeles County, California, alleging tortious interference with contract and other related claims. On January 27, 2004, attorney David Schindler of Latham &

Watkins, LLP, contacted PL&A, seeking to negotiate a resolution of the pending dispute on behalf of Bridge Publications, WISE, and CSI. Schindler met with Letterese and two of his attorneys on February 13, 2004, to negotiate a settlement. On February 27, 2004, Schindler sent Letterese's attorney a letter confirming the terms of an agreement that provided for the dismissal of the pending suit without prejudice and for a one-year moratorium on litigation of any kind between any entity affiliated with Letterese and any entity affiliated with the Church. PL&A dismissed its suit, as agreed. PL&A also sought further assurances that Schindler was indeed authorized to act on behalf of all Church-related entities, and that the agreement was enforceable.

On April 8, 2004, believing that satisfactory assurances had not been provided, PL&A returned to the Los Angeles County Superior Court and filed a second suit against Bridge Publications, WISE, CSI, and others, seeking a declaration either that the February 27 letter was not a binding agreement, or that it constituted a binding agreement with all Church-affiliated entities.[5]

B.

On September 10, 2004, PL&A brought this present suit in the United States

[5] The record does not indicate what subsequently transpired in PL&A's suit in Los Angeles County Superior Court.

District Court for the Southern District of Florida against CSI, CST, and WISE[6] for the alleged violation of its exclusive rights pursuant to the Copyright Act, 17 U.S.C. § 101 et seq., within the three years prior to filing.[7] The complaint set forth four vaguely pled causes of action, which we construe in conjunction with the parties' briefs.

Count 1 is against all defendants and alleges that the WISE Sales Course's checksheets and drill sheets constitute unauthorized reproductions of Big League Sales in violation of 17 U.S.C. § 106(1).[8] Count 2 also names all defendants and

---

[6] PL&A's complaint also named as defendants several additional organizations: Bridge Publications, Inc.; the Church of Scientology Flag Service Organization; New Era Publications International (a named but unserved defendant); Scientology Missions International ("SMI"); Church of Scientology Mission of Fort Lauderdale, Inc. ("Mission"); the Church of Scientology of Florida; and 3200 unknown entities affiliated with Scientology. The complaint contained five counts – the four counts described in the text which are before us in this appeal, and a count brought under section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), which the court construed as a claim both for false designation of origin and false advertising. The complaint sought both legal and equitable relief. PL&A amended its complaint at least twice. A revised first amended complaint, filed on July 13, 2005, deleted the fifth count and elected statutory damages as PL&A's legal relief. The second amended complaint, filed on August 19, 2005 (four days before the district court granted defendants' motion for summary judgment now under review) dropped the additional defendants named above – leaving only CSI, CST, and WISE in the case – and limited PL&A's prayer for relief to a declaratory judgment and a permanent injunction. In the text, our reference to the complaint is to the second amended complaint unless otherwise indicated.

[7] 17 U.S.C. § 507(b) sets a three-year statute of limitations for civil actions brought under the Copyright Act.

[8] 17 U.S.C. § 106(1) grants to a copyright owner the exclusive right to reproduce and to authorize others to reproduce "the copyrighted work in copies."

Based on our review of the pleadings, and by negative implication from Counts 2 and 4, we understand Counts 1 and 3 to allege that defendants' checksheets and drill sheets constitute unauthorized reproductions of Big League Sales, and not that they are derivative works of the

alleges that the WISE Sales Course as a whole – which includes the checksheets, drill sheets, and Big League Sales itself – constitutes an infringing derivative work based upon the book in violation of 17 U.S.C. § 106(2).[9]

Counts 3 and 4 name only CSI and CST as defendants and concern courses such as CSI's Organization Executive Course and Professional Registration Course. Count 3 alleges that the checksheets and drill sheets used in these courses infringe the copyright in Big League Sales in violation of 17 U.S.C. § 106(1). Like Count 2, Count 4 alleges that these courses as a whole constitute infringing derivative works based upon the book in violation of 17 U.S.C. § 106(2).

Defendants answered PL&A's claims by denying that the use of the course materials described in the complaint violated the Copyright Act. As affirmative defenses, defendants alleged that their use of Big League Sales was permissible under the fair use doctrine and, alternatively, that PL&A's claims were barred by laches.

---

book. But even were this not the case, and Counts 1 and 3 properly alleged that the checksheets and drill sheets are derivative works of Big League Sales, PL&A would still be required to demonstrate that the putative derivative works would otherwise be infringing, including a determination of substantial similarity. See Atkins v. Fischer, 331 F.3d 988, 993 (D.C. Cir. 2003); Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp., 354 F.3d 112, 117 (2d Cir. 2003); Kohus v. Mariol, 328 F.3d 848, 858 (6th Cir. 2003); Dam Things from Denmark v. Russ Berrie & Co., Inc., 290 F.3d 548, 565 (3d Cir. 2002); Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 267 (5th Cir. 1988); Litchfield v. Spielberg, 736 F.2d 1352, 1357 (9th Cir. 1984).

[9] The exclusive rights of a copyright owner include the right to prepare and to authorize others to prepare "derivative works based upon the copyrighted work." 17 U.S.C. § 106(2).

Following a period of discovery, PL&A moved for summary judgment on Counts 2 and 4 only, arguing that the Sales Course, Organization Executive Course, and Professional Registration Course represent infringing derivative works of Big League Sales.[10] Defendants filed cross-motions for summary judgment on all counts, arguing that the course material is not substantially similar to the book and thus does not infringe its copyright, and further advancing the defenses of fair use and laches. The district court did not conclude that the copyright in Big League Sales had been infringed; rather, it assumed the existence of infringement and held that, in any event, fair use precluded recovery on all counts – including, of course, against those parties alleged to be liable for

[10] This was, in fact, PL&A's second motion for summary judgment on the issue of copyright infringement. PL&A filed its first motion on April 1, 2005, before defendants had conducted any discovery and solely on the strength of affidavits submitted by Letterese and PL&A's counsel. Because defendants were unable to present facts essential to justify its opposition to PL&A's motion, the court denied the motion without prejudice. See Fed. R. Civ. P. 56(f) (providing that "[i]f a party opposing [a summary judgment motion] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" provide appropriate relief, including denial of the motion or the grant of a continuance to permit additional discovery).

Additionally, notwithstanding PL&A's voluntary withdrawal of its claims against SMI and Mission, see supra note 6, PL&A claims in this appeal that the district court should have granted Rule 56(f) relief to permit discovery into essential facts necessary to the proper disposition of summary judgment motions submitted by SMI and Mission. We dispose of this argument in short order. The request for Rule 56(f) relief to pursue further discovery with respect to SMI and Mission was rendered moot when the district court granted PL&A leave to file a second amended complaint, which dropped all parties except defendants CSI, CST, and WISE, a consequence which was argued by PL&A itself in its memorandum in support of its motion for leave to amend ("[F]or the dismissed parties it removes any FRCP 56(f) issues that the motion to compel raises."), and which was readily admitted by PL&A's counsel at the hearing on the motion.

contributory or vicarious infringement.[11] The district court also held that defendants were entitled to summary judgment on the ground of laches.[12] Pursuant to its ruling, the district court entered judgment for defendants on August 23, 2005. This appeal followed.[13]

II.

---

[11] The district court specifically noted the existence of "genuine issues of material fact regarding CST's right to supervise the [alleged] infringing activity and financial benefit therefrom as to be liable for contributory or vicarious infringement." Nonetheless, because "[t]here can be no contributory infringement without a direct infringement," Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 889 (6th Cir. 2004), the court found it unnecessary to rule on the issue of secondary liability.

[12] In its brief, PL&A makes two meritless arguments. First, as evidence to support its motion for summary judgment, PL&A tried to obtain evidence via discovery that defendants purportedly launched an "economic attack" against it immediately after it brought this suit. Among other things, this evidence would purportedly include testimony that defendants mounted an "internet smear campaign" of Letterese that "compromis[ed] this litigation" because the campaign caused him to lose income from his business and distracted PL&A's counsel. Defendants moved the district court to bar such discovery. The court sustained their objection. In its brief on appeal, PL&A argues that the court abused its discretion. Had the discovery been allowed, it contends, the resulting evidence would have established that defendants lacked "clean hands" and, moreover, willfully infringed its copyright in Big League Sales. PL&A's argument is baseless. The evidence at issue is irrelevant (belonging, if anything, to another lawsuit). Second, PL&A claims that the district court erred in adopting the magistrate judge's denial of its motion for sanctions premised on allegations that defendants engaged in witness tampering. Since PL&A failed to make a timely objection to the magistrate judge's denial of the motion, as it was required to do under Fed. R. Civ. P. 72(a), PL&A has waived this claim. See Farrow v. West, 320 F.3d 1235, 1249 n.21 (11th Cir. 2003).

[13] We review the grant of a motion for summary judgment de novo, applying the same legal standards as the district court. Custom Mfg. & Eng'g, Inc. v. Midway Servs., 508 F.3d 641, 646 (11th Cir. 2007). The grant of summary judgment is appropriate where, upon viewing the admissible evidence and drawing all reasonable factual inferences therefrom in the light most favorable to the non-moving party, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Johnson v. Bd. of Regents, 263 F.3d 1234, 1243 (11th Cir. 2001) (citation omitted).

We begin by analyzing the antecedent issue, whether PL&A has made out a prima facie case of infringement as to all claims. As to Counts 2 and 4, claims brought under 17 U.S.C. § 106(2), we find that defendants' courses as a whole are not derivative works of Big League Sales, and therefore affirm the court's grant of summary judgment for defendants as to those counts. See Parks v. City of Warner Robins, 43 F.3d 609, 613 (11th Cir. 1995) ("[W]e may affirm the district court's decision on any adequate ground, even if it is other than the one on which the court actually relied."). With respect to Counts 1 and 3, we find that there is a genuine issue of material fact as to whether defendants' course materials are substantially similar to Big League Sales in violation of 17 U.S.C. § 106(1).

A.

PL&A contends that the district court erred in not treating defendants' courses as derivative works of Big League Sales, which it believes would necessitate the grant of summary judgment in its favor as to Counts 2 and 4.[14]

---

[14] A derivative work is defined as

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

Specifically, PL&A argues that the courses as a whole are akin to the derivative works described in the much-criticized case of Mirage Editions v. Albuquerque A.R.T. Co., 856 F.2d 1341 (9th Cir. 1988). See Lee v. A.R.T. Co., 125 F.3d 580, 582 n.1 (7th Cir. 1997) ("Scholarly disapproval of Mirage Editions has been widespread."). In that case, the defendant cut pages of artwork prints out of plaintiffs' book, "mounted them individually onto ceramic tiles and sold the tiles at retail." Mirage Editions, 856 F.2d at 1342. Because conventional mounting and framing techniques clearly do not result in the preparation of derivative works, the court's decision finding infringement could not have been based on the fact that the tile was a sort of "flush frame," but, as the Lee court observed, must have been based on the fact that "the epoxy resin bonds the art to the tile." Lee, 125 F.3d at 581.

Like others before us, we believe that this justification is a highly questionable one indeed. See id. (noting that "this is a distinction without a difference," in part because conventional mounting and framing techniques are likewise not "easily reversible," as they commonly involve punctures, trimming, or bonding as a prelude to framing). But even if we were to regard Mirage Editions as representing the outer boundary of what constitutes a derivative work, what PL&A alleges in Counts 2 and 4 falls outside that boundary because defendants do

not sell checksheets and drill sheets that are affixed to Big League Sales. Nor are any pages from the book photocopied as part of the coursepack. Indeed, the book is not a part of defendants' courses in the sense that the checksheets, drill sheets, and book "as a whole, represent an original work of authorship," 17 U.S.C. § 101; "the authorship of [the checksheets and drill sheets] is entirely different and separate from the authorship of [Big League Sales]." See SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 306 (S.D.N.Y. 2000). PL&A's argument reduces simply to the flightless claim that selling the course materials (specifically, selling the checksheets and drill sheets to be used with lawfully acquired copies of the book) facilitates a "remounting" of Big League Sales. But like any other frame, this argument does not fulfill the requirement that a derivative work must "recast, transform, or adapt" the preexisting work. See Lee, 125 F.3d at 582 ("[T]he copyrighted note cards and lithographs were not 'transformed' in the slightest. The art was bonded to a slab of ceramic, but it was not changed in the process. It still depicts exactly what it depicted when it left Lee's studio.").[15] We therefore affirm the district court's grant of summary

---

[15] PL&A attempts to distinguish the courses further by arguing that the "frame" (the skills sheets and checksheets) interrelates with, adds on to, and modifies the "painting" (Big League Sales) such that the overall course could not stand without the book. We find this argument unintelligible, even in the intended analogous context; a frame is typically chosen to complement and interrelate with the style of the painting, and may interrelate with the painting on a very high level indeed (take, for example, Georges Seurat's painted borders and frames, such as for The

judgment as to Counts 2 and 4 because the courses as a whole do not constitute derivative works.

B.

Before embarking on an analysis of PL&A's remaining claims of copyright infringement, Counts 1 and 3, we first clarify the relevant legal standard. To make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the book and (2) defendants copied protected elements from the book. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991); SunTrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1266 (11th Cir. 2001). Defendants have not contested PL&A's ownership of a valid copyright. Rather, they focus on Feist's second prong, which, in turn, entails proof of both factual and legal copying, that is: (1) "whether the defendant, as a factual matter, copied portions of the plaintiff's [work]"; and (2) "whether, as a mixed issue of fact and law, those elements of the [copyrighted work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." MiTek Holdings, Inc. v. Arce Eng'g, Inc., 89 F.3d 1548, 1554 (11th Cir. 1996) (citation

---

Channel of Gravelines, Petit Fort Philippe). And certainly a framed Mona Lisa would be nothing without the Mona Lisa.

omitted); see also BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1148 n.40 (11th Cir. 2007).

In the absence of direct proof, factual copying may be inferred from circumstantial evidence, either through establishing that the works are "strikingly similar," see Calhoun v. Lillenas Publ'g, 298 F.3d 1228, 1232 n.6 (11th Cir. 2002); or through "proof of access to the copyrighted work and probative similarity." Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1541 (11th Cir. 1996) (internal quotation mark omitted).[16] Because defendants admit that portions of Big League Sales were copied, this appeal centers on the subsequent inquiry of whether such copying is "legally actionable; that is, whether there is 'substantial similarity' between the allegedly offending [works] and the protectable, original elements" of the book. See Bateman, 79 F.3d at 1542; Oravec v. Sunny Isles Luxury Ventures, L.C., No. 06-14495, 2008 U.S. App. LEXIS 10354, at *11 n.5 (11th Cir. May 14, 2008) (considering "whether a reasonable jury could find the

[16] Probative similarity, "in this sense, 'exists where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000) (quoting Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 (11th Cir. 1982)). Previous cases in this circuit have also referred to this requirement of probative similarity as "substantial similarity," which potentially confuses those aspects of similarity necessary to establish the factual predicate that can support an inference of copying, with the different aspects of similarity necessary to establish that the copying is legally actionable. See Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 n.4 (11th Cir. 1994) ("The term 'substantial similarity' in copyright infringement actions has not always been used with precision.").

competing [works] substantially similar at the level of protected expression"); see also Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000) (noting that substantial similarity in this "second, more focused way" is necessary to establish that the defendant's attempt at appropriation "succeeded to a meaningful degree").[17]

---

[17] As a preliminary matter, the district court, adopting defendants' view, erred in its assessment that Big League Sales is only entitled to protection as a factual compilation of sales techniques and concepts. The Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works." 17 U.S.C. § 101. Big League Sales is a nondramatic literary work that does more than simply list bare facts and data in a creative format. See, e.g., BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129 (11th Cir. 2007) (yacht listing database); Warren Publ'g v. Microdos Data Corp., 115 F.3d 1509 (11th Cir. 1997) (printed directory containing cable facts); Schoolhouse, Inc. v. Anderson, 275 F.3d 726 (8th Cir. 2002) (tables of information on area schools). It is an extended argument that Les Dane "will show you that the sale should be and can be made at the first or second contact" with a sales prospect. It is not, therefore, a "compilation" within the meaning of the Copyright Act.

Defendants compound the error by arguing that because (they believe) the book is a compilation, the course material cannot be found to infringe the book's copyright unless there is "virtual identity," not simply "substantial similarity" of expression. The copyright in a factual compilation is "thin" in the sense that the protective scope of the copyright extends only to certain elements – namely, the creative and original "selection, arrangement, and coordination" of the compilation – and not to the underlying facts or ideas. See BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc., 999 F.2d 1436, 1440 (11th Cir. 1993) (en banc) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348, 111 S. Ct. 1282, 1289, 113 L. Ed. 2d 358 (1991)); see also Warren Publ'g v. Microdos Data Corp., 115 F.3d 1509, 1515 (11th Cir. 1997) (en banc) ("Only when one copies the protected selection, coordination, or arrangement in a factual compilation has one infringed the compilation copyright; copying of the factual material contained in the compilation is not infringement."). But this description of which elements are copyrightable does not further entail applying a more stringent standard to such elements, i.e., by requiring a showing of "virtual identity" between the allegedly infringing elements and the original elements. Rather, the law in this circuit is that outside of the narrow context of "claims of compilation copyright infringement of nonliteral elements of a computer program," the appropriate standard to resolve claims for the infringement of the selection, order, and arrangement of a factual compilation is "substantial similarity." BUC Int'l Corp. v. Int'l Yacht

Copyright protects original expression only; it does not extend to any underlying ideas, procedures, processes, and systems.[18] Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1248 (11th Cir. 1999). "For example, the idea of hunting a formidable whale at the lead of an eccentric captain is not protected by copyright law. The expression of this idea as it is encapsulated in the novel Moby-Dick, however, is protected by copyright." BUC Int'l Corp., 489 F.3d at 1143. Uncopyrightable "ideas" include scenes à faire, which are "sequences of events which necessarily follow from a common theme," or "incidents, characters, or settings that are indispensable or standard in the treatment of a given topic." Herzog, 193 F.3d at 1248 (internal citations and quotation marks omitted). See, e.g., Beal v. Paramount Pictures Corp., 20 F.3d 454, 463 (11th Cir. 1994) ("[A]ll works involving courtship and marriage will feature a wedding, usually near the end of the story."); Herzog, 193 F.3d at 1262 ("[D]eath due to foul play instead of natural causes is a standard element of murder mysteries.").

Historically, courts have hesitated to make determinations as to

---

Council Ltd., 489 F.3d 1129, 1148–49 (11th Cir. 2007) (distinguishing MiTek Holdings, Inc. v. Arce Eng'g Co., 89 F.3d 1548, 1558–59 (11th Cir. 1996)).

[18] 17 U.S.C. § 102(b) provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

infringement or non-infringement on a summary judgment motion because of their "reluctan[ce] to make subjective determinations regarding the similarity between two works." Herzog, 193 F.3d at 1247; see also Beal, 20 F.3d at 459. Nonetheless, where "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work," or where "no reasonable jury, properly instructed, could find that the two works are substantially similar," summary judgment is appropriate. Herzog, 193 F.3d at 1247.

Based on our evaluation of the course material, we find that PL&A has established a prima facie case of infringement with respect to Counts 1 and 3. A factfinder ultimately may conclude that the similarities between the protected elements of Big League Sales and the course material are not substantial, but the similarities are significant enough to create a genuine issue of material fact. We now proceed to that analysis.

C.

The central question with which Big League Sales grapples is: "Why does the prospect balk when he gets face-to-face with the decision to buy or not buy?" Drawing upon his personal experience and the experience of fellow salesmen, Les Dane describes "step-by-specific step" how a salesman ought to deal with the case of a reluctant purchaser who is wrapped in a "brick overcoat" of his or her

individual fears: "remove the bricks until the prospective buyer is stripped of his fear – his sales resistance – and becomes susceptible to a close." The book is organized into thirteen chapters. Each chapter is further subdivided into sections with headings identifying the particular technique or illustrative anecdote. For example, Chapter 1, "The Brick Overcoat of Resistance to the Sale: How Five Key Bricks Can Help You" contains eleven sections: "Scaredy-Cat," "The Legitimate Objection," "Listen For the Close," "The Night Shift Close," "You and the Finance Man," "Anything Goes," "Fool-Proof Financing Formula," "The Shopper-Stopper," "The Go-Ahead," "The Today-Only Close," and "Simple Sell Close."

Defendants' course material expressly teaches the content of Big League Sales. Organized into outline form, a checksheet typically lists the book chapter to be read and recites both the chapter title and the section headings. For example, a sample checksheet used in the Professional Registration Course contains a reference to "Chapter 1: 'The Brick Overcoat of Resistance to the Sale: How Five Key Bricks Can Help You," and lists the pertinent subheadings: "a. The scaredy-cat and how to close him"; "b. The legitimate objection"; "c. Listening for the close"; "d. The night-shift close"; "e. The go-ahead"; "f. The today-only close"; "g. The simple sell close." No further explanation of these terms is listed on the checksheet; instead, the checksheet cross-references the sales drill attachments,

which contain "DRILLS FOR BIG-LEAGUE SALES CLOSING TECHNIQUES, CHAPTER 1, THE BRICK OVERCOAT OF RESISTANCE TO THE SALE."

Although the differences among the three courses are manifest upon even a cursory review of the material, the parties' briefs did not evaluate each course separately in light of these differences. The content of CSI's Professional Registration Course and Organization Executive Course varies from that of WISE's Sales Course in terms of overall organization and in terms of the content and length of the descriptions in the sales drills. CSI's courses are more similar to the course material developed by the Church in the 1970s. Significantly, a Hubbard Communications Office Bulletin of November 12, 1972, explained that the registrar salesmanship drills based on Big League Sales "follow the same sequence as the book section by section," and instructed students to adhere to that order. CSI's courses remain faithful to that sequential approach. By contrast, the WISE Sales Course's checksheet and sales drills employ a somewhat rearranged approach to the sections of the book. (They are accompanied by the same stern admonition: "All items on this checksheet are to be done in the sequence shown.")

Our review of the works in question revealed potential instances of both fragmented literal similarity and comprehensive nonliteral similarity of protected

expression.[19] We will begin by reviewing the latter. Certain nonliteral aspects of Big League Sales are protectible as the author's original expression, reflecting his opinion as to which sales techniques, and in which order, are likely to yield the most effective sales results. Nonliteral similarity between the book and the course material may be present in the manner in which the course material tracks the selection and organization of the sales techniques in the book. The case for nonliteral similarity appears to be stronger with respect to CSI's courses, which canvass the book's topics in the same order and sequence, but we conclude that the differences in the order of WISE's Sales Course might be deemed insufficient to defeat an ultimate finding of comprehensive nonliteral similarity.

As for potential literal similarity, one of the more striking examples cited by PL&A is contained in Chapter 12 and the corresponding sales drill described in Attachment L of the Professional Registration Course:

| Big League Sales | Professional Registration Course, Attachment L |
| --- | --- |

[19] Literal similarity refers to verbatim copying or paraphrasing of a copyrighted work. "Fragmented literal similarity" exists where "the work [copies] only a small part of the copyrighted work but [does] so word-for-word." Palmer v. Braun, 287 F.3d 1325, 1330 (11th Cir. 2002). This may rise to the level of substantial similarity "[i]f this fragmented copy is important to the copyrighted work, and of sufficient quantity." Id. Comprehensive nonliteral similarity concerns the nonliteral elements of a work, and is "evident where the fundamental essence or structure of one work is duplicated in another." Id. (internal quotation marks omitted).

| Six Basic Questions That Guarantee Sound Qualifying: . . .<br>The questions:<br>1. Where does he (she) work and how long?<br>2. What does he do there?<br>3. Where does he live and how long? (Circumstances – own, rent, etc.?)<br>4. Marital status? Children?<br>5. Who is the (car, boat, insurance, furniture) for?<br>6. Appearance? (Physical, speech, manner, attitude) | . . . the six basic questions that guarantee sound qualifying.<br>The questions are:<br>1. Where does he (she) work and how long?<br>2. What does he do there?<br>3. Where does he live and how long? (Circumstances – own, rent, etc.)<br>4. Marital status? Children?<br>5. Who is the service or materials for?<br>6. Appearance? (Physical, speech, manner, attitude) |
|---|---|

Similarly, Attachment H of the Professional Registration Course sets forth the "six closing errors" described in Chapter 8 of the book in nearly identical language. The book admonishes: "Don't argue with your prospect; Don't offer your opinions or criticise your prospects; Don't knock your competition; Don't assume authority or break the chain of command; Don't oversell your product or the finance terms; and most important of all, Don't ever succumb to one of the other five 'don'ts' believing that, 'Just this once won't hurt,' or, 'The DON'TS really didn't apply in this case." The sales drill explains that "the 'six don'ts'" are "1. Don't argue with your prospect"; "2. Don't offer your opinions or criticize your prospect's"; "3. Don't knock your competition"; "4. Don't assume authority or break the chain of command or violate policy"; "5. Don't oversell your product or the finance terms"; and "6. Don't succumb to one of the other five 'don'ts'

believing that just once won't hurt or that they didn't really apply in that case." And in addition to these nearly identical examples, there are several instances of paraphrasing of the book which could likewise support a finding of literal similarity.[20] See Kepner-Tregoe, Inc. v. Leadership Software, No. H-90-804, 1992 U.S. Dist. LEXIS 12780, at *3 (S.D. Tex. Jan. 9, 1992) (finding substantial similarity between five definitions or "processes" incorporated from plaintiff's management training seminar materials into defendant's management training

---

[20] Chapter 6 of the book is named "All in Favor Nod Your Head: Three Basic Musts and Four Ways to Apply Them to the Close." The reader is admonished to stick to three basic musts: "you control the conversation, you offer a choice rather than a yes-or-no, and you deliver your sales talk in a positive, 'nod your head' nature." These three basic musts are then applied through four approaches: first, "when the salesman, rather than concentrating on overcoming objections, places the emphasis on clauses or features of the service or product in which the prospect has shown an interest." In the second approach, the "salesman has found what his prospect wants. The things he likes, or is most concerned about. From here on he will apply the pressure there, and the close will come much easier than it would if he bucked his man, trying to overcome objections." The third approach "is to let your prospect tell you what you're selling," a technique which is illustrated by the anecdote "Mr. Elrod, I'm Dumb . . . ." Finally, the fourth approach is for the salesman to "use the demonstration." "Would you buy a four-thousand-dollar car, a thirty-thousand-dollar home, or a $90 per month insurance portfolio before you had seen what you're getting for your money?"

Sales Drill #4 of the Sales Course sets forth "the three basic musts": "1. Control the conversation"; "2. Offer a choice as a gimmick to bypass a large decision"; "3. Deliver your sales in a positive manner." The sales drill explains that these are "done in various ways," and provides four examples. First: "Don't concentrate on overcoming objections but find features of the service that the prospect is interested in and increase that interest, thereby raising the A, R, and C." Second: "Find out what the prospect is most concerned about, what it is he wants handled and make full use of the ARC Triangle and comm formula and show him that it really can be handled." Third: "Let him tell you how it would work for him (play dumb)." And fourth: "Employ the use of demonstration (showing the person what he is getting for his money). This can be done by using success stories, before and after graphs, letting him handle the new model, etc."

computer program).

Defendants contend that the course material "does not copy expression from [Big League Sales], and, where it does, it consists almost exclusively of short phrases, titles, unprotected methods or procedures, or concepts that Dane admittedly took from others." In the first place, the claim that Les Dane pilfered sales techniques from other salesmen misses the mark. Certainly, many of the sales techniques described in the book were nothing new to a profession that is one of the world's oldest. What is relevant for the purposes of copyright law is that an abstract idea is never eligible for copyright protection. But while Les Dane could not have copyrighted the underlying sales technique, any original expression he used to describe that technique falls squarely into the realm of copyright. See Palmer v. Braun, 287 F.3d 1325, 1331 (11th Cir. 2002) (noting that the idea "that people's beliefs can alter how they experience and understand their lives" is not copyrightable, but "the question is whether [plaintiff's course] expresses this idea in a way that infringes on original expression of the same idea in the [defendant's course] materials"); see also Barbour v. Head, 178 F. Supp. 2d 758, 764 (S.D. Tex. 2001) (noting that although recipes that are "nothing more than mere recitations of facts" in the form of "mechanical listings of ingredients and cooking directions" are not eligible for copyright protection, "at least a few" of defendant's recipes

"contain statements that may be sufficiently expressive to exceed the boundaries of mere fact," such as anecdotal language and suggestions for food presentation); Kepner-Tregoe, Inc., 1992 WL 281474 at *1. ("Both the Vroom/Yetton model and the Vroom/Jago model are tools used to train managers in better ways of making decisions. Although the theory utilized by both models is an idea taught worldwide, the actual models are expressions of a method by which to make decisions.").

We have previously recognized that "in many copyright cases, the line between [idea] and expression is not easily drawn," and is to be determined on the totality of the facts. Palmer, 287 F.3d at 1334; see also SunTrust Bank, 268 F.3d at 1266 (noting that although "stock scenes and hackneyed character types" at one end of the spectrum are considered ideas, "as plots become more intricately detailed and characters become more idiosyncratic, they at some point cross the line into 'expression'"). When drawing the line, however, "it is useful to note the policy purposes served by the distinction"; to "encourag[e] the creation of original works on the one hand," and to "promot[e] the free flow of ideas and information on the other." Oravec, 2008 U.S. App. LEXIS 10354, at *14. A reasonable factfinder could conclude that this line has been breached on more than one occasion by the course material. For example, both the book and the Professional

Registration Course identify the "four basic buyer types" as "the professional buyer," "the individual," "the unattached female," and "the family buyer." With respect to the professional buyer, the book urges salesmen to "[s]ell him facts, hard prices and, where possible, demonstration of the product or service," as he is someone who "wants facts, demonstrations, and proof that yours is the best service or produce [sic] he can buy for the least money." The sales drill states: "The student must make the close by showing with cold facts and demonstration that the service or item will produce the results required. Student must have such facts, proof and demonstration at his fingertips." Another salient example of the appropriation of original expression follows from the book's description of the "unattached female." An unmarried woman, according to the book, is someone who is susceptible to "a dab of flattery here, some good, practical advice there." The book then relates an anecdote from a salesman who confided to the author, "[W]hat they really want is to be able to trust what I tell them." The corresponding sales drill paraphrases this passage as follows: "The unattached female. The student must handle by using flattery, good sound practical advice, etc., so the prospect feels she can trust what the Registrar is telling her."

Defendants have submitted charts comparing the two works which further reflect a misguided understanding of what may constitute infringement.

Defendants argue that short and unoriginal phrases such as "night shift," "tag team," and "scaredy cat" must be "filtered out of a court's consideration" altogether. We decline to adopt defendants' approach as one that unduly constricts the scope of copyright protection. A similar argument was advanced by the defendant in Salinger v. Random House, Inc., 811 F.2d 90, 92 (2d Cir. 1987), in which the defendant wrote a biography of the author J.D. Salinger that borrowed from Salinger's unpublished letters. In advancing the fair use defense, the defendant argued that he had used only a small proportion of copyrighted expression, excluding from his calculations several passages in which Salinger used clichés and mundane combinations of words. Id. at 98. In rejecting this argument, the court observed:

> [Copyright] protection is available for the "association, presentation, and combination of the ideas and thought which go to make up the [author's] literary composition." Or as we have recently stated, "What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals his facts, his choice of words and the emphasis he gives to particular developments." The "ordinary" phrase may enjoy no protection as such, but its use in a sequence of expressive words does not cause the entire passage to lose protection. And though the "ordinary" phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such a phrase.

Id. (second alteration in original) (internal citations omitted). Similarly, here, Les

Dane's inclusion of uncopyrightable short phrases in Big League Sales does not thereby cause the passage in which they are used to lose protection of its copyrightable elements – the original "sequence of thoughts, choice of words, emphasis, and arrangement." Id.

Defendants also argue that any copying that occurred was de minimis. See 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, 8-24, § 8.01[G] (2002) ("[F]or similarity to be substantial, and hence actionable, it must apply to more than simply a de minimis fragment."). We disagree. The extent of copying must be assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole. MiTek Holdings, Inc., 89 F.3d at 1560 & n.26 (noting that substantial similarity in this respect involves a comparison of the works "as a whole, not constituent elements" thereof); see also Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 75 (2d Cir. 1997) (noting that a finding of "substantial similarity," to be legally actionable, requires that "the amount of the copyrighted work that is copied" must be "quantitatively and qualitatively sufficient"). In the first place, even if the borrowed expression from the book does not exceed one percent of defendants' course materials (itself a questionable calculation in light of defendants' overly narrow view of the book's protected expression), that argument is not really on

point, because it is the relative portion of the copyrighted work – not the relative portion of the infringing work – that is the relevant comparison. Taken to its extreme, such a view would potentially permit the wholesale copying of a brief work merely by inserting it into a much longer work. Moreover, though the amount of expression copied may be quantitatively small with respect to the length of the book (constituting approximately 180 prose pages), the qualitative importance of the portion copied – particularly as it appears in the sales drills – is significant enough to preclude the grant of summary judgment for defendants on this ground. Accordingly, PL&A has established a prima facie case of infringement of Big League Sales with respect to Counts 1 and 3.

III.

The district court's decision largely eschewed the foregoing analysis and rested primarily on fair use grounds.[21] Because the district court misconstrued the factors relevant to the defense of fair use, we are at some pains to reiterate the doctrine's underlying principles and to demonstrate their application "in separating the fair use sheep from the infringing goats" in this case. Campbell v.

[21] The affirmative defense of fair use is a mixed question of law and fact as to which the proponent carries the burden of proof. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590, 114 S. Ct. 1164, 1177, 127 L. Ed. 2d 500 (1994); Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560, 105 S. Ct. 2218, 2230, 85 L. Ed. 588 (1985).

Acuff-Rose Music, Inc., 510 U.S. 569, 586, 114 S. Ct. 1164, 1175, 127 L. Ed. 2d 500 (1994). We find upon proper application of the factors that defendants are entitled to the defense at the summary judgment stage as to Count 3 only.

A.

The Copyright Act provides that:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include –
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Fair use doctrine is an "equitable rule of reason"; neither the examples of possible fair uses nor the four statutory factors are to be considered exclusive.[22] Stewart v. Abend, 495 U.S. 207, 236–37, 110 S. Ct. 1750, 1768, 109

---

[22] The district court found that all four of the statutory factors favored defendants and concluded that defendants had "hit a grand slam on the fair use playing field." The district court thus relied upon the Second Circuit for the proposition that where a defendant "shut[s] out her opponent on the four factor tally," then "victory on the fair use playing field is assured." Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1079 (2d Cir. 1992) (internal quotation marks and citation omitted). We disagree. In certain circumstances, such "rigid application of the copyright statute" might "stifle the very creativity which that law is designed to foster." See Campbell, 510 U.S. at

L. Ed. 2d 184 (1990); Campbell, 510 U.S. at 577–78, 114 S. Ct. at 1170–71. Furthermore, the statutory factors are not to "be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 578, 114 S. Ct. at 1170–71.

The district court explicitly adopted a "fifth" factor, which it described as "the copyright owner's actual consent to the use of the copyrighted material." The court pointed to record evidence showing that "both Dane and Plaintiff knew of, assented to, and participated in Defendants' use of [Big League Sales] for decades," namely, (1) the fact that in the 1980s, Les Dane taught the book and used sales drills in Church seminars, and (2) the fact that Letterese knew of Les Dane's participation in Church seminars and, as a practicing Scientologist, took several courses teaching the book. In addition to creating a "consent" factor, the court further explained that these facts "permeate[d]" its evaluation of the four statutory factors.

This was incorrect, both in terms of logic and precedent. As the district

---

577, 114 S. Ct. at 1170. A court must examine the four statutory factors to the extent they are relevant to a particular case, but we do not rule out the possibility that specific factual circumstances may compel a conclusion that cuts against the grain of all four factors. See also Ty, Inc. v. Publ'ns Int'l Ltd., 292 F.3d 512, 522 (7th Cir. 2002) (noting that because "the four factors are a [non-exhaustive] checklist of things to be considered rather than a formula for decision," a party "can get nowhere in defending [summary] judgment by arguing that some or even all of them lean against the defense of fair use").

court itself recognized, the existence of actual consent negates the necessity of conducting a fair use analysis in the first place, as the existence of a license is an independent affirmative defense to a claim of copyright infringement. See Acuff-Rose Music, Inc. v. Jostens, Inc., 155 F.3d 140, 144 n.2 (2d Cir. 1998) ("The doctrine of 'fair use' allows the appropriation of a copyrighted work without consent under certain circumstances.") (emphasis added). Actual consent therefore is not properly a factor in fair use analysis.[23]

Moreover, the district court erred in finding that defendants had obtained actual consent to copy the book during the relevant period. Did Les Dane, at one time, give implied consent to the use of the book in the course material? Perhaps so; he evidently knew of and permitted Hubbard's use of the book to some extent, as he even taught seminars utilizing sales drills on behalf of the Church during the

---

[23] The case law and congressional history speak of fair use as "predicated on the author's implied consent to 'reasonable and customary' use," Harper & Row, 471 U.S. at 550, 105 S. Ct. at 2225, but we understand such language to refer more to the doctrinal underpinnings of fair use in a sort of "hypothetical consent" by a rational author to a particular kind of use, cf. Hanna Pitkin, Obligation and Consent–I, 59 Am. Pol. Sci. Rev. 990, 999 (1965) (explaining the doctrine of hypothetical consent as one that predicates political obligation upon "the nature" and "the objective characteristics of the government": "If it is a good, just government doing what a government should, then you must obey it" because "rational men in a hypothetical 'state of nature' would consent to be governed by such a government"); and not to suggest that in determining whether a use is fair, one should look to the actual past conduct of the copyright owner to determine whether consent may be implied.

1980s.[24] See Korman v. HBC Fla., Inc., 182 F.3d 1291, 1293 (11th Cir. 1999) ("While an exclusive license to use copyrighted material must be written, a nonexclusive license can be granted orally or can be implied from the conduct of the parties."). But PL&A does not allege that defendants' use during that time was infringing; rather, this case is concerned with a period of defendants' use of the book that took place after any such grant of rights to defendants would have lapsed. Because Les Dane died before he could register for the book's renewal term, he could not have consented to defendants' use of the book in the renewal term, even had he wished it. See Stewart, 495 U.S. at 230, 110 S. Ct. at 1765. Les Dane's "death, prior to the renewal period, terminate[d] his [contingent] interest in the renewal," id. at 219, 110 S. Ct. at 1759, and the subsequent renewal of the copyright by his statutory heirs, the Dane family, created a "new estate" that was "clear of all rights, interests or licenses granted under the original copyright." P.C. Films Corp. v. MGM/UA Home Video, 138 F.3d 453, 456–57 (2d Cir. 1998) (quotation marks omitted).

By finding that defendants' use of Big League Sales was fair because of Les

[24] At oral argument, PL&A's counsel argued that Les Dane could not have granted an implied license to defendants because "Prentice Hall had those rights." It is unclear from the record exactly which rights Les Dane assigned to Parker Publishing (Prentice Hall's predecessor), but as explained infra, this determination is ultimately unnecessary.

Dane's earlier consent, the district court effectively contravened this principle by encumbering the renewal term. Nor does the fact that Letterese took several of the courses while he was still a practicing Scientologist mean that PL&A consented to defendants' use of the book; PL&A was not then the exclusive licensee of the book.

B.

As PL&A did not actually consent to defendants' use of Big League Sales, it is appropriate to consider whether defendants were entitled to the defense of fair use. We proceed through an analysis of the statutory factors.

1. Purpose and Character of the Use.

"The first factor in the fair-use analysis, the purpose and character of the allegedly infringing work, has several facets." SunTrust Bank, 268 F.3d at 1269. Two such facets are (1) whether the use serves a nonprofit educational purpose, as opposed to a commercial purpose; and (2) the degree to which the work is a "transformative" use, as opposed to a merely superseding use, of the copyrighted work. Id. Before illumining these facets, however, we observe that the Supreme Court has cautioned against the use of the facets to create "hard evidentiary presumption[s]" or "categories of presumptively fair use." Campbell, 510 U.S. at 584, 114 S. Ct. at 1174 ("[T]he mere fact that a use is educational and not for

profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness."). Rather, the commercial or non-transformative uses of a work are to be regarded as "separate factor[s] that tend[] to weigh against a finding of fair use," and "the force of that tendency will vary with the context." Id. at 585, 114 S. Ct. at 1174 (internal quotation marks omitted). And "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Id. at 579, 114 S. Ct. at 1171.

The Supreme Court has emphasized that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562, 105 S. Ct. 2218, 2231, 85 L. Ed. 2d 588 (1985). The district court misconstrued this statement, concluding that because "Dane and Plaintiff knew about Defendants' use of [Big League Sales] but never charged or demanded a fee for it[,] . . . there appears to have been no 'customary price' at all for their particular use of [the book]." The question is not whether PL&A and defendants had set a price between themselves over a course of dealing (which defendants then neglected to pay); it is whether the nature of defendants' use vis-a-vis the

public was such that defendants stood to profit commercially from it. See Paramount Pictures Corp. v. Carol Publ'g Group, 11 F. Supp. 2d 329, 334 (S.D.N.Y. 1998), aff'd mem., 1999 WL 319328 (2d Cir. May 13, 1999) (noting that the first aspect "is whether the work is primarily commercial in nature or whether [it] aspires to serve broad public purposes").

That WISE charged $75 for each Sales Course pack clearly demonstrates the commercial purpose of the course materials. See SunTrust Bank, 268 F.3d at 1269 & n.24 (noting that the fact that defendant "chose a method of publication designed to generate economic profit" weighed against a finding of fair use). CSI did not charge a monetary fee outright for consumption of the Professional Registration Course or Organization Executive Course, but it undeniably derived a commercial benefit therefrom by obtaining a promissory note for the fixed "donation amount of the course," which became payable in the event that the student failed to render services to the Church for the full duration of his or her staff contract. Cf. Roy Export Co. Establishment v. Columbia Broad. Sys. Inc., 503 F. Supp. 1137, 1144 (S.D.N.Y. 1980) (noting that although CBS's broadcast of a tribute to Charlie Chaplin which included copyrighted film clips was not sponsored, CBS "stood to gain at least indirect commercial benefit from the ratings boost which it had reason to hope would (and in fact did) result from the

special").

Nor may defendants' course materials properly be deemed "transformative" of the book. A transformative work is one that "adds something new, with a further purpose or different character, altering the first [work] with new expression, meaning or message." Campbell, 510 U.S. at 579, 114 S. Ct. at 1171. On the other hand, a work that is not transformative, and that "merely supersede[s] the objects of the original creation," is less likely to be entitled to the defense of fair use because of the greater likelihood that it will "supplant" the market for the copyrighted work, "fulfilling demand for the original."[25] See id. at 579, 588, 114 S. Ct. at 1171, 1176 (alteration in original) (internal quotation marks omitted); Harper & Row, 471 U.S. at 562, 105 S. Ct. at 2231 (noting the defendant's effect and intended purpose of "supplanting" the copyright owner's commercial rights). The difference between a transformative use and a superseding use is illustrated by the contrast between two works derived from Margaret Mitchell's novel, Gone

[25] This does not mean that a use that harms the market for the original work cannot be transformative. A transformative work may well reduce demand for the original work or its derivatives, as in the case of an unfavorable review. See Castle Rock Ent'mt, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 145 (2d Cir. 1998). But the interaction of this first factor with the fourth factor, the effect on the market, is not centered around "whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work. The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." Id. (emphasis added) (internal citation omitted).

With the Wind ("GWTW"). Alice Randall's novel, The Wind Done Gone, inverts the original storyline of GWTW in order "to explode the romantic, idealized portrait of the antebellum South during and after the Civil War." SunTrust Bank, 268 F.3d at 1270. Whereas the original novel "describes how both blacks and whites were purportedly better off in the days of slavery," Randall's highly transformative parody "flips GWTW's traditional race roles, portrays powerful whites as stupid or feckless, and generally sets out to demystify GWTW and strip the romanticism from Mitchell's specific account of this period of our history." Id. By contrast, despite the inclusion of several elements of parody or satire in the 1979 musical production, Scarlett Fever, the work "as a whole is not a critical commentary" of the original work, but rather a work that fulfills the same "overall function" – "to entertain." Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Coop. Prods., Inc., 479 F. Supp. 351, 357, 361 (N.D. Ga. 1979).

The difference, then, is one of substance and not of degree. Viewed in this light, defendants' use of Big League Sales in their course materials falls short of a transformative use. The book selects, orders, and describes a number of sales techniques with the purpose of educating its readers to become more effective salesmen. The same is true of the WISE and CSI course materials. As the district court noted, "Defendants' courses and materials merely attempt to provide a user-

friendly method of reading and learning from [Big League Sales]." The course materials do not reshape the instructional purpose or character of the book, or cast the book in a different light through a new meaning, message, or expression. Although the course materials adopt a different format, incorporate pedagogical tools such as sales drills, and condense the material in the book, these changes do not alter the educational character of the material taken from the book; they merely emphasize, rather than transform, the overall purpose and function of the book. See also Blanch v. Koons, 467 F.3d 244, 252 (2d Cir. 2006) (noting that it would be futile for defendant to argue that a painting is transformative of a photograph, because such a defendant would have "done no more than find a new way to exploit the creative virtues of the original work"); Paramount Pictures Corp., 11 F. Supp. 2d at 335 (finding the defendant's work was not transformative because "it simply retells the story of Star Trek in a condensed version, albeit in a different order"; humorous asides interspersed throughout the summary did "not sufficiently transform" the Star Trek story).[26] The further addition of Scientological terms or

---

[26] In this respect, the course materials teaching Big League Sales are somewhat analogous to The Seinfeld Aptitude Test, a trivia quiz book that tested its readers' memory of events and characters from the television series Seinfeld. In Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., the Second Circuit determined that the purpose of the trivia quiz book was not "to educate, criticize, parody, comment, report upon, or research Seinfeld," as claimed by defendants, but simply "to repackage Seinfeld to entertain Seinfeld viewers." 150 F.3d at 142–43. Specifically, the court held that the trivia book's effort to "capture Seinfeld's flavor in quiz book fashion" was such a minimal alteration of the original expression of Seinfeld as to lack

concepts likewise does not transform the overall educative purpose of the book. This is particularly true with respect to CSI's course materials; in the corresponding sales drills, the use of Scientological terms is incidental. For example, students pretend to be registrars (rather than ordinary salesmen) and practice selling "E-meters" or "Academy training" (rather than cars or insurance policies). Accordingly, the first factor favors PL&A.[27]

2. Nature of the Copyrighted Work.

The second factor "recognizes that there is a hierarchy of copyright protection" depending upon the nature of the copyrighted work. SunTrust Bank, 268 F.3d at 1271. Works that are "closer to the core of intended copyright protection," and thus merit greater protection, include original as opposed to derivative works; creative as opposed to factual works; and unpublished as

---

transformative purpose. Id. at 142 (internal quotation marks omitted).

[27] A third aspect of the character of the use is "the propriety of the defendant's conduct," as "[f]air use presupposes good faith and fair dealing." Harper & Row, 471 U.S. at 562–63, 105 S. Ct. at 2231–32 (internal quotation marks omitted) (noting that defendants "knowingly exploited a purloined manuscript"). Evidence of bad faith may be a relevant, but not necessarily dispositive, aspect of the first factor. See Campbell, 510 U.S. at 585 & n.18, 114 S. Ct. at 1174 & n.18. Here, the district court found that defendants had acted in "good faith" because they first utilized the book in the 1970s with the permission of the author, "continued such use for decades without any protestations from Dane or Plaintiff," did not conceal their use of the book, did not make unlawful duplicates of the book, and did not fail to attribute the book to Les Dane.

Even if we were to credit the district court's good-faith finding, however, since good faith does not insulate a defendant from liability and is merely a "presupposition" of a defendant's claim to the defense, its existence here would not outweigh the commercial and superseding nature of defendants' use.

opposed to published works. See Campbell, 510 U.S. at 586, 114 S. Ct. at 1175; Harper & Row, 471 U.S. at 563, 105 S. Ct. at 2232 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); id. at 551, 105 S. Ct. at 2226–27 ("Publication of an author's expression before he has authorized its dissemination seriously infringes the author's right to decide when and whether it will be made public, a factor not present in fair use of published works."); SunTrust Bank, 268 F.3d at 1271 ("[O]riginal, creative works are afforded greater protection than derivative works or factual compilations.").

Big League Sales is neither a derivative work nor a factual compilation. It does, however, fall roughly under the rubric of a factual work. But "within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography." Harper & Row, 471 U.S. at 563, 105 S. Ct. at 2232 (quoting Gorman, Fact or Fancy? The Implications for Copyright, 29 J. Copyright Soc. 560, 561 (1982)) (internal quotation marks omitted). While the underlying sales techniques in Big League Sales are not copyrightable, the original and creative expression in which they are couched may be. Our review of the book reveals that, notwithstanding its informational nature, the book contains a significant "proportion of fact and fancy," and not merely in the subjective selection and

arrangement of sales techniques; Les Dane utilizes original expression that surpasses the bare facts necessary to communicate the underlying technique. Although the techniques are presented by way of personal anecdote, it is hard to believe that such anecdotes feature actual persons and actual retellings of past events and conversations, as opposed to composite characters and experiences served with a healthy dose of fiction.

As for the publication status of Big League Sales, defendants characterize the book as out of print, which would tend to favor their claim of fair use. See Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171, 1176 n.14 (5th Cir. 1980) ("[I]f the copyrighted work is out of print and cannot be purchased, a user may be more likely to prevail on a fair use defense.").[28] Pursuant to our review of the record, however, we are convinced that the publication status of the book requires further refinement. The book was published in 1971 and was subsequently withdrawn from the market by PL&A in the mid-1990s. Although the book's withdrawal did not thereby render it an "unpublished" work, we find that the policies underlying the greater protection of unpublished works are implicated to a certain degree and counsel against lumping

[28] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Big League Sales together with the kind of out-of-print works that might be more susceptible to the defense of fair use.

The law provides greater copyright protection for unpublished works in recognition of the author's property interest in the "commercially valuable right of first publication," including the "exploitation of prepublication rights, which are valuable in themselves and serve as a valuable adjunct to publicity and marketing," Harper & Row, 471 U.S. at 562, 555, 105 S. Ct. at 2231, 2228, and because of the author's "personal interest" in "creative or quality control," id. at 564, 105 S. Ct. at 2232.[29] By contrast, out-of-print works are generally accorded less copyright protection. The relevant fact is not simply that the work is unavailable for purchase through normal channels. "Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." Id. at 569, 105 S. Ct. at 2235. Rather, that fair use is more likely to apply in the standard scenario of an out-of-print work reflects in large part the assumption that no market harm to the owner will come of the use, as presumably it was lack of demand for the work that led to its demise. Moreover, as it was the market mechanism that caused the work to become unavailable, the countervailing

---

[29] We note that "[t]he converse of this principle does not follow, however: The fact that a work is published does not mean that the scope of fair use is broader." See 1 William F. Patry, Copyright Law & Practice 767 n.195 (1994).

personal interest of the author is not implicated; the author presumably would wish for the work's continued dissemination. Neither the personal nor the property interests of the author are thus strongly implicated with respect to the typical out-of-print work.

Defendants' characterization of Big League Sales as an out-of-print work obscures the actual nature of the book. It is not "out of print" in the typical sense, as it was the copyright owner's decision to withhold the book, and not the dearth of sales, that led to its withdrawal from the market. Cf. id. at 553, 105 S. Ct. at 2227 (distinguishing unpublished works from out-of-print works because although "the work is unavailable, this is the result of a deliberate choice on the part of the copyright owner"). Nonetheless, the personal interests of the author are less compelling with respect to the withdrawn work; the author has already had ample opportunity to exercise creative and quality control over his work during the "critical stage" prior to "the first public appearance" of his work. Id. at 555, 105 S. Ct. at 2227–28 (noting the "obvious benefit to author and public alike of assuring authors the leisure to develop their ideas free from fear of expropriation" prior to publication). Moreover, the author of an already-published work is not altogether powerless to exert continued editorial control; the printing of retractions or of subsequent revised editions supply such further opportunity.

Unlike the case of an out-of-print work, however, the application of fair use in this context may harm the copyright owner's market, and not simply because demand for the original work is presumably still extant. PL&A claims that its decision to withdraw the book is accompanied by the reservation of "the decision as to when or whether to make [Big League Sales] public again." As PL&A indicates, the decision to withdraw a work from the market and then re-release it can be a valuable marketing tool – taking advantage of timing and pent-up market demand, cf. Belushi v. Woodward, 598 F. Supp. 36, 37 (D.D.C. 1984) (noting the importance of "carefully orchestrated and costly plans for selling and marketing the book" that "depends upon the coordination of advertising, serialization, author appearances, and reviews, and the release to the public of the book") – that has been successfully utilized by others. See, e.g., Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 485 (2d Cir. 1998) (noting that Walt Disney has re-released the film "Fantasia," starring Mickey Mouse, for theatrical distribution at least seven times since its original release).

We cannot agree, therefore, that the publication status of Big League Sales favors defendants' claim of fair use. Similarly, the semi-factual nature of Big League Sales neither expands nor constricts the scope of the fair use defense. On balance, therefore, we conclude that this factor is neutral.

3. Amount and Substantiality of the Portion Used.

Whatever the use, the portion of the copyrighted work that is taken must be reasonable; in other words, this third factor examines whether defendants have "helped themselves overmuch" to the copyrighted work in light of the purpose and character of the use. Campbell, 510 U.S. at 587, 114 S. Ct. at 1175. Like the preceding factors, this factor is intertwined with the fourth factor and partly functions as a heuristic to determine the impact on the market for the original.[30] A book reviewer who copies snippets of a book is likely to increase the demand for the book, but "were a book reviewer to quote the entire book in his review, or so much of the book as to make the review a substitute for the book itself, he would be cutting into the publisher's market, and the defense of fair use would fail." Ty, Inc. v. Publ'ns Int'l Ltd., 292 F.3d 512, 517 (7th Cir. 2002).

Two points bear particular emphasis. First, "the amount and substantiality of the portion used" is measured with respect to the "copyrighted work as a

[30] See, e.g., William W. Fisher III, Reconstructing the Fair Use Doctrine, 101 Harv. L. Rev. 1659, 1678 (1988). In this respect, the analysis of the third factor, while facially similar in some respects to the threshold inquiry of whether the amount taken is de minimis and therefore does not rise to the level of actionable copying, see supra, is more nuanced. The inquiry is whether the amount taken is reasonable in light of the purpose of the use and the likelihood of market substitution. See Campbell, 510 U.S. at 588, 114 S. Ct. at 1176 (noting that in the context of parody, after determining the amount that is necessary to conjure up the original, determining "how much more is reasonable will depend, say, on the extent to which the [work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original").

whole," not to the putatively infringing work. Defendants therefore go astray in focusing on the argument that the copyrighted expression taken from Big League Sales amounts to a small fraction of the 127 pages of the course pack for the Sales Course, the 22 pages of checksheets and 250 pages of the course pack for the Professional Registration Course, and the 47 pages encompassing the checksheet and sales drills for the Organization Executive Course. "[A] taking may not be excused merely because it is insubstantial with respect to the infringing work. . . . '[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate.'" Harper & Row, 471 U.S. at 565, 105 S. Ct. at 2233 (quoting Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936)).

Second, in analyzing the amount and substantiality of the portion used, a court considers "not only . . . the quantity of the materials used, but . . . their quality and importance, too." Campbell, 510 U.S. at 587, 114 S. Ct. at 1175. Quantitatively, the amount of verbatim copying or paraphrasing appears to be a small portion of Big League Sales. But the amount taken may be substantial from a qualitative perspective if the defendant has copied the "heart of the book." Harper & Row, 471 U.S. at 564–65, 105 S. Ct. at 2233. That may very well be the case here; as the district court observed, "the inherent value of [Big League Sales] comes not just from the sales techniques and concepts, but particularly from the

way they were 'selected, coordinated, or arranged' by Dane." Nonetheless, we might have found the bare-bones copying of chapter headings and subheadings into the course checksheets to be insubstantial, if defendants had stopped there. In such a scenario, the amount taken might have been deemed negligible because one could hardly imagine that the headings and subheadings, divorced from context and any explanation, could have a substitution effect on the market for Big League Sales or derivative works. But the incorporation of the sales drills, which include explanations of the sales techniques, adds flesh to the organizational bones and renders the whole of defendants' copying substantial enough that demand for the book or derivative works might be reduced. Thus, the amount and substantiality of the portion used slightly favors PL&A.

4. Effect on the Market.

The fourth factor is the degree to which the defendant's use adversely affects the potential market or value of either the original work or derivative works. We must consider two inquiries: (1) "the extent of the market harm caused by the particular actions of the alleged infringer," and (2) "whether unrestricted and widespread conduct of the sort engaged in by the defendant [] would result in a substantially adverse impact on the potential market." Campbell, 510 U.S. at 590, 114 S. Ct. at 1177 (internal quotation marks omitted). In particular, the

adverse effect with which fair use is primarily concerned is that of market substitution.[31] Uses which are complementary, on the other hand, are more likely to be found fair because most authors would not want those uses to be impeded by a license requirement. See Ty, Inc., 292 F.3d at 517 ("[Fair use doctrine] thus economizes on transaction costs.").

The district court's analysis of this factor centered around PL&A's stipulation in open court that, "for purposes of this case only and for purposes of the statutory damages and the fair use defense," "there is no existing market for the Dane related material that [PL&A has] a copyright to. That there is no potential market for any of that material, i.e., that [PL&A has] never made a sale, [and is] never going to make a sale." The district court also found that defendants' course material actually contributed to the market for the book, since the courses require the purchase and study of the book. Defendants contend that PL&A has effectively conceded the fourth factor by entering into the stipulation. We

---

[31] As Judge Posner explains, "[I]n economic terminology that has become orthodox in fair-use case law, we may say that copying that is complementary to the copyrighted work (in the sense that nails are complements of hammers) is fair use, but copying that is a substitute for the copyrighted work (in the sense that nails are substitutes for pegs or screws), or for derivative works from the copyrighted work, is not fair use." Ty, Inc., 292 F.3d at 517 (internal citation omitted). See also 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, 13-182, § 13.05[A][4] (1994) ("The fourth factor looks to adverse impact only by reason of usurpation of the demand for plaintiff's work through defendant's copying of protectible expression from such work.").

disagree as to both the scope and effect of the stipulation on our determination of the fourth factor.[32]

This was an evidentiary stipulation made in the context of defendants' motion for sanctions due to PL&A's resistance to the production of certain financial records.[33] Based on our review of the hearing transcript, however, we do not believe that PL&A thereby intended to concede defeat as to the fourth fair-use factor. PL&A apparently believed that the universe of existing or potential markets included only those markets that were being commercially exploited by themselves or by the defendants – the "existing market," according to PL&A, is

---

[32] Like the question of fair use overall, this fourth factor is "a mixed question of law and fact." SunTrust Bank, 268 F.3d at 1275 n.32 (noting that while the fourth factor is not "a purely legal matter," neither is it a "purely factual or evidentiary matter"). To the extent that the fourth factor involves a question of law, we are not generally bound by PL&A's evidentiary stipulation.

[33] During the course of discovery, a dispute arose over PL&A's refusal to produce financial records from its dental consulting business. The district court, adopting the magistrate judge's recommendation, ordered PL&A to produce the requested documents. In an apparent effort to avoid their production, PL&A revised its first amended complaint so as to drop Count 5 entirely and to elect statutory damages, thereby disclaiming actual damages and profits pursuant to 17 U.S.C. § 504(a). See 17 U.S.C. § 504(c)(1) (permitting "an award of statutory damages for all infringements involved in the action, with respect to any one work . . . in a sum of not less than $750 or more than $30,000 as the court considers just"). Defendants insisted that the business records remained relevant to their fair use defense, specifically, to the market for Big League Sales. Defendants wished to demonstrate that PL&A's profits from the book had been plummeting, and to disprove PL&A's claim that it would "market [the book] to Fortune [500] companies" and would "make millions of dollars doing that." PL&A entered into the stipulation in response to defendants' motion for sanctions.

PL&A's subsequent decision to drop its claim for statutory damages was apparently motivated by its belief that it would thus avoid the application of the equitable doctrine of laches. We address this argument in part IV, infra.

"what the plaintiff does" with the copyright, whereas the "potential market" refers to "what the defendants do with it" (from the plaintiff's perspective, a "potential market" for exploitation by the plaintiff). Based on that understanding, a stipulation that there were no existing or potential markets for Big League Sales and derivative works would be tantamount to a concession that PL&A had been unable to profit from the book, and would not develop any such market in the future. Our review of the transcript further suggests that defendants and the district court may have been similarly laboring under an erroneous understanding of the applicable rule of law about the fourth factor, which renders questionable the content that defendants would give the stipulation. Cf. Tex. Instruments Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995) ("Litigation stipulations can be understood as the analogue of terms binding parties to a contract.").

Even putting aside the issue of intent, however, construing the stipulation as broadly as defendants would like is problematic given the undisputed facts of the case. It is undisputed, for example, that Bridge Publications sought several times to purchase rights to Big League Sales by contacting the Dane estate directly and, later, attempting to negotiate with PL&A. What is further undeniable is that the course materials that are the subject of this litigation expressly rely upon

contemporaneous use of Big League Sales, a fact which the district court emphasized in finding that the course materials actually contributed to the market for the book. A stipulation that Big League Sales and derivative works lacked all value and any potential market, therefore, would flatly contradict undisputed facts at the very heart of the case. See Darwish v. Temp-Glass Group, Inc., 26 Fed. Appx. 477, 480 (6th Cir. 2002) (unpublished) ("We agree with the district court that 'parties [cannot] stipulate to patently untrue facts.'") (alteration in original) (quoting FDIC v. St. Paul Fire & Marine Ins. Co., 942 F.2d 1032, 1038 n.3 (6th Cir. 1991). While parties are permitted and encouraged to stipulate to facts that expedite the conduct of litigation and avoid unnecessary proof of peripheral factual matters, it goes almost without saying that such facts should be "within the range of possibly true facts." See St. Paul Fire & Marine Ins. Co., 942 F.2d at 1038 n.3.

As we read the stipulation, therefore, PL&A has conceded that it has failed to develop a profitable market for Big League Sales or derivative works, and will not do so in the future. Such a concession, however, falls short of establishing that the intrinsic value of the copyright is zero. "Even an author who ha[s] disavowed any intention to publish his work during his lifetime [is] entitled to protection of his copyright, first, because the relevant consideration [is] the 'potential market'

and, second, because he has the right to change his mind." Worldwide Church of God, 227 F.3d at 1119 (citing Salinger v. Random House, Inc., 811 F.2d 90, 99 (2d Cir. 1987)). PL&A is not required to prove that it has actually developed or will develop a market for Big League Sales or derivative works; even if a plaintiff "has evidenced little if any interest in exploiting [a] market for derivative works . . . , the copyright law must respect that creative and economic choice." Castle Rock Entm't Inc., 150 F.3d at 145–46; Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1496 (11th Cir. 1984) ("The fact that WXIA does not actively market copies of the news programs does not matter, for Section 107 looks to the 'potential market' in analyzing the effects of an alleged infringement. Copyrights protect owners who immediately market a work no more stringently than owners who delay before entering the market."); Salinger, 811 F.2d at 99 ("[Salinger] is entitled to protect his opportunity to sell his letters.").

The question remains, therefore, whether defendants' use, or widespread use of the same kind, would result in substantial adverse harm to the potential market for Big League Sales or derivative works, which "includes only those [markets] that creators of original works would in general develop or license others to

develop." Campbell, 510 U.S. at 590, 114 S. Ct. at 1178.[34] With respect to the WISE Sales Course, we think it may. The unrestricted and widespread dissemination of the Sales Course – a use that is not transformative of the book and may be regarded as appropriating "the heart" of its expression – namely, the selection and structure of sales techniques and distinctive descriptions thereof – may well usurp the potential market for Big League Sales and derivative works.[35] Defendants have provided insufficient evidence in support of their claim that the Sales Course is unlikely to adversely affect the potential market.

The same is not true, however, with respect to the CSI courses. According to CSI, the Organization Executive Course "consist[s] exclusively of writings by

---

[34] There is thus "no protectible derivative market for criticism" because of "the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions." Campbell, 510 U.S. at 592, 114 S. Ct. at 1178. Moreover, a plaintiff's actual licensing activity cannot stake a claim over a derivative market that "creators of original works" would not "in general develop or license others to develop." See Castle Rock Entm't, 150 F.3d at 145 n.11.

[35] In finding that defendants' course materials actually contributed to the market for the book, the district court overlooked the crucial fact that the control of derivative works is part of a copyright owner's bundle of rights. The course materials may be complementary to the book, but they may also be market substitutes for derivative works of the book. See Ty, Inc., 292 F.3d at 518 ("Were control of derivative works not part of a copyright owner's bundle of rights, it would be clear that [defendant's] books fell on the complement side of the divide and so were sheltered by the fair use defense.").

Furthermore, the fact that PL&A might "offer a competing course of entirely different substance with its own set of explanations, drills, and other means of teaching the sales techniques," as the district court suggested, misses the point. The inquiry is not whether the market for derivative works has been utterly usurped; it is whether there is a substantial market substitution effect.

L. Ron Hubbard concerning the administration of churches." Similarly, the Professional Registration course pack contains "246 pages of text by L. Ron Hubbard, the Founder of the Scientology religion." These courses are not taught through traditional pedagogical means; it is a fundamental feature of the courses that "[t]here is no 'teacher' or 'lecturer' in a Scientology course"; the course supervisor merely monitors and assists the student's progress through the course materials.[36]

What this suggests is that derivative works developed by PL&A (or developed by others pursuant to a license) would not be utilized by CSI, because they would not derive from Hubbard's writings. Defendants have apparently developed course material up until 1994, eight years after Hubbard's death, but even those versions bear the distilled imprimatur of Hubbard's pen. For example, the end of each volume of the Organization Executive Course, dated 1991,

---

[36] Specifically, the course supervisor "does not lecture, nor in any way add his own rendition of the subject." This aspect of the courses "ensur[es] that a student receives only the pure rendition as written or spoken by Mr. Hubbard himself," because the Church believes that "the results obtained in Scientology come only from closely following the technology exactly as written by Mr. Hubbard. . . . Verbal renditions passed on from teacher to student would inevitably contain alterations from the original, however unintentional, until Scientology's efficacy would be lost." Therefore, the main task of the course supervisor is to "assist the student to apply the study principles developed by L. Ron Hubbard, so that he overcomes any misunderstanding and grasps the meaning directly from the Scripture." In keeping with this idea, and in contrast to the WISE courses, the CSI courses more closely resemble the courses as developed by the Church through the policy letters disseminated by the Hubbard Communications Office.

concludes with the legend: "L. RON HUBBARD; Founder; Compilation assisted by LRH Technical Research and Compilations." The fine print below this reads: "(The directions, drills and study assignments which make up this course checksheet were written by LRH Technical Research and Compilations staff. The compilation of this checksheet was done according to specific LRH advices on what materials should be on this course, as well as LRH policies and instructions which prescribe the standard format for course checksheets.)." Sales of CSI's courses to Scientology registrars and officers would have no impact on the potential market for derivative works developed by PL&A, because registrars and officers would not study such texts.[37] Cf. Pac. & S. Co., Inc, 744 F.2d at 1496 ("Some commercial purposes . . . might not threaten the incentives because the user profits from an activity that the owner could not possibly take advantage

---

[37] One might wonder why PL&A could not claim as market harm the loss of revenue it would earn if defendants were required to license the book for use in the existing CSI courses, which registrars and officers obviously would study. In the absence of evidence that such a licensing market has been developed, however, we are persuaded that "the loss of the licensing fee sought in the case itself does not constitute 'market harm.' If it did, circular reasoning would resolve all fair use cases for the plaintiff, who certainly profits less if the defendant wins." Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007) (citing Ringgold v. Black Entm't Television, 126 F.3d 70, 81 (2d Cir. 1977) ("Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor.")); see also Am. Geophysical Union v. Texaco, 60 F.3d 913, 931 (2d Cir. 1994) ("[I]t is sensible that a particular unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an authorized use should be considered 'less fair' when there is a ready market or means to pay for the use. The vice of circular reasoning arises only if the availability of payment is conclusive against fair use.").

of."). Simply put, PL&A's derivative works would not be market substitutes for CSI's courses, and vice versa. See Campbell, 510 U.S. at 593, 114 S. Ct. at 1178 ("The only harm to derivatives that need concern us . . . is the harm of market substitution.").

Overall Assessment

With respect to all of the courses in question, the first and third factors favor PL&A to some degree, while the second factor is neutral. Given the lack of sufficient evidence disproving the likelihood that widespread dissemination of the WISE Sales Course would supplant PL&A's market for derivative works, the fourth factor also favors PL&A with respect to those course materials. Defendants have therefore failed to prove their entitlement to summary judgment based on fair use with respect to Count 1. Because the use of Big League Sales in CSI's courses does not have a substantially adverse substitution effect on the potential market for derivative works, however, the fourth factor strongly favors defendants in that context. Upon consideration of the factors in the aggregate, we find that defendants are entitled to summary judgment as to Count 3.

IV.

We next consider whether summary judgment for defendants was appropriate as to Count 1 on the alternate ground that PL&A's claim is barred by

the defense of laches, which prevents a plaintiff who has slept on his rights from enforcing those rights against a defendant. The question whether the equitable doctrine of laches may bar a claim for copyright infringement that was filed within the statute of limitations has generated a circuit split and is a question of first impression in this circuit.[38]

Judge Learned Hand has stated that:

> It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win.

Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y. 1916). But at the time of that writing, "there was no statute of limitations on civil suits relating to copyright infringement, and courts applied the law of the state in which the action was brought." Prather v. Neva Paperbacks, Inc., 446 F.2d 338, 339 (5th Cir. 1971). Where the analogous state statute of limitations had not yet run, the application of laches as a judge-made, flexible limit on the period in which a plaintiff could bring

---

[38] We review the district court's application of the laches defense for abuse of discretion. See Sanders v. Dooly County, 245 F.3d 1289, 1291 (11th Cir. 2001). However, the question of whether laches is available as a defense in the context of a copyright infringement case is a pure question of law, which we decide de novo. See Young v. New Process Steel, LP, 419 F.3d 1201, 1203 (11th Cir. 2005) ("We decide pure law issues de novo, which is another way of saying that a ruling based on an error of law is an abuse of discretion.") (internal citation omitted).

suit did not present the same question as it does today.

In 1957, however, Congress enacted a three-year statute of limitations for copyright infringement claims. Id.[39] Its purpose was to counteract the problem of forum-shopping by prescribing a "uniform federal period of limitations." Id. However, in deciding that the equitable doctrine of tolling nonetheless applied to a copyright infringement claim, the former Fifth Circuit observed that "the intent of the drafters was that the limitations period would affect the remedy only, not the substantive right, and that equitable considerations would therefore apply to suspend the running of the statute." Id. at 340. The court in Prather therefore held that a court "must look to general equitable principles to determine the proper disposition" of the plaintiff's cause of action. Id.

In answering the question of whether the defense of laches may be interposed in a copyright infringement suit, therefore, we cannot agree with the conclusion of the Fourth Circuit, which is an unqualified "no." See Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 798 (4th Cir. 2001). Prather recognized the applicability of general equitable doctrines, and like tolling, laches falls into that category. Cf. Teamsters & Employers Welfare Trust of Ill. v.

---

[39] The statute of limitations, 17 U.S.C. § 507(b), serves only to limit the period of recovery to three years. See Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir. 1992) ("Each act of infringement is a distinct harm giving rise to an independent claim for relief.").

Gorman Bros. Ready Mix, 283 F.3d 877, 882 (7th Cir. 2002) ("What is sauce for the goose (the plaintiff seeking to extend the statute of limitations) is sauce for the gander (the defendant seeking to contract it)."). However, we remain mindful of the Fourth Circuit's invocation of separation of powers principles which counsel against the use of "the judicially created doctrine of laches to bar a federal statutory claim that has been timely filed under an express statute of limitations." Lyons P'ship, 243 F.3d at 798. We therefore answer this question with a presumptive "no"; there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run. Only in the most extraordinary circumstances will laches be recognized as a defense. Cf. Chirco v. Crosswinds Communities, Inc., 474 F.3d 227, 234 (6th Cir. 2007) (noting the limited applicability of laches to copyright cases in "what can best be described as unusual circumstances"); Jacobsen v. Deseret Book Co., 287 F.3d 936, 951 (10th Cir. 2002) ("Although it is possible, in rare cases, that a statute of limitations can be cut short by the doctrine of laches, we see no reason to supplant the statute of limitations in this case." (internal quotation marks and citation omitted)).

Even where such extraordinary circumstances exist, however, laches serves as a bar only to the recovery of retrospective damages, not to prospective relief. As the former Fifth Circuit explained in a patent infringement action:

> Although laches and estoppel are related concepts, there is a clear distinction between the two. The defense of laches may be invoked where the plaintiff has unreasonably and inexcusably delayed in prosecuting its rights and where that delay has resulted in material prejudice to the defendant. The effect of laches is merely to withhold damages for infringement which occurred prior to the filing of the suit.
>
> Estoppel, on the other hand, "arises only when one has so acted as to mislead another and the one thus misled has relied upon the action of the inducing party to his prejudice." Estoppel forecloses the patentee from enforcing his patent prospectively through an injunction or through damages for continuing infringement.

Studiengesellschaft Kohle mbH v. Eastman Kodak Co., 616 F.2d 1315, 1325 (5th Cir. 1980) (internal citations omitted). This distinction between the remedies foreclosed by laches and those foreclosed by estoppel applies with equal force in the copyright context.[40] It is also true in the copyright infringement context that "from the very nature of the thing [a copyright owner] cannot be fully cognizant of all infringements that occur throughout the length and breadth of this country. His information may be largely hearsay," and "the validity of [the copyright] and the

---

[40] The fact that we have permitted laches to bar injunctive relief in trademark cases, see, e.g., Kason Indus., Inc. v. Component Hardware Group, Inc., 120 F.3d 1199, 1207 (11th Cir. 1997), does not compel our holding likewise in the copyright context. Unlike patent and copyright infringement actions, claims brought pursuant to the Lanham Act are not subject to an express statute of limitations, id. at 1203, and unlike the limited terms of protection accorded to patents and copyrights, trademark protection "can be of indefinite duration and laches may correspondingly run for decades." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1040 (Fed. Cir. 1992) (noting moreover that "the public interest in avoidance of confusion in the market place may lead a court to grant an injunction against trademark infringement on laches alone").

infringement thereof may be, as here, disputed. These defenses present mixed questions of fact and law concerning which there is necessarily some doubt and uncertainty. In many cases, if not in most cases, the doubts are serious ones." See A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1040–41 (Fed. Cir. 1992) ("[L]aches bars relief on a patentee's claim only with respect to damages accrued prior to suit."). Permitting laches to operate as a bar on post-filing damages or injunctive relief would encourage copyright owners to initiate much needless litigation in order to prevent others from obtaining effective immunity from suit with respect to future infringements.[41] Laches therefore does

[41] The Fourth Circuit has similarly held that "laches may not be invoked to deny injunctive relief that otherwise would appear appropriate," Lyons P'ship, 243 F.3d at 800, although its reasons for so doing appear to be grounded in the prerequisites of injunctive relief: "A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches." Id. at 798; see also Hampton v. Paramount Pictures Corp., 279 F.2d 100, 105 (9th Cir. 1960) (affirming the trial court's finding that the action was not barred by laches where "[o]nly future use of the films is enjoined. Hence, Paramount's knowledge in years past, prior to asserting a specific claim against Hampton, is immaterial. This action is grounded upon the 1955 infringements alone, and was commenced less than nine months thereafter"); Hayden v. Chalfant Press, Inc., 177 F. Supp. 303, 307 (S.D. Cal. 1959), aff'd, 281 F.2d 543 (9th Cir. 1960) (noting, with respect to plaintiff's claim of copyright infringement, that in contrast to estoppel, which "destroys the very rights which it is sought to assert," laches "might result in denial of equitable relief, such as injunction and recovery of profits. But it would not stand in the way of the granting of damages for the unauthorized copying or of injunction against future violations") (emphasis added).

More recently, the Ninth Circuit, while acknowledging the "generally sound" principle that "even if laches applied, it does not bar a prospective injunction against future infringement," nonetheless has recognized an exception permitting laches to bar a claim for prospective injunctive relief where "the feared future infringements are identical to the alleged past infringements" and are "subject to the same prejudice that bars retrospective relief." See Danjaq L.L.C. v. Sony Corp., 263 F.3d 942, 959 (9th Cir. 2001) (denying injunction to bar future sequels

not preclude PL&A from seeking prospective relief.[42]

---

and re-releases in the James Bond movie franchise). We find this departure from sound principle to be unwarranted in light of the policy grounds outlined above.

[42] In this case, PL&A sought to avoid the defense of laches by disclaiming damages and seeking only prospective equitable relief. The district court rebuffed this attempt, citing the Supreme Court case of City of Sherrill v. Oneida Indian Nation of New York for the proposition that "[i]t is well established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief." 544 U.S. 197, 217, 125 S. Ct. 1478, 1491, 161 L. Ed. 2d 386 (2005). The circumstances of City of Sherrill, however, render it eminently distinguishable from the facts of the case before us. In that case, the Oneida Indian Nation ("the Tribe") sought "declaratory and injunctive relief recognizing its present and future sovereign immunity from local taxation on parcels of land the Tribe purchased in the open market, properties that had been subject to state and local taxation for generations" – since the early 1800s, to be more precise. Id. at 214, 125 S. Ct. at 1489. Specifically, the Tribe's claims were premised on "a federal common law right to Indian homelands." Id. at 210, 125 S. Ct. at 1488 (internal quotation mark omitted). As Justice Stevens had pointed out in a dissent to the opinion in an earlier iteration of the case, the Tribe's "ancient claim at common law" arose "under the federal common law, not under any congressional enactment, and in this context the Court would not risk frustrating the will of the Legislature" if it were to apply laches. County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 261–62, 105 S. Ct. 1245, 1266, 84 L. Ed. 2d 169 (1985) (Stevens, J., dissenting). Accordingly, the Court chose to apply laches, explaining that a "claim to a sovereign's prerogative . . . does 'not survive eternally.'" City of Sherrill, 544 U.S. at 221 n.14, 125 S. Ct. at 1494 n.14. With respect to PL&A's copyright infringement claim, however, "[s]eparation of powers principles . . . preclude us from applying the judicially created doctrine of laches to bar a federal statutory claim that has been timely filed under an express statute of limitations." Lyons P'ship, 243 F.3d at 798 ("[W]hen considering the timeliness of a cause of action brought pursuant to a statute for which Congress has provided a limitations period, a court should not apply laches to overrule the legislature's judgment as to the appropriate time limit to apply for actions brought under the statute."). Notwithstanding the Supreme Court's holding in City of Sherrill that laches barred the Tribe's ancient claim at common law to regain Indian homelands, therefore, we are bound in this copyright infringement case by our prior panel precedent that has not been implicitly overruled. See Atl. Sounding Co. v. Townsend, 496 F.3d 1282, 1284 (11th Cir. 2007) ("Under our prior panel precedent rule, a later panel may depart from an earlier panel's decision only when the intervening Supreme Court decision is 'clearly on point.'"quoting Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1290–92 (11th Cir. 2003)); see also Fla. League of Prof'l Lobbyists, Inc. v. Meggs, 87 F.3d 457, 462 (11th Cir. 1996) ("[W]e are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court.").

The district court also cited New Era Publications International v. Henry Holt & Co., 873 F.2d 576, 584–85 (2d Cir. 1989), for the proposition that "equitable considerations [of laches] dictate denial of injunctive relief in this [copyright infringement] action." The persuasive value

Our holding today does not, of course, otherwise restrict the power of a court, in its discretion, to fashion appropriate remedial relief. As the Supreme Court has observed, a permanent injunction does not automatically issue upon a finding of copyright infringement. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392, 126 S. Ct. 1837, 1840, 164 L. Ed. 641 (2006) ("Like the Patent Act, the Copyright Act provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.'" (quoting 17 U.S.C. § 502(a)). Rather, under "well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief," and a court's decision to grant or deny such relief is within the exercise of its discretion. Id. at 391, 126 S. Ct. at 1839.

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id. See, e.g., Christopher Phelps & Assocs. v. Galloway, 492 F.3d 532, 543–46

---

of New Era Publications International has been considerably weakened by the fact that a district court within the Second Circuit has declined to be strictly bound by its holding, noting that the opinion "fails to mention, much less discuss, the statute of limitations or separation of powers concerns later raised and addressed by Ivani [Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997)], albeit in the context of a different statute." Price v. Fox Entm't Group, Inc., 2007 U.S. Dist. LEXIS 6081, at *15 n.41 (S.D.N.Y. Jan. 26, 2007).

(4th Cir. 2007) (affirming district court's decision, based on traditional equity principles, to deny plaintiff's request for an order permanently enjoining defendant from leasing or selling a house that infringed plaintiff's architectural plans).

V.

For the reasons herein stated, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: ______
Deputy Clerk
Atlanta, Georgia